UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

DARNELL HICKS,

Plaintiff,

v.

MICHAEL IAPONCE, Comm., Dep't of Soc. Servs. Comm'rs Office; RITA WOODS, Dep't of Soc. Servs. Comm'rs Office; PHILLIP CATALDI, UC Dep't Soc. Servs. – Legal; WENDY RICKS, UC Dep't Soc. Servs. – Legal; REBECCA BALZAC, UC Dep't Soc. Servs. – Legal; MS. BLOCK, UC Dep't of Soc. Servs.; MS. JENNINGS, UC Dep't of Soc. Servs.; LAURA NORDSTROM, UC Dep't of Soc. Servs.; and MS. NOVOTNY, UC Dep't of Soc. Servs.,

1:26-CV-1793 (AMN/ML)

Defendants.

---

APPEARANCES: OF COUNSEL:

DARNELL HICKS
Plaintiff, *Pro Se*
Post Office Box 1036
Kingston, New York 12402

MIROSLAV LOVRIC, United States Magistrate Judge

**ORDER and REPORT-RECOMMENDATION**

Plaintiff Darnell Hicks ("Plaintiff") commenced this *pro se* civil rights action against Defendants Michael Iaponce, Rita Woods, Phillip Cataldi, Wendy Ricks, Rebecca Balza, Ms. Block, Ms. Jennings, Laura Nordstrom, and Ms. Novotny (collectively "Defendants") by filing a complaint together with an application to proceed *in forma pauperis* ("IFP"). (Dkt. Nos. 1, 2.)

For the reasons set forth below, I grant Plaintiff's IFP application and recommend that the Complaint be accepted in part for filing and dismissed in part.

## I. BACKGROUND

Construed as liberally[1] as possible, the Complaint alleges violations of Plaintiff's rights by Defendants. (*See generally* Dkt. No. 1.)

The only factual allegations contained in the Complaint allude to an issue whereby Defendants withheld evidence by reporting that they sent Plaintiff a video that he never received. (Dkt. No. 1 at 3.) The Complaint alleges that "[t]hey never reported this incident to Albany" but it is unclear what incident Plaintiff refers to. (*Id.*) The Complaint directs the Court to its attachments. (*Id.* at 2, 4.)

Attached to the Complaint are the following five documents: (1) an email that appears to be from Defendant Cataldi to Plaintiff (and "Michael") acknowledging that Plaintiff had appointments with Ulster County Temporary Assistance Unit on September 17, 2026, at 9:00 a.m., and a hearing in the Bronx on September 17, 2026, at 4:30 p.m., and noting that all future communication is to be in writing only; (2) an email from Defendant Cataldi to Plaintiff (and "Michael") noting that Plaintiff appeared at Ulster County that morning and completed all required actions to ensure placement at an appropriate facility; (3) a document titled Formal Pre-Litigation Settlement Demand Letter from Plaintiff directed to Defendants Iaponce, Balzac, and Ricks from Plaintiff ("Settlement Demand Letter") dated September 21, 2026; (4) a document from Plaintiff titled Sworn Statement & Affidavit of Rebuttal ("Rebuttal Affidavit") dated

---

[1] The court must interpret *pro se* complaints to raise the strongest arguments they suggest. *Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995) (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)).

September 20, 2026; and (5) a document titled Sworn Notice of Intent to Bring Legal Action ("Notice of Intent") from Plaintiff. (Dkt. No. 1 at 6-14.)

The Settlement Demand Letter alleges that on April 8, 2026, Plaintiff was engaged in an interaction with a receptionist at the Ulster County Department of Social Services ("UCDSS") office and without warning or provocation, Defendant Block charged directly into Plaintiff's face and screamed "Dumb ass mother fucker, who the fuck is he talking to!" (Dkt. No. 1 at 8; *accord* Dkt. No. 1 at 12.) The Settlement Demand letter alleges that Defendant Nordstrom stood in her doorway staring at Plaintiff which triggered panic attacks, stress, hypervigilance, and a massive reaction from Plaintiff. (*Id*. at 8; *accord* Dkt. No. 1 at 12.)

The Settlement Demand Letter alleges that UCDSS staff attempted to force Plaintiff to an out-of-county placement at the Red Roof Inn in Poughkeepsie, New York (Dutchess County) where Plaintiff previously survived five years of extreme high-crime violence and trauma. (Dkt. No. 1 at 8.) The Settlement Demand Letter alleges that Plaintiff submitted a Good Cause Objection pursuant to 18 N.Y.C.R.R. § 352.35 and requested an accommodation under Title II of the Americans with Disabilities Act ("ADA") wherein he explained that this placement would cause severe psychological trauma and remove his partner, Shakeena, from essential local medical providers. (*Id*.) The Settlement Demand Letter alleges that UCDSS reported Plaintiff's disability-related safety objection as a false "housing refusal," which inflicted extreme psychological distress. (*Id*.)

The Settlement Demand Letter alleges that Plaintiff participated in a State Fair Hearing on September 17, 2026, and UCDSS staff issued a retaliatory LDSS-4002 sanction on September 18, 2026, which rendered Plaintiff destitute and unsheltered. (Dkt. No. 1 at 9.)

The Rebuttal Affidavit alleges that Plaintiff accepted a placement in Saugerties, New York but the facility denied access to Plaintiff's partner, which was a facility restriction and not Plaintiff's refusal. (Dkt. No. 1 at 10.) The Rebuttal Affidavit alleges that because Saugerties could not accept Plaintiff and his partner together, UCDSS reassigned and placed Plaintiff and his partner at the Kingston Motel in Kingston, New York, which Plaintiff accepted without objection and resided there. (*Id.*) The Rebuttal Affidavit alleges that the only time that Plaintiff objected to a housing placement was to the proposed transfer to Poughkeepsie, New York because (1) the placement would have placed Plaintiff in an environment of extreme danger, and (2) the placement would have placed Plaintiff's partner outside of their established medical provider network, which threatened his partner's health and stability. (*Id.*)

The Notice of Intent alleges that Plaintiff engaged in protected activity when he videoed Defendant Nordstrom "engaging in improper administrative conduct." (Dkt. No. 1 at 12.) The Notice of Intent alleges that Defendant Nordstrom "delayed administrative action to observe whether the footage would be published on social media." (*Id.*)

The Notice of Intent alleges that Defendants Balzac, Ricks, Cataldi and Iaponce violated Plaintiff's Fourteenth Amendment due process rights by issuing a 30-day housing lockout without judicial authority. (Dkt. No. 1 at 13.)

The Notice of Intent alleges that Plaintiff, who is Black, was subjected to disparate treatment, racial bias, unprovoked physical/verbal aggression, and arbitrary housing sanctions under color of state law. (*Id.*)

The Notice of Intent alleges that UCDSS's refusal to accommodate Plaintiff's safety objections regarding the out of county transfer to Poughkeepsie, New York violated Title II of the ADA. (*Id.*)

Construing the Complaint and its attachments liberally, the undersigned ascertained the following six claims: (1) a claim of assault pursuant to New York common law against Defendant Block based on the interaction at the UCDSS Office on April 8, 2026; (2) a claim that Plaintiff was discriminated against based on his disability pursuant to Title II of the ADA related to his good cause objection to housing in Poughkeepsie and the subsequent 30-day lockout; (3) a claim of retaliation pursuant to the First Amendment and 42 U.S.C. § 1983 related to the pre-hearing 30-day lockout notice that Plaintiff received on September 18, 2026; (4) a claim of spoliation of evidence; (5) a claim of denial of due process pursuant to the Fourteenth Amendment and 42 U.S.C. § 1983 related to Defendants Balzac, Ricks, Cataldi, and Iaponce enforcing a 30-day housing lockout without judicial authority; and (6) a claim of race discrimination pursuant to 42 U.S.C. § 1981. (*See generally* Dkt. No. 1.)

As relief, Plaintiff seeks, among other things, $3,500,000.00 in damages. (Dkt. No. 1 at 5, 13.)

Plaintiff seeks leave to proceed IFP. (Dkt. No. 2.)

## II. PLAINTIFF'S APPLICATION TO PROCEED *IN FORMA PAUPERIS*

When a civil action is commenced in a federal district court, the statutory filing fee, currently set at $405, must ordinarily be paid. 28 U.S.C. § 1914(a). A court is authorized, however, to permit a litigant to proceed IFP status if a party "is unable to pay" the standard fee for commencing an action. 28 U.S.C. § 1915(a)(1).[2] After reviewing Plaintiff's IFP application

[2] The language of that section is ambiguous because it suggests an intent to limit availability of IFP status to prison inmates. *See* 28 U.S.C. § 1915(a)(1) (authorizing the commencement of an action without prepayment of fees "by a person who submits an affidavit that includes a statement of all assets such prisoner possesses"). The courts have construed that section, however, as making IFP status available to any litigant who can meet the governing financial criteria. *Hayes v. United States*, 71 Fed. Cl. 366, 367 (Fed. Cl. 2006); *Fridman v. City of N.Y.*, 195 F. Supp. 2d 534, 536 n.1 (S.D.N.Y. 2002).

(Dkt. No. 2), the Court finds that Plaintiff meets this standard.[3] Therefore, Plaintiff's application to proceed IFP is granted.[4]

## III. LEGAL STANDARD FOR REVIEW OF THE COMPLAINT

"Notwithstanding any filing fee, or any portion thereof, that may have been paid, the court shall dismiss the case at any time if the court determines that . . . the action . . . (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2).

In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia*, "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (emphasis added) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 [2007]). "Determining whether a complaint states a plausible claim for relief . . . requires the . . . court to draw on its judicial experience and common sense. . . . [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not shown–that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (internal citation and punctuation omitted).

---

[3] Plaintiff is reminded that proceeding IFP is always a privilege, not an unqualified right. Misuse of the IFP process by a litigant, such as repetitive filing of frivolous lawsuits, may result in the denial of a request to proceed IFP.

[4] Plaintiff is reminded that, although his IFP application has been granted, he is still required to pay fees that he may incur in this action, including copying and/or witness fees.

"In reviewing a complaint . . . the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994) (citation omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

Courts are "obligated to construe a pro se complaint liberally." *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009); *see also Nance v. Kelly*, 912 F.2d 605, 606 (2d Cir. 1990) (per curiam) (reading the plaintiff's *pro se* complaint "broadly, as we must" and holding that the complaint sufficiently raised a cognizable claim). "[E]xtreme caution should be exercised in ordering sua sponte dismissal of a pro se complaint before the adverse party has been served and [the] parties . . . have had an opportunity to respond." *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983).

## IV. ANALYSIS

In addressing the sufficiency of a plaintiff's complaint, the court must construe his pleadings liberally. *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008). Having reviewed Plaintiff's Complaint with this principle in mind, I recommend that it be accepted in part for filing and dismissed in part.

### A. Claims Against Defendants Woods, Jennings, and Novotny

A careful review of the Complaint reveals that Defendants Woods, Jennings, and Novotny are listed in the caption and mentioned in the list of defendants. (Dkt. No. 1 at 1-2.) However, the Complaint fails to allege any action or inaction on behalf of Defendants Woods, Jennings, and Novotny. (*See generally* Dkt. No. 1.)

"Dismissal is appropriate where a defendant is listed in the caption, but the body of the complaint fails to indicate what the defendant did to the plaintiff." *Cipriani v. Buffardi*, 06-CV-0889, 2007 WL 607341, at *1 (N.D.N.Y. Feb. 20, 2007) (Khan, J.) (citing *Gonzalez v. City of New York*, 97-CV-2246, 1998 WL 382055, at *2 (S.D.N.Y. July 9, 1998)); *see also Crown v. Wagenstein*, 96-CV-3895, 1998 WL 118169, at *1 (S.D.N.Y. Mar. 16, 1998) (mere inclusion of warden's name in complaint insufficient to allege personal involvement); *Taylor v. City of New York*, 953 F. Supp. 95, 99 (S.D.N.Y. 1997) (same).

As a result, I recommend that Plaintiff's claims against Defendants Woods, Jennings, and Novotny be dismissed for failure to state a claim upon which relief may be granted.

**B. Claims of Race Discrimination**

To state a claim under Section 1981, a plaintiff "must initially plead and ultimately prove that, but for race, [he] would not have suffered the loss of a legally protected right." *Comcast Corp. v. Nat'l Ass'n of African American-Owned Media*, 589 U.S. 327, 341 (2020). Specifically, he must allege that "(1) the plaintiff is a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) the discrimination concerned one or more of the activities enumerated in the statute (i.e., make and enforce contracts, sue and be sued, give evidence, etc.)." *Brevil v. Cnty. of Rockland*, 15-CV-5103, 2017 WL 4863205, at *8 (S.D.N.Y. Oct. 26, 2017) (quoting *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 7 F.3d 1085, 1087 (2d Cir. 1993)).

Although the Complaint alleges that Plaintiff is Black, it fails to allege facts plausibly suggesting that Plaintiff was discriminated against on the basis of his race. (*See generally* Dkt. No. 1.) "Simply being a member of a protected class, without something more to link that status to the action in question, is not enough to raise a reasonable inference of discriminatory animus."

*Cole v. Board of Trustees of Northern Ill. Univ.*, 838 F.3d 888, 900 (7th Cir. 2016); *see Karunakaran v. Borough of Manhattan Cmty. Coll.*, 18-CV-10723, 2022 WL 902370, at *3 (S.D.N.Y. Mar. 28, 2022) (quoting *Littlejohn v. City of New York*, 795 F.3d 297, 311 (2d Cir. 2015)) ("Although a plaintiff is not required to plead facts proving each element of a prima facie case of discrimination at the pleading stage, her allegations must provide 'plausible support' for a 'minimal inference' that the [defendant] was motivated by discriminatory intent."); *Canady v. Union 1199/SEIU*, 527 F. Supp. 3d 515, 516 (W.D.N.Y. 2021) ("simply falling into a protected category is not enough"); *Perry v. County of Westchester*, 06-CV-3000, 2008 WL 11438085, at *17 (S.D.N.Y. Mar. 31, 2008) ("Plaintiff's membership in a protected class in and of itself does not establish discriminatory animus").

As a result, I recommend that Plaintiff's race discrimination claim be dismissed for failure to state a claim upon which relief may be granted.

### C. Title II of the ADA Claim

Title II of the ADA "proscribes discrimination against the disabled in access to public services." *Harris v. Mills*, 572 F.3d 66, 73 (2d Cir. 2009) (citation omitted). The statute provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." *Harris*, 572 F.3d at 73 (citing 42 U.S.C. § 12132).

"In order to establish a prima facie violation under [the ADA], [a plaintiff] must show that 1) he is a qualified individual with a disability; 2) [the agency] is an entity subject to the acts; and 3) he was denied the opportunity to participate in or benefit from [the agency's] services, programs, or activities or . . . otherwise discriminated against . . . by reason of his

disability." *Wright v. New York State Dep't of Corr.*, 831 F.3d 64, 72 (2d Cir. 2016) (citing *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003)). "For purposes of determining whether an ADA plaintiff is a 'qualified individual with a disability,' . . . the ADA defines 'disability' to include, inter alia, 'a physical or mental impairment that substantially limits one or more major life activities[.]'" *Hamilton v. Westchester Cnty.*, 3 F.4th 86, 92 (2d Cir. 2021) (quoting *Woolf v. Strada*, 949 F.3d 89, 93 (2d Cir. 2020) (quoting 42 U.S.C. § 12102(1)(A))).

Title II of the ADA does not "provide[ ] for individual capacity suits against state officials." *Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn*, 280 F.3d 98, 107 (2d Cir. 2001); *Keitt v. New York City*, 882 F. Supp. 2d 412, 426 (S.D.N.Y. 2011) (citing *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009)) ("Individuals in their personal capacities are not proper defendants on claims brought under the ADA . . . ."). Accordingly, I recommend that to the extent that Plaintiff's ADA claims are asserted against the named defendants in their individual capacities, those claims be dismissed with prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and 28 U.S.C. § 1915A(b)(1) for failure to state a claim upon which relief may be granted.

However, out of an abundance of caution, mindful of the Second Circuit's instruction that a *pro se* plaintiff's pleadings must be liberally construed, and without expressing an opinion as to whether Plaintiff can withstand a properly filed motion to dismiss or for summary judgment, I recommend that a response be required to Plaintiff's Title II ADA claim against Defendants Iaponce, Cataldi, Ricks, Balzac, Block, and Nordstrom in their official capacities.

**D. Due Process Claim**

To establish a violation of the Fourteenth Amendment's right to procedural due process, a plaintiff must establish that he "was deprived of property . . . without constitutionally adequate pre- or post-deprivation process." *Ahlers v. Rabinowitz*, 684 F.3d 53, 62 (2d Cir. 2012). In

general, "the Constitution requires some kind of a hearing *before* the State deprives a person of liberty or property." *Zinermon v. Burch*, 494 U.S. 113, 127 (1990) (emphasis in original); *see also Gudema v. Nassau County*, 163 F.3d 717, 724 (2d Cir. 1998) ("Ordinarily, the Due Process Clause requires that the state not deprive an individual of a significant liberty or property interest without affording notice and some opportunity to be heard *prior to the deprivation.*" (emphasis added)).

Out of an abundance of caution, mindful of the Second Circuit's instruction that a *pro se* plaintiff's pleadings must be liberally construed, and without expressing an opinion as to whether Plaintiff can withstand a properly filed motion to dismiss or for summary judgment, I recommend that a response be required to Plaintiff's due process claim against Defendants Balzac, Ricks, Cataldi, and Iaponce in their individual capacities.[5]

**E. Retaliation Claim**

"To sustain a claim for retaliation in violation of the First Amendment under § 1983, a [plaintiff] must demonstrate '(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection

---

[5] To the extent that the Complaint asserts a claim or claims against Defendants in their official capacities pursuant to 42 U.S.C. § 1983, I recommend that it be dismissed. A claim against an individual in his official capacity is in effect a claim against the governmental entity itself. *Lore v. City of Syracuse*, 670 F.3d 127, 164 (2d Cir. 2012). "[P]laintiffs who sue local governments under Section 1983 must prove that their injury resulted from 'action pursuant to official municipal policy.'" *Jimenez v. City of New York*, 190 F.4th 145, 170 (2d Cir. 2026) (quoting *Monell v. Depart. of Soc. Serv. of City of New York*, 436 U.S. 658, 691 (1978)). "In other words, to prevail on a Section 1983 claim against a municipality based on the unconstitutional acts of municipal employees, 'a plaintiff [must] plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right.'" *Jimenez*, 190 F.4th at 170 (quoting *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983)). Plaintiff has not alleged an official policy or custom that caused the purported constitutional violations. (*See* Dkt. No. 1.)

between the protected speech and the adverse action.'" *Walker v. Senecal*, 130 F.4th 291, 298 (2d Cir. 2025) (quoting *Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009)).

Plaintiff alleges that he participated in a State Fair Hearing on September 17, 2026, and on September 18, 2026—in retaliation for his participation in the hearing—he was issued an arbitrary notice imposing an unlawful 30-day housing sanction. (Dkt. No. 1 at 13.)

Out of an abundance of caution, mindful of the Second Circuit's instruction that a *pro se* plaintiff's pleadings must be liberally construed, and without expressing an opinion as to whether Plaintiff can withstand a properly filed motion to dismiss or for summary judgment, I recommend that a response be required to Plaintiff's retaliation claim against Defendants Iaponce, Cataldi, Ricks, Balzac, Block, and Nordstrom in their individual capacities.[6]

**F. Spoliation of Evidence Claim**

The Court of Appeals for the Second Circuit describes spoliation as "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999). A federal district court may impose sanctions under Federal Rule of Civil Procedure 37(b) when a party spoliates evidence in violation of a court order. *West*, 167 F.3d at 779 (citing Fed. R. Civ. P. 37(b)(2); *John B. Hull, Inc., v. Waterbury Petroleum Prods., Inc.*, 845 F.2d 1172, 1176 (2d Cir. 1988)). Even without a discovery order, a federal district

---

6 *See*, *supra*, note 5.

To the extent that Plaintiff's retaliation claim is based on his purported "protected activity" of video taping Defendant Nordstrom "engaging in improper administrative conduct" (Dkt. No. 1 at 12), I recommend that it be dismissed for failure to state a claim upon which relief may be granted.

court may impose sanctions for spoliation under "its inherent power to control litigation." *Id.* (citations omitted).

While a party to an action may bring a motion for sanctions for spoliation against another party in that action, there is no independent federal cause of action for spoliation. *See Sterbenz v. Attine*, 205 F. Supp. 2d 65, 74 (E.D.N.Y. 2002) (holding there is no federal cause of action for spoliation); *see also Cummerlander v. Patriot Preparatory Acad. Inc.*, 86 F. Supp. 3d 808, 828 (S.D. Ohio 2015) ("[T]here is no independent federal cause of action . . . for spoliation of evidence."); *Coriam v. Magical Cruise Co., Ltd.*, 14-CV-0398, 2014 WL 12609120, at *5 (M.D. Fla. Nov. 24, 2014)2014 WL 12609120, at *5 (M.D. Fla. Nov. 24, 2014) ("A federal law claim for spoliation of evidence does not exist."); *In re Elec. Mach. Enterprises, Inc.*, 416 B.R. 801, 872 (Bankr. M.D. Fla. 2009) ("There is no federal cause of action for spoliation.").

As a result, I recommend that any claim for spoliation of evidence be dismissed for failure to state a claim upon which relief may be granted.[7]

**G. Claim for Assault**

"Under New York law, "[a]n 'assault' is an intentional placing of another person in fear of imminent harmful or offensive contact." *Girden v. Sandals Int'l*, 262 F.3d 195, 203 (2d Cir. 2001) (quoting *United Nat'l Ins. Co. v. Waterfront N.Y. Realty Corp.,* 994 F.2d 105, 108 (2d Cir. 1993)). "To establish a prima facie claim of assault under New York law, a plaintiff must prove physical conduct placing the plaintiff in imminent apprehension of harmful contact." *Doe v. Jackson*, 23-CV-4910, 2025 WL 753949, at *6 (S.D.N.Y. Mar. 10, 2025). However, physical

---

[7] Further, "New York does not recognize spoliation of evidence as an actionable tort." *Farquharson v. Lafayette*, 19-CV-3446, 2020 WL 1699985, at *12 (S.D.N.Y. 2020); *see Poulos v. County of Warren,* 21-2656, 2023 WL 4004692, at *1 (2d Cir. June 15, 2023) (summary order) (affirming dismissal of spoliation claim because "there is no independent spoliation tort claim under New York Law").

contact is not required. *Oakley v. MSG Networks*, 17-CV-6903, 2026 WL 2364632, at *8 (S.D.N.Y. Aug. 14, 2026).

Out of an abundance of caution, mindful of the Second Circuit's instruction that a *pro se* plaintiff's pleadings must be liberally construed, and without expressing an opinion as to whether Plaintiff can withstand a properly filed motion to dismiss or for summary judgment, I recommend that a response be required to Plaintiff's assault claim against Defendant Block.

## V. OPPORTUNITY TO AMEND

Generally, a court should not dismiss claims contained in a complaint filed by a *pro se* litigant without granting leave to amend at least once "when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Branum v. Clark*, 927 F.2d 698, 704-05 (2d Cir. 1991); *see also* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when justice so requires."). An opportunity to amend is not required, however, where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000); *see also Cortec Indus. Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice."). Stated differently, "[w]here it appears that granting leave to amend is unlikely to be productive, . . . it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993); *accord, Brown v. Peters*, 95-CV-1641, 1997 WL 599355, at *1 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.).[8]

---

[8] *See also Carris v. First Student, Inc.*, 132 F. Supp. 3d 321, 340-41 n.1 (N.D.N.Y. 2015) (Suddaby, C.J.) (explaining that the standard set forth in *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 796 (2d Cir. 1999)—that the Court should grant leave to amend "unless the court can rule out any possibility, however unlikely it might be, that an amended complaint would be

The problems with Plaintiff's spoliation claim and any Title II ADA claim against Defendants in their individual capacities are substantive such that a better pleading could not cure the defects. As a result, I recommend that those claims be dismissed without leave to re-plead.

However, with respect to Plaintiff's (1) claims against Defendants Woods, Jennings, and Novotny, (2) a discrimination claim pursuant to 42 U.S.C. § 1981, and (3) any claims pursuant to 42 U.S.C. § 1983 against Defendants in their official capacities, a better pleading could potentially cure the defects identified herein. As a result, I recommend that Plaintiff be granted leave to replead these claims.

If Plaintiff chooses to file an amended complaint, he should note that in any amended complaint, Plaintiff must clearly set forth facts that give rise to the claims, including the dates, times, and places of the alleged underlying acts, and each individual who committed each alleged wrongful act. In addition, the revised pleading should allege facts demonstrating the specific involvement of any of the named defendants in the constitutional deprivations alleged in sufficient detail to establish that they were tangibly connected to those deprivations. *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). Finally, Plaintiff is informed that any such amended complaint will replace the existing Complaint and must be a wholly integrated and complete pleading that does not rely upon or incorporate by reference any pleading or document previously filed with the Court. *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) ("It is well established that an amended complaint ordinarily supersedes the original and renders it of no legal effect.").

---

successful in stating a claim"—is likely not an accurate recitation of the governing law after *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)), *rev'd on other grounds*, 682 F. App'x 30.

PLAINTIFF IS ADVISED THAT HE SHOULD NOT SEEK TO FILE A MOTION TO AMEND HIS COMPLAINT UNTIL UNITED STATES DISTRICT JUDGE NARDACCI RULES ON THIS COURT'S RECOMMENDATIONS WITH RESPECT TO PLAINTIFF'S COMPLAINT. ANY AMENDED COMPLAINT OR MOTION TO AMEND BEFORE JUDGE NARDACCI'S DECISION WITH RESPECT TO THIS COURT'S RECOMMENDATIONS WILL BE STRICKEN AS PREMATURE AND WILL NOT BE CONSIDERED BY THE COURT. As noted below, however, Plaintiff may file objections to this Court's recommendations.

**ACCORDINGLY**, it is

**ORDERED** that Plaintiff's application to proceed *in forma pauperis* (Dkt. No. 2), is **GRANTED**; and it is further respectfully

**RECOMMENDED** that Plaintiff's Complaint (Dkt. No. 1) be **ACCEPTED** to the extent that it asserts the following four claims (1) an assault claim pursuant to New York common law against Defendant Block, (2) a claim that Plaintiff was discriminated against on the basis of his disability pursuant to Title II of the ADA against Defendants Iaponce, Cataldi, Ricks, Balzac, Block, and Nordstrom in their official capacities, (3) a claim of retaliation pursuant to the First Amendment and 42 U.S.C. § 1983 against Defendants Iaponce, Cataldi, Ricks, Balzac, Block, and Nordstrom in their individual capacities, and (4) a claim that Plaintiff was denied due process pursuant to the Fourteenth Amendment and 42 U.S.C. § 1983 against Defendants Balzac, Ricks, Cataldi, and Iaponce in their individual capacities; **DISMISSED** with leave to amend to the extent that it asserts the following three claims (1) claims against Defendants Woods, Jennings, and Novotny, (2) a discrimination claim pursuant to 42 U.S.C. § 1981, and (3) any claims pursuant to 42 U.S.C. § 1983 against Defendants in their official capacities; and

**DISMISSED** without leave to amend to the extent that it asserts a spoliation claim and a Title II ADA claim against Defendants in their individual capacities; and it is further

**ORDERED** that the Clerk of the Court shall file a copy of this Order and Report-Recommendation on the docket of this case and serve a copy upon the parties in accordance with the local rules.[9]

**NOTICE:** Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[10] Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. 28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)).

Dated: November 12, 2026
Binghamton, New York

Miroslav Lovric
Miroslav Lovric
U.S. Magistrate Judge

---

[9] The Clerk shall also provide Plaintiff with copies of all unreported decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

[10] If you are proceeding *pro se* and served with this report, recommendation, and order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date that the report, recommendation, and order was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

2017 WL 4863205
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Marie BREVIL, Plaintiff,
v.
COUNTY OF ROCKLAND, Ed Day, Scott Vanderhoef, June Gray, Rockland County Department of Social Services, Susan Sherwood, Joan Silvestri, Barbara Gavin, Joseph Filippone, Carla Ortiz, P.T. Thomas, Scott Firestone, Ram Nagubandi, and John Fella, Defendants.

15 CV 5103 (VB)
|
Signed 10/25/2017
|
Filed 10/26/2017

**Attorneys and Law Firms**

Marie Brevil, Thiells, NY, pro se.

Larraine Susan Feiden, Feiden Law Firm, New City, NY, Thomas Edward Humbach, County of Rockland Department of Law, New York, NY, for Defendants.

## OPINION AND ORDER

Vincent L. Briccetti, United States District Judge

***1** Plaintiff Marie Brevil, proceeding pro se, brings this action alleging defendants discriminated and retaliated against her on the basis of her race, gender, national origin, and religion, and subjected her to a hostile work environment in violation of 42 U.S.C. § 1983, Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. § 2000e, et seq., and the New York State Human Rights Law, N.Y. Exec. Law § 290 et seq. Plaintiff also brings claims for violations of 42 U.S.C. §§ 1981, 1982, 1985, 1986, and the First and Fourteenth Amendments to the Constitution. Finally, plaintiff also asserts claims for assault and battery and intentional and negligent infliction of emotional distress.

Now pending is defendants' motion to dismiss the amended complaint pursuant to Rule 12(b)(6). (Doc. #51).

For the reasons set forth below, defendants' motion is GRANTED. However, plaintiff is granted leave to file a second amended complaint, with the limitations explained below.

The Court has subject matter jurisdiction under 28 U.S.C. § 1331.

## BACKGROUND

In deciding the pending motion to dismiss, the Court accepts as true all well-pleaded factual allegations in the amended complaint ("Am. Compl.") and draws all reasonable inferences in plaintiff's favor.

Plaintiff began her employment as a caseworker for the Rockland County Department of Social Services ("DSS") in June 2007. At least as of the filing of her amended complaint, plaintiff continued to hold that position.

Plaintiff alleges from June 2007 to the present, she has "experience[d] adverse, critical, derogatory and demeaning statements and comments from co-workers and employees and subordinates of defendants." (Am. Compl. ¶ 42). She alleges "senior management" of Rockland County (the "County") and DSS have been "constructively" made aware of the conduct to which plaintiff has been subjected. (Id.).

Plaintiff alleges in April 2013, she was "physically assaulted by defendant Scott Firestone ... arising out of the racial, gender, and religious animus held by defendants." (Am. Compl. ¶ 43). She alleges Firestone, also a DSS caseworker, was "criminally prosecuted" for the assault but that defendants "formally reprimanded plaintiff for the assault" because "she failed to recognize the personal stress that ... Firestone was under and therefore the cause of his anger and hostility towards her." (Id. at ¶¶ 44-45). Plaintiff alleges "in the days immediately following the attack by ... Firestone, plaintiff was forced to take a medically necessary leave of absence from her employment, for treatment of depression, anxiety, and irregular heart beats [sic]." (Id. at ¶ 46).

In addition, plaintiff alleges:

> [S]ince the 2013 assault, plaintiff has been isolated, teased, and subjected to cruel treatment by defendants, to wit: admonished not to speak in Creole, even though her clients sometimes

> speak the language; admonished about her dress, including a head wrap/scarf, that arises, in large part, because of her religious beliefs; and subjected to constant electronic monitoring of her work, unlike and to a much lesser degree than similarly situated co-workers.

***2** (Am. Compl. ¶ 47).

Plaintiff further alleges from April 2013 to October 2015, she was subjected to "extreme workplace hostility, with constant references by immediate supervisors to her race, religion, nationality and gender." (Am. Compl. ¶ 48).

Plaintiff alleges she informed defendants about these issues, but that "defendants, up to and including defendant Ed Day, trivialize[ed], minimiz[ed] and fail[ed] to act on her grievances." (Am. Compl. ¶ 49).

From October 2015 to May 2016, plaintiff took a second leave of absence from work because she was allegedly suffering from "severe health issues" stemming from "the workplace animus she had been experiencing." (Am. Compl. ¶ 50). During this leave, plaintiff claims she was diagnosed with "severe emotional distress, depression, post stress disorder and a heart condition requiring the surgical implantation of a heart monitor." (Id. ¶ 51).

On June 24, 2014, plaintiff filed complaints of discrimination, harassment, and retaliation with the New York State Division of Human Rights ("NYSDHR") and the Equal Employment Opportunity Commission ("EEOC"). By decision dated December 19, 2014, the NYSDHR dismissed the complaint and closed the case. On January 20, 2015, the EEOC issued a Notice of Right to Sue ("EEOC Notice"). Because the initial EEOC Notice was returned to the EEOC as undeliverable, the EEOC re-sent the Notice on April 15, 2015. Plaintiff received the re-sent EEOC Notice on April 20, 2015. She filed this lawsuit on June 30, 2015.

## DISCUSSION

### I. Legal Standard

In deciding a Rule 12(b)(6) motion, the Court evaluates the sufficiency of the operative complaint under the "two-pronged approach" articulated by the Supreme Court in Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009). First, plaintiff's legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not entitled to the assumption of truth and are thus not sufficient to withstand a motion to dismiss. Id. at 678; Hayden v. Paterson, 594 F.3d 150, 161 (2d Cir. 2010). Second, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Ashcroft v. Iqbal, 556 U.S. at 679.

To survive a Rule 12(b)(6) motion, the allegations in the complaint must meet a standard of "plausibility." Ashcroft v. Iqbal, 556 U.S. at 678; Bell Atl. Corp. v. Twombly, 550 U.S. 544, 564 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id.

Because plaintiff is proceeding pro se, the Court must construe her submissions liberally and interpret them "to raise the strongest arguments that they suggest." Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 474 (2d Cir. 2006) (per curiam) (internal quotation marks omitted). "Even in a pro se case, however ... threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Chavis v. Chappius, 618 F.3d 162, 170 (2d Cir. 2010) (internal quotation marks omitted). Nor may the Court "invent factual allegations [plaintiff] has not pled." Id.

### II. DSS

***3** Plaintiff's claims against the DSS must be dismissed because County agencies or departments do not have the capacity to be sued under New York law. See Omnipoint Commc'ns, Inc. v. Town of LaGrange, 658 F. Supp. 2d 539, 552 (S.D.N.Y. 2009) ("In New York, agencies of a municipality are not suable entities."); Hall v. City of White Plains, 185 F. Supp. 2d 293, 303 (S.D.N.Y. 2002) ("Under New York law, departments which are merely administrative arms of a municipality do not have a legal identity separate and apart from the municipality and cannot sue or be sued."); see also N.Y. Gen. Municipal Law Sec. 2 ("The term 'municipal corporation,' as used in this chapter, includes only a county, town, city and village.").


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

Accordingly, DSS is dismissed as a defendant.

III. Employment Discrimination, Retaliation and Hostile Work Environment Claims

Plaintiff's amended complaint contains eighteen causes of action against fourteen defendants. Eleven of the eighteen causes of action sound in employment discrimination, retaliation, and hostile work environment (the "employment-related claims"). For the following reasons, each of plaintiff's employment-related claims is dismissed. However, because a liberal reading of plaintiff's amended complaint indicates valid employment-related claims might be stated, the Court sua sponte grants plaintiff leave to file a second amended complaint and replead those claims she can allege truthfully and plausibly.

A. Title VII Discrimination and Retaliation Claims

Defendants argue plaintiff's Title VII discrimination and retaliation claims must be dismissed because (i) the individual defendants may not be held personally liable under Title VII, and (ii) plaintiff has failed to allege she suffered from an adverse employment action.

The Court agrees.

First, "individuals are not subject to liability under Title VII." Wrighten v. Glowski, 232 F.3d 119, 120 (2d Cir. 2000) (citing Tomka v. Seiler Corp., 66 F.3d 1295, 1313 (2d Cir. 1995)). Thus, any Title VII claims may be asserted only against the County here.

Next, to state a Title VII discrimination claim, a plaintiff must "allege two elements: (1) the employer discriminated against [her] (2) because of [her] race, color, religion, sex, or national origin." Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 85 (2d Cir. 2015) (citing 42 U.S.C. § 2000e–2(a)(1)). "As to the first element, an employer discriminates against a plaintiff by taking an adverse employment action against [her]." Id. "An adverse employment action is one which is more disruptive than a mere inconvenience or an alteration of job responsibilities." Id. (internal quotation marks omitted). "Examples of materially adverse changes include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." Id. (internal quotation marks omitted).

Finally, to state a Title VII retaliation claim, a plaintiff "must plausibly allege that: (1) defendants discriminated —or took an adverse employment action—against [her], (2) 'because' [she] has opposed any unlawful employment practice." Vega v. Hempstead Union Free Sch. Dist., 801 F.3d at 90 (citing 42 U.S.C. § 2000e–3(a)). In the context of a Title VII retaliation claim, "an adverse employment action is any action that 'could well dissuade a reasonable worker from making or supporting a charge of discrimination.' " Id. (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 57 (2006)). "As for causation, a plaintiff must plausibly plead a connection between the act and his engagement in protected activity." Id. (citing 42 U.S.C. § 2000e–3(a)). "A retaliatory purpose can be shown indirectly by timing: protected activity followed closely in time by adverse employment action." Id.

***4** Here, plaintiff alleges defendants "adversely impact[ed] plaintiff's employment, employment opportunities, promotional opportunities, and past and future wages ... in retaliation for plaintiff exercising her rights under federal and state constitutional law" (Am. Compl. ¶ 54), but the amended complaint contains no well-pleaded factual allegations supporting this broad, conclusory statement, or how, exactly, defendants' actions adversely affected her employment. Plaintiff remains employed by DSS, and she alleges no facts suggesting, for example, that she was up for, but was denied, a particular promotion in a specific year. Likewise, the amended complaint is devoid of non-conclusory factual allegations suggesting she was retaliated against for filing her EEOC or NYSDHR complaints. (See Am. Compl. ¶ 132).

As a result, plaintiff's Title VII discrimination and retaliation claims are dismissed. However, as explained in greater detail below, because a liberal reading of plaintiff's amended complaint suggests she may be able to state valid Title VII claims, plaintiff is granted leave to replead these claims.

B. New York Human Rights Law Retaliation Claim

Plaintiff's New York State Human Rights Law ("NYSHRL") retaliation claim also fails.

"The standards for evaluating ... [a] retaliation claim[ ] are identical under Title VII and the NYSHRL. Kelly v. Howard I. Shapiro & Assocs. Consulting Engineers, P.C., 716 F.3d 10, 14 (2d Cir. 2013) (citing Weinstock v. Columbia Univ, 224 F.3d 33, 42 n. 1 (2d Cir. 2000)). However, unlike Title VII, certain individuals may be held liable under the NYSHRL,

either directly as employers or indirectly as aider-abettors. A supervisor—that is, a person with the power to hire and fire plaintiff—may be held liable as an employer if he or she "actually participates in the conduct giving rise to the discrimination." Feingold v. New York, 366 F.3d 138, 157 (2d Cir. 2004) (internal quotations and alterations omitted).

As explained when addressing plaintiff's Title VII claims, plaintiff has failed to allege an adverse employment action sufficient to state a retaliation claim. Moreover, the amended complaint does not make clear who plaintiff's supervisors were or which defendants participated in the conduct giving rise to the discrimination. She has thus also insufficiently alleged a NYSHRL retaliation claim against any of the individual defendants.

Accordingly, plaintiff's NYSHRL retaliation claim is dismissed. However, because her amended complaint suggests she may be able to state a valid retaliation claim under NYSHRL, plaintiff may replead this claim.

C. Section 1983 Claims Against the Individual Defendants

Defendants also argue plaintiff's Section 1983 claim must be dismissed against all of the individual defendants because plaintiff failed to allege their personal involvement in the actions giving rise to the claims.

The Court agrees.

"The Fourteenth Amendment provides public employees with the right to be 'free from discrimination.' " Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 87 (2d Cir. 2015) (quoting Demoret v. Zegarelli, 451 F.3d 140, 149 (2d Cir. 2006)). "Consequently, public employees aggrieved by discrimination in the terms of their employment may bring suit under 42 U.S.C. § 1983 against any responsible persons acting under color of state law." Id. (citing Back v. Hastings on Hudson Union Free Sch. Dist., 365 F.3d 107, 122–23 (2d Cir. 2004)). "To state a claim under § 1983, a plaintiff must allege two elements: (1) 'the violation of a right secured by the Constitution and laws of the United States,' and (2) 'the alleged deprivation was committed by a person acting under color of state law.' " Id. at 87–88 (quoting Feingold v. New York, 366 F.3d at 159). "A state employee acting in his official capacity is acting under color of state law." Id. (internal quotation marks omitted).

***5** However, "[a]n individual may be held liable under ... 1983 only if that individual is 'personally involved in the alleged deprivation.' " Littlejohn v. City of New York, 795 F.3d 297, 314 (2d Cir. 2015) (quoting Back v. Hastings On Hudson Union Free Sch. Dist., 365 F.3d at 127).

A showing of personal involvement requires evidence that:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference ... by failing to act on information indicating that unconstitutional acts were occurring.

Back v. Hastings On Hudson Union Free Sch. Dist., 365 F.3d at 127 (citing Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995)).

Here, with one exception, plaintiff has not alleged any specific conduct attributable to any of the individual defendants. The only exception is plaintiff's allegation that Firestone physically assaulted her in 2013 "arising out of the racial, gender, and religious animus held by defendants." (Am. Compl. ¶ 43). However, even this allegation is vague—for example, it does not explain what specific circumstances gave rise to this attack. Furthermore, plaintiff does not specifically allege which of the individual defendants were her supervisors or co-workers, or what their relationship to plaintiff was, or is today.

As such, the allegations in the amended complaint are insufficient to state a Section 1983 claim against the individual defendants. However, because a liberal reading of plaintiff's amended complaint suggests she may be able to

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

state a valid Section 1983 claim, plaintiff is granted leave to replead this claim.

D. Section 1983 Claims Against the County

To the extent plaintiff seeks to sue the County for discrimination, retaliation, or a hostile work environment under Section 1983, those claims also fail.

"[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents." Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 694 (1978) ("Monell"). "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." Id.

To state a Monell claim, a plaintiff need not allege the policy or custom itself is unconstitutional; rather, liability exists when a municipal policy is valid but the municipality's actual practice is not. Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 125–26 (2d Cir. 2004) (practice of using excessive force can be basis for municipal liability even though city's policy on use of force is itself constitutional).

"While Monell claims are not subject to a 'heightened' pleading standard beyond that defined in Rule 8(a)(2), such claims nevertheless must meet the plausibility requirements of Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 572 (2007), and Ashcroft v. Iqbal, 556 U.S. 662, 678, (2009)." Guzman v. United States, 2013 WL 5018553, at *4 (S.D.N.Y. September 13, 2013) [1] (quoting Leatherman v. Tarrant Cty. Narcotics Intelligence and Coordination Unit, 507 U.S. 163, 168 (1993)). "In other words, boilerplate allegations will not suffice." Id. (internal quotation marks omitted). In sum, without more, "[t]he allegations [a defendant] acted pursuant to a 'policy,' without any facts suggesting the policy's existence, are plainly insufficient." Missel v. Cty. of Monroe, 351 Fed.Appx. 543, 545-46 (2d Cir. 2009) (summary order) (citing Dwares v. City of New York, 985 F.2d 94, 100-02 (2d Cir. 1993)).

***6** Here, plaintiff has not alleged that there existed a policy or custom of discrimination against women, or people of plaintiff's race, national origin, or religion. Instead, the amended complaint only contains allegations related to the treatment of plaintiff individually.

As a result, plaintiff's Monell claim is dismissed, but as with her Section 1983 claim against the individual defendants, plaintiff may replead this claim.

E. Hostile Work Environment

Plaintiff's amended complaint also lacks sufficient detail to state a hostile work environment claim.

"To establish a hostile work environment under Title VII ... or § 1983, a plaintiff must show that the 'workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.' " Littlejohn v. City of New York, 795 F.3d at 320–21 (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)). However, to survive a motion to dismiss, "a plaintiff need only plead facts sufficient to support the conclusion that she was faced with 'harassment ... of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse.' " Patane v. Clark, 508 F.3d 106, 113 (2d Cir. 2007) (quoting Terry v. Ashcroft, 336 F.3d 128, 148 (2d Cir. 2003)).

"[A] work environment's hostility should be assessed based on the totality of the circumstances." Patane v. Clark, 508 F.3d at 113 (internal quotation marks omitted). "Factors that a court might consider in assessing the totality of the circumstances include: (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is threatening and humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with an employee's work performance." Id. (internal quotation marks omitted). "[W]hether a particular work environment is objectively hostile is necessarily a fact-intensive inquiry." Id. at 114.

Here, although plaintiff's amended complaint contains allegations that suggest the existence of a hostile work environment claim, it makes only generalized assertions against all "defendants" over broad periods of time. For example, plaintiff alleges she has been "admonished not to speak in Creole ... admonished about her dress ... and subjected to constant electronic monitoring of her work." (Am. Compl. ¶ 47). The amended complaint lacks any details about who made these remarks, when, how frequently, or whether it interfered with her performance.

Accordingly, plaintiff's hostile work environment claim is dismissed, but with leave to replead.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

IV. Remaining Constitutional Claims

Plaintiff also brings claims under the First and Fourteenth Amendments. For the following reasons, those claims are also dismissed but with leave to replead.

A. First Amendment Claims

The First Amendment prohibits government officials from retaliating against a person for exercising her right to freedom of speech. Hartman v. Moore, 547 U.S. 250, 256 (2006). To prevail on a First Amendment retaliation claim, a plaintiff must offer evidence showing: (i) her speech was constitutionally protected; (ii) she suffered an adverse employment action; and (iii) the speech at issue was a substantial or motivating factor in the decision to retaliate. See Morrison v. Johnson, 429 F.3d 48, 51 (2d Cir. 2005).

***7** In the First Amendment retaliation context, employment action is adverse if it "would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." Zelnick v. Fashion Inst. of Tech., 464 F.3d 217, 225 (2d Cir. 2006) (internal quotation marks omitted). "In this context, '[a]dverse employment actions include discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand.' " Id. at 226 (quoting Morris v. Lindau, 196 F.3d 102, 110 (2d Cir. 1999)). "This list of retaliatory conduct is certainly not exhaustive, however, and 'lesser actions may also be considered adverse employment actions.' " Id. (quoting Morris v. Lindau, 196 F.3d at 110). "Adverse employment actions may include negative evaluation letters, express accusations of lying, assignment of lunchroom duty, reduction of class preparation periods, failure to process teacher's insurance forms, transfer from library to classroom teaching as an alleged demotion, and assignment to classroom on fifth floor which aggravated teacher's physical disabilities." Id. (internal quotation marks omitted).

To state a First Amendment freedom of religion retaliation claim against a public official, a plaintiff "must plead and prove: (1) he engaged in speech protected by the First Amendment; (2) defendants' actions were motivated or substantially caused by his exercise of that right; and (3) there was a resultant and "actual chill[ing]" of his exercise of that constitutional right." Rathbun v. DiLorenzo, 438 Fed.Appx. 48, 49 (2d Cir. 2011) (Curley v. Vill. of Suffern, 268 F.3d 65, 73 (2d Cir. 2001)).

Here, plaintiff alleges defendants violated her First Amendment rights to free speech by "minimizing, adversely addressing and stigmatizing plaintiff's dress and clothing," and that defendants' actions "ma[de] her weary and fearful of coming to work and caus[ed] her to take an extended medical leave of absence." (Am. Compl. ¶¶ 102-03). In addition, plaintiff alleges defendants violated her right to freedom to exercise her religion by "significantly minimizing, adversely addressing and stigmatizing plaintiff['s] religious beliefs," and that this "instill[ed] in plaintiff the fear that her personal beliefs are illegal, inappropriate and not in conformity with the culture," and it made her "weary and fearful of coming to work and causing her to take an extended medical leave of absence." (Id. ¶¶ 106-08). These allegations are overly broad, conclusory, and generally insufficient to show an adverse employment action or an actual chilling of plaintiff's exercising her religion.

Accordingly, plaintiff's First Amendment claims are dismissed but, because the amended complaint suggests she may have an actionable First Amendment cause of action, she is granted leave to replead this claim.

B. Fourteenth Amendment Procedural Due Process Claim

"To state a cause of action under the due process clause, a plaintiff must show that she has a property interest, created by state law, in the employment or the benefit that was removed." Bernheim v. Litt, 79 F.3d 318, 322 (2d Cir. 1996). "If a protected interest exists, [the Court] must then determine whether the [employer] deprived [the plaintiff] of that interest without due process." Strong v. Bd. of Educ. of Uniondale Union Free Sch. Dist., 902 F.2d 208, 211 (2d Cir. 1990).

Here, plaintiff has not alleged defendants denied her employment or any benefits that would give rise to a Fourteenth Amendment claim.

Accordingly, plaintiff's Fourteenth Amendment due process claim is dismissed but with leave to replead. However, plaintiff may replead this claim only if she can truthfully allege she was denied a benefit related to her employment without due process.

V. Section 1981, 1982, 1985, and 1986 Claims

Plaintiff also brings causes of action under Sections 1981, 1982, 1985, and 1986 of Title 42 of the United States Code. For the following reasons, each of these causes of action is dismissed with prejudice and without leave to replead.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

A. Sections 1981 and 1982

***8** First, "[t]o establish a claim under § 1981, a plaintiff must allege facts in support of the following elements: (1) the plaintiff is a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) the discrimination concerned one or more of the activities enumerated in the statute (i.e., make and enforce contracts, sue and be sued, give evidence, etc.)." Mian v. Donaldson, Lufkin & Jenrette Sec. Corp., 7 F.3d 1085, 1087 (2d Cir. 1993). Section 1982 claims are evaluated under the same standard. See Puglisi v. Underhill Park Taxpayer Ass'n, 947 F.Supp. 673, 699–700 (S.D.N.Y. 1996).

Plaintiff's amended complaint is devoid of any allegations suggesting defendants' alleged discrimination concerned any of the enumerated activities contained in the statute such as making and enforcing contracts, sue and be sued, etc. (Section 1981) or inherit, purchase, etc. property (Section 1982).

Accordingly, plaintiff's Section 1981 and 1982 claims are dismissed. Because nothing in the amended complaint suggests she may have a valid claim under either Section 1981 or Section 1982, these claims are dismissed with prejudice and without leave to replead.

B. Sections 1985 and 1986

Next, "[t]he four elements of a § 1985(3) claim are: (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the laws, or of equal privileges and immunities under the laws; (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right of a citizen of the United States." Mian v. Donaldson, Lufkin & Jenrette Sec. Corp., 7 F.3d at 1087–88 (citing United Bhd. of Carpenters, Local 610 v. Scott, 463 U.S. 825, 828–29 (1983)). "Furthermore, the conspiracy must also be motivated by 'some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action.' " Id. (quoting United Bhd. of Carpenters, Local 610 v. Scott, 463 U.S. at 829).

In addition, Section 1986 "provides a cause of action against anyone who 'having knowledge that any of the wrongs conspired to be done and mentioned in section 1985 are about to be committed and having power to prevent or aid, neglects to do so.' " Mian v. Donaldson, Lufkin & Jenrette Sec. Corp., 7 F.3d at 1088 (quoting Katz v. Morgenthau, 709 F.Supp. 1219, 1236 (S.D.N.Y.), aff'd in part and rev'd in part on other grounds, 892 F.2d 20 (2d Cir. 1989)). "Thus, a § 1986 claim must be predicated upon a valid § 1985 claim." Id. (citing Dacey v. Dorsey, 568 F.2d 275, 277 (2d Cir. 1978), cert. denied, 436 U.S. 906 (1978)).

However, "it is well settled that there can be no actionable conspiracy under the civil rights laws if the alleged conspirators are employees of a single organization and their alleged actions were taken in the course of their employment." Ahmed v. Gelfand, 160 F. Supp. 2d 408, 413 (E.D.N.Y. 2001).

Here, plaintiff's amended complaint fails to offer more than conclusory allegations of conspiracy, and all of the allegations are made against fellow employees of the County or DSS.

Accordingly, plaintiff's Sections 1985 or 1986 claims are dismissed with prejudice and without leave to replead.

VI. Other State Law Claims

Finally, plaintiff has tacked on state law claims that bear little relation to the remainder of the allegations in her complaint. These claims are also dismissed.

A. Assault and Battery Claim

***9** Plaintiff's claim for "assault and battery" must also be dismissed. Under New York law, "an action to recover damages for assault" is covered by a one-year statute of limitations. CPLR § 215(3). Here, the assault of which plaintiff complains occurred in April 2013, well more than one year before she filed this action in June 2015.

Accordingly, plaintiff's assault and battery claim is dismissed with prejudice. Because amendment of this claim would be futile, she may not replead it.

B. Intentional and Negligent Infliction of Emotional Distress

To state a claim for intentional infliction of emotional distress under New York law, a plaintiff must allege: "(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress." Howell v. N.Y. Post Co., 81 N.Y.2d 115, 121 (1993). "In practice, courts [tend] to focus on the outrageousness element, [which is the element] most susceptible to determination as a matter of law." Id. "The

requirements of the rule are rigorous, and difficult to satisfy." Id. at 122 (internal quotation marks omitted). "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Id. (internal quotation marks omitted).

Likewise, a plaintiff alleging negligent infliction of emotional distress must plead "conduct that was so outrageous and extreme as to support a claim for emotional distress." Acquista v. New York Life Ins. Co., 285 A.D.2d 73, 83 (1st Dep't 2001). In addition, "[i]n order to state a claim for negligent infliction of emotional distress, a plaintiff must allege that she was owed a duty, that the defendant breached that duty, and that the plaintiff suffered emotional injury as a result." Fisk v. Letterman, 424 F. Supp. 2d 670, 676 (S.D.N.Y. 2006) (quoting Green v. Leibowitz, 118 A.D.2d 756, 757 (2d Dep't 1986)). "In addition, the defendant's conduct must have unreasonably endangered the plaintiff's physical safety." Id.

Here, plaintiff's amended complaint provides only a summary description of defendants' conduct, and thus fails plausibly to allege that defendants acted outrageously.

Accordingly, plaintiff's claims for intentional and negligent infliction of emotional distress are dismissed. Plaintiff may replead these claims, but only if she can do so truthfully, understanding the difficulty of satisfying the rigorousness of the standards these claims require.

VII. Leave to Amend

Rule 15(a)(2) instructs that courts "should freely give leave" to amend a complaint "when justice so requires." Liberal application of Rule 15(a) is warranted with respect to pro se litigants who "should be afforded every reasonable opportunity to demonstrate that [they have] a valid claim." Matima v. Celli, 228 F.3d 68, 81 (2d Cir. 2000) (quoting Satchell v. Dilworth, 745 F.2d 781, 785 (2d Cir. 1984)). District courts "should not dismiss [pro se complaints] without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." Cuoco v. Moritsugu, 222 F.3d 99, 112 (2d Cir. 2000) (quoting Gomez v. USAA Fed. Sav. Bank, 171 F.3d 794, 795 (2d Cir. 1999)).

***10** However, leave to amend may "properly be denied for ... 'futility of amendment.' " Ruotolo v. City of New York, 514 F.3d 184, 191 (2d Cir. 2008) (quoting Foman v. Davis, 371 U.S. 178, 182 (1962)). This is true even when plaintiff is proceeding pro se. See Martin v. Dickson, 100 Fed.Appx. 14, 16 (2d Cir. 2004) (summary order).

Here, a liberal reading of the amended complaint indicates that valid Title VII, NYSHRL, Section 1983, First Amendment, Fourteenth Amendment, and intentional and negligent infliction of emotional distress claims may be stated.

However, granting plaintiff leave to amend the remainder of her claims would be futile. That is because, as explained above, plaintiff's claims under Sections 1981, 1982, 1985, and 1986, and for assault and battery, are legally deficient or barred by the statute of limitations, and amendment could not cure those defects.

Accordingly, plaintiff is granted leave to file a second amended complaint asserting **only claims for violations of Title VII, NYSHRL, Section 1983, the First and Fourteenth Amendments, and for intentional and negligent infliction of emotional distress**. [2]

Plaintiff is reminded that any factual allegation in the second amended complaint must be true to the best of her knowledge, information, and belief. See Fed. R. Civ. P. 11(b)(3). In the second amended complaint, plaintiff shall clearly set forth the facts that give rise to her claims, including the dates, times, and places of the alleged underlying acts.

To the greatest extent possible, plaintiff's second amended complaint must address the deficiencies identified in this Opinion and Order and must:

1. give the names and titles of all relevant persons and state their professional relationship to plaintiff (e.g., direct supervisor for a particular time period);

2. describe all relevant events, stating the facts that support plaintiff's case including what each defendant did or failed to do;

3. give the dates and times of each relevant event or, if not known, the approximate date and time of each relevant event;

4. give the location where each relevant event occurred;

5. describe how each defendant's acts or omissions violated plaintiff's rights and describe the injuries plaintiff suffered; and

***11** 6. state what relief plaintiff seeks from the Court, such as money damages, injunctive relief, or declaratory relief.

Essentially, the body of plaintiff's second amended complaint must tell the Court: who violated her federally protected rights; what facts show that her federally protected rights were violated; when such violation occurred; where such violation occurred; and why plaintiff is entitled to relief.

**The second amended complaint will completely replace, not supplement, the existing complaint. Therefore, plaintiff must include in the second amended complaint all information necessary for her claims.**

Finally, as mentioned in the Court's May 4, 2017, Order, the Court strongly encourages plaintiff to contact the NYLAG Legal Clinic for Pro Se Litigants for assistance (although not legal representation) in this case. (See Doc. #58).

## CONCLUSION

Defendants' motion to dismiss the amended complaint is GRANTED.

Plaintiff is granted leave to amend her claims for violations of Title VII, NYSHRL, Section 1983, the First and Fourteenth Amendments, and for intentional and negligent infliction of emotional distress. The remainder of plaintiff's claims may not be repleaded. In addition, DSS may not be named as a defendant in the second amended complaint.

**Plaintiff shall file her second amended complaint by no later than December 1, 2017. If plaintiff fails to comply with this Order, the case may be dismissed for failure to prosecute or failure to comply with a court order. Fed. R. Civ. P. 41(b).**

The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this Order would not be taken in good faith, and therefore in forma pauperis status is denied for the purpose of an appeal. See Coppedge v. United States, 369 U.S. 438, 444–45 (1962).

The Clerk is instructed to terminate the motion (Doc. #51) and terminate the Department of Social Services as a defendant.

SO ORDERED.

### All Citations

Not Reported in Fed. Supp., 2017 WL 4863205

## Footnotes

1 Because plaintiff is proceeding pro se, she will be provided with copies of all unpublished opinions cited in this decision. See Lebron v. Sanders, 557 F.3d 76, 79 (2d Cir. 2009).

2 The Court notes that plaintiff previously sought leave to file a second amended complaint, but by Order dated May 4, 2017, the Court denied that motion without prejudice. (Doc. #58). The Court's May 4, 2017, Order instructed plaintiff that "[i]f plaintiff still wishes to seek leave to file a second amended complaint, she shall make that application separate and apart and in addition to her opposition to defendants' motion," and "[a]ny such application must include, at a minimum, a copy of the proposed second amended complaint and a detailed explanation for why plaintiff believes amendment is necessary." (Doc. #58). Plaintiff did not move for leave to file a second amended complaint. Nevertheless, the Court concludes that because plaintiff is proceeding pro se and because it appears she may be able to state some valid claims—once properly pleaded—the Court now sua sponte grants plaintiff leave to file a second amended complaint despite her failure to move for permission to do so.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

1997 WL 599355
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Kenneth BROWN, Plaintiff,
v.
Andrew PETERS, Warden, Watertown Correctional Facility; Joseph Williams, Warden, Lincoln Work–Release Center; Francis J. Herman, Senior Parole Officer Interstate Bureau; T. Stanford, Senior Parole Officer; Deborah Stewart, Parole Officer; John Doe # 1, Parole Agent, Watertown Correctional Facility; John Doe # 2, Parole Agent, Lincoln Work Release Center; Susan Bishop, Director of Interstate Compact, South Carolina; Cecil Magee, Parole Officer, South Carolina; Frank Barton, Parole Officer, South Carolina; John McMahan, Parole Officer, South Carolina, Defendants.

No. Civ.A. 95CV1641RSPDS.
|
Sept. 22, 1997.

**Attorneys and Law Firms**

Kenneth Brown, State Court Institute–Greene, Waynesburg, PA, plaintiff, pro se.

Dennis C. Vacco, New York State Attorney General, The Capitol Albany, NY, for defendants Peters, Herman Stewart, Doe # 1, Doe # 2, and Williams, Jeffrey M. Dvorin, Assistant Attorney General, Carl N. Lundberg, Chief Legal Counsel, South Carolina Department of Probation, Columbia, SC, for defendants Bishop, Magee, Barton, McMahan, and Stanford, Carl N. Lundberg, of Counsel.

DECISION AND ORDER

POOLER, J.

***1** The above matter comes to me following a Report–Recommendation by Magistrate Judge Daniel Scanlon, Jr., duly filed on April 17, 1997. Following ten days from the service thereof, the Clerk has sent me the entire file, including any and all objections filed by the parties herein.

Plaintiff Kenneth Brown commenced this Section 1983 civil rights action on November 17, 1995. On February 12, 1996, Magistrate Judge Scanlon ordered Brown to submit an amended complaint alleging the specific acts committed by the individuals named as defendants which Brown claimed violated his constitutional rights. Brown filed an amended complaint on March 21, 1996. In his amended complaint, Brown alleged that defendants violated his rights under the Eighth and Fourteenth Amendments by failing to process properly his interstate compact paperwork, resulting in Brown being imprisoned pursuant to a parole hold when in fact he had never violated the conditions of his parole. For a more complete statement of Brown's claims, see his amended complaint. Dkt. No. 5.

On August 5, 1996, defendants Peters and Williams made a motion to dismiss for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6). Dkt. No. 13; Dkt. No. 14, at 2. On August 19, 1996, defendants Bishop, Magee, Barton, and McMahan made a motion to dismiss the complaint against them or, in the alternative, for summary judgment. Dkt. No. 20. On October 17, 1996, defendants Herman, Stewart, and Stanford made a motion to dismiss for failure to state a claim. Dkt. No 34. On April 17, 1996, Magistrate Judge Scanlon recommended that all defendants' motions to dismiss be granted and that the complaint be dismissed. Dkt. No. 50.

On June 9, 1997, Brown filed objections to the magistrate judge's report-recommendation, having been granted additional time in which to do so. Dkt. No. 52. In addition, Brown filed on June 9, 1997, a motion for leave to file a second amended complaint and a copy of his proposed amended complaint. Dkt. No. 53. I turn first to the last motion filed, Brown's motion for leave to amend his complaint a second time.

Brown seeks to file a second amended complaint "setting forth in detail the personal involvement of each defendant and how their acts of commission and omission served to deprive plaintiff of Constitutionally secured rights." Dkt. No. 53. The district court has discretion whether to grant leave to amend. *Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129, 131 (2d Cir.1993). In exercising that discretion, the court should freely grant leave to amend when justice so requires. Fed.R.Civ.P. 15(a). However, the court need not grant leave to amend where it appears that amendment would prove to be unproductive or futile. *Ruffolo,* 987 F.2d at 131.

Here, Brown moved to amend his complaint to add additional allegations against the named defendants. However, the additional allegations fail to cure the deficiency which

forms the basis of defendants' motion to dismiss—the absence of defendants' personal involvement in a constitutional deprivation. Section 1983 imposes liability upon an individual only when personal involvement of that individual subjects a person to deprivation of a federal right. *See* *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). A complaint is fatally defective if it fails to allege personal involvement sufficient to establish that a supervisor was "directly and personally responsible for the purported unlawful conduct." *Alfaro Motors, Inc. v. Ward,* 814 F.2d 883, 886 (2d Cir.1987).

***2** Brown's proposed amended complaint alleges in conclusory fashion that defendants acted "in a grossly negligent and concerted manner which breached their duties owed to Plaintiff and is the proximate cause of [the violation of plaintiff's constitutional rights]." Proposed Am. Compl., at 3. Brown continues in the same vein, stating that defendants owed duties to plaintiff to carry out their jobs in a professional manner and they failed to carry out those duties appropriately. The complaint states that defendants held specific responsibilities, such as checking for outstanding warrants, which if performed properly should have alerted them to a problem. However, nowhere does the complaint set forth allegations that these defendants either participated directly in any constitutional infraction or that they were even aware of such an infraction. The proposed amended complaint merely alleges that these defendants failed in performing their supervisory and ministerial functions. "These bare assertions do not state a claim under 42 U.S.C. § 1983." *Smiley v. Davis,* 1988 WL 78306, *2 (S.D.N.Y.).

This plaintiff previously has had the opportunity to amend his complaint for the same reason asserted here, to allege personal involvement on the part of defendants. Brown's first amended complaint failed to accomplish that task, and it appears that even if allowed to amend again Brown would be unable to make the requisite allegations with sufficient specificity to sustain his complaint. Consequently, I find that amendment would be futile, and I deny Brown's motion for leave to amend his complaint.

I turn now to the magistrate judge's report-recommendation and defendants' motions. The magistrate judge recommends that I grant defendants' motions and dismiss the complaint as to all defendants. The report-recommendation clearly describes the grounds on which the magistrate judge recommends dismissal as to each defendant. Fed.R.Civ.P. 72(b) requires the district judge to make a *de novo* determination on "any portion of the magistrate's disposition to which specific, written objection has been made." Brown's objections fail to address directly any of the analysis. Brown's objections state (1) that he has been deprived of his constitutional rights; (2) that he has stated a cause of action; (3) that the court wrongly refused to appoint an attorney for him and wrongly stayed discovery pending the outcome of these motions; (4) that he seeks to file an amended complaint; (5) the standard of review for a Fed.R.Civ.P. 12(b)(6) motion; (6) that he disagrees with the magistrate judge's recommendation to grant defendants' motions because the allegations in his complaint, which he repeats, show that his rights were violated; and (7) the text of the Fourteenth and Eighth Amendments.

Even affording the objections the liberal reading required for *pro se* pleadings, I find that these objections fail to state any basis whatsoever, much less a specific one, for the court not to adopt the magistrate judge's rulings. They simply re-state the relief sought and the facts on which Brown grounds his complaint and conclude that the magistrate judge's conclusions are wrong. When the parties make only frivolous, conclusive, or general objections, the court reviews the report-recommendation for clear error. *See* *Camardo v. General Motors Hourly–Rate Employees Pension Plan,* 806 F.Supp. 380, 382 (W.D.N.Y.1992) (court need not consider objections which are frivolous, conclusive, or general and constitute a rehashing of the same arguments and positions taken in original pleadings); *Chambrier v. Leonardo,* 1991 WL 44838, *1 (S.D.N.Y.) (restatement of allegations already before the court and assertion that valid constitutional claim exists insufficient to form specific objections); *Schoolfield v. Dep't of Correction,* 1994 WL 119740, *2 (S.D.N.Y.) (objections stating that magistrate judge's decisions are wrong and unjust, and restating relief sought and facts upon which complaint grounded, are conclusory and do not form specific basis for not adopting report-recommendation); *Vargas v. Keane,* 1994 WL 693885, *1 (S.D.N.Y.) (general objection that report does not address violation of petitioner's constitutional rights is a general plea that report not be adopted and cannot be treated as objection within the meaning of 28 U.S.C. § 636), *aff'd,* 86 F.3d 1273 (2d Cir.), *cert. denied,* 519 U.S. 895, 117 S.Ct. 240, 136 L.Ed.2d 169 (U.S.1996). *See also* *Scipio v. Keane,* 1997 WL 375601, *1 (1997) (when objections fail to address analysis directly, court reviews report-recommendation for clear error); Fed.R.Civ.P. 72(b), Advisory Comm. Note (when no specific, written objections filed, "court need only satisfy itself that there is

no clear error on the face of the record in order to accept the recommendation”).

***3** Because Brown fails to make specific objections or provide any basis for his general objections, I review the report-recommendation for clear error. After careful review, I conclude that the magistrate judge's report-recommendation is well-reasoned and is not clearly erroneous.[1] The magistrate judge employed the proper standard, accurately recited the facts, and reasonably applied the law to those facts. Consequently, I adopt the report-recommendation.

CONCLUSION

Because plaintiff's proposed amendment demonstrates that amendment would be futile, I deny plaintiff's motion for leave to amend his complaint. I approve the magistrate judge's recommendation and grant defendants' motions to dismiss. Plaintiff's complaint is dismissed in its entirety.

IT IS SO ORDERED.

**ORDER and REPORT–RECOMMENDATION**

This matter was referred to the undersigned for report and recommendation by the Hon. Rosemary S. Pooler, United States District Judge, by Standing Order dated November 12, 1986. Currently before this Court are a number of motions. Defendants Peters and Williams have filed a motion to dismiss (dkt.13); defendants Bishop, Magee, Barton and McMahan have filed a motion for summary judgment, or in the alternative to dismiss (dkt.20); and defendants Herman, Stewart and Stanford also have filed a motion to dismiss (dkt.34). Plaintiff opposes these three motions (dkts.27, 29, 33, 38). Defendants Bishop, Magee and McMahan have filed a motion to stay discovery (dkt.41) and plaintiff has filed a motion to extend time (dkt.44) in which to file opposition to the latter motion for a stay of discovery.

The Court addresses these issues *seriatim.*

**BACKGROUND**

Plaintiff's amended complaint, which he has brought pursuant to 42 U.S.C. § 1983, alleges the following facts. In October, 1991, plaintiff was incarcerated in the Watertown Correctional Facility in Watertown, New York. He applied for an interstate compact because he wanted to return to South Carolina to live with his common law wife, Pamela Reid. During the application process, he was interviewed by the facility's parole officer, identified only as defendant John Doe # 1. After signing the necessary papers, his application was forwarded to defendant Andrew Peters, the facility's superintendent, who reviewed, signed and forwarded the papers to the Interstate Bureau. Amend. Compl. at ¶¶ 1–2; Exs. A, B.

On or about January 15, 1992, while his compact was waiting for review at the Interstate Bureau, plaintiff was approved for work release and sent to the Lincoln Work Release Center in New York City. While at the center, plaintiff spoke to a parole officer, defendant John Doe # 2, and told him that he was seeking a compact that would return him to South Carolina upon his conditional release. Plaintiff claims the parole officer told him that he would handle the necessary paperwork, although the officer had had no experience with an interstate compact. Amend. Compl. at ¶¶ 3, 4.

***4** Plaintiff, meanwhile, asked Reid whether any officials had contacted her in South Carolina regarding his prospective residence in that state. Upon discovering no one had contacted her, plaintiff asked a lawyer he knew, Navron Ponds, to inquire as to his compact status. In March, 1992, the lawyer spoke with defendant Susan Bishop, who is the director of the interstate compact program in South Carolina. Bishop allegedly told Ponds that plaintiff “was disapproved because there was a discrepancy about approving plaintiff['s] compact.” The “discrepancy” was the fact that plaintiff owed the state of South Carolina eighty-six days of confinement from a previous sentence. Plaintiff claims Bishop told Ponds to contact defendants Cecil Magee and Frank Barton, who worked for the South Carolina Parole Department. Sometime in March, 1992, Ponds made some calls to Barton and Magee. A verbal agreement was reached, and plaintiff, upon speaking with Barton and Magee was told that his compact had been approved. He also was told that he should report to the South Carolina Department of Parole upon being released. Amend. Compl. at ¶¶ 5–7.

Prior to leaving the Lincoln Work Release Center, plaintiff processed paperwork related to his interstate compact. His paperwork was sent by Doe # 2 to defendant Joseph Williams, the superintendent of the center. Williams reviewed, signed and returned the paperwork to plaintiff. On May 1, 1992,

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

upon his release from the center, plaintiff traveled to South Carolina. Three days later, he entered a South Carolina parole office and promptly was arrested because of the eighty-six days of confinement that he owed the state. Plaintiff's paperwork was given to defendant John McMahan, a parole officer. Plaintiff claims that McMahan never returned this paperwork to him. On May 20, 1992, the state of South Carolina revoked plaintiff's parole and plaintiff was returned to prison to serve the eighty-six days that he owed. When he asked McMahan what would happen to his one year of parole from New York, the officer allegedly told him that his New York parole would run concurrently with his South Carolina parole, and that when he finished his South Carolina parole, he would not owe any parole whatsoever. Plaintiff served the eighty-six days he owed and was released on July 31, 1992. Amend. Compl. at ¶¶ 8–10.

In February, 1993, plaintiff was arrested on robbery charges in South Carolina. The charges ultimately were dropped, but he apparently encountered some difficulties regarding this arrest as a result of a parole hold that New York state had placed upon him. Bishop's office told him that it had nothing to do with his parole hold and that any problem that he had was between him and the state of New York. He talked to authorities in Albany, New York regarding the parole hold, but was not successful in his efforts to have the hold removed. On September 30, 1993, after had been extradited to New York as a fugitive from justice, plaintiff was given a preliminary hearing at Riker's Island, New York. The hearing officer found no probable cause that plaintiff had violated any condition of parole. He was released. Amend. Compl. at ¶¶ 11–14; Exs. C–J.

***5** Plaintiff claims that he would not have suffered hardships if his interstate compact had been handled correctly. He alleges that defendant Deborah Stewart failed to follow up and see whether plaintiff had arrived in South Carolina. If she had, he argues, she would have discovered that he had been arrested upon his arrival. He alleges that defendant Francis Herman, a parole officer at the Interstate Bureau failed to do his job by not investigating plaintiff's violation reports. Amend. Compl. at ¶¶ 15–17; Exs. F–I.

Plaintiff asserts that the foregoing amounts violations of his Eighth and Fourteenth Amendment rights, wherefore he both compensatory and declaratory relief.

## DISCUSSION

A. Motion to Dismiss by Williams and Peters.

Williams and Peters have filed a motion to dismiss plaintiff's complaint pursuant to FED.R.CIV.P. 12(b)(6) on the grounds that it fails to state a claim upon which relief may be granted. In a Rule 12(b)(6) motion, all factual allegations in the complaint must be taken and construed in plaintiff's favor. *See* *LaBounty v. Adler,* 933 F.2d 121, 122 (2d Cir.1991) (citing *Ortiz v. Cornette,* 867 F.2d 146, 149 (1989)). The Court's role is not to assess whether plaintiffs have raised questions of fact or demonstrated an entitlement to a judgment as a matter of law, as in a motion made pursuant to FED.R.CIV.P. 56 for summary judgment, but rather to determine whether plaintiff's complaint sufficiently alleges all of the necessary legal elements to state a claim under the law. *See* *Christopher v. Laidlaw Transit, Inc.* 899 F.Supp. 1224, 1226 (S.D.N.Y.1995), (citing *Ricciuti v. New York City Transit Authority,* 941 F.2d 119, 124 (2d Cir.1991)). Factual allegations in brief or memoranda may not be considered. *Fonte v. Board of Managers of Continental Towers Condominium,* 848 F.2d 24, 25 (2d Cir.1988). The Court now turns to the issues presented.

Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994). As superintendents at New York State Correctional facilities, Williams and Peter may be found personally involved in the alleged deprivation of plaintiff's constitutionally protected rights by a showing that they: (1) directly participated in the infraction; (2) knew of the infraction, but failed to remedy the wrong; (3) created or continued a policy or custom under which unconstitutional practices occurred; or (4) were grossly negligent in managing subordinates who caused unlawful conditions or events. *Id.,* (quoting *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986)). Supervisory liability also may be imposed against Williams or Peters with a showing of gross negligence or deliberate indifference to plaintiff's constitutional rights. *Id.* Absent some personal involvement by Williams or Peters in the allegedly constitutionally infirm conduct of their subordinates, neither can be held liable under § 1983. *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987).

***6** Plaintiff has not provided any evidence linking either Williams or Peters to his alleged constitutional deprivations. All that plaintiff has alleged is that Williams and Peters, as superintendents, have reviewed and signed paperwork

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

relating to plaintiff's compact. Though it has long been held that *pro se* complaints are held to "less stringent standards than formal pleadings drafted by lawyers" for the purpose of a motion to dismiss under Rule 12(b)(6), *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 595–96, 30 L.Ed.2d 652 (1972), plaintiff has not explained how the ministerial conduct of these two defendants was violative of the Constitution. Their motion to dimiss should be granted.

B. Motion for Summary Judgment or to Dismiss by Bishop, Magee, Barton and McMahan.

Bishop, Magee, Barton and McMahan have filed a motion for summary judgment, or in the alternative a motion to dismiss. The Court will treat their motion as a motion to dismiss. "[C]omplaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning." *Barr v. Adams,* 810 F.2d 358, 363 (2d Cir.1987). Plaintiff has not alleged specifically how the conduct of these four defendants infringed upon his constitutional rights. In his amended complaint, he contends that defendants violated the Constitution by "continuously breaching [[[their] duty" to him. This language underscores the defect with the complaint: if it alleges anything at all, it alleges that defendants were negligent in handling plaintiff's interstate compact and parole. To state a cognizable § 1983 claim, the prisoner must allege actions or omissions sufficient to demonstrate deliberate indifference; mere negligence will not suffice. *Hayes v. New York City Dept. of Corrections,* 84 F.3d 614, 620 (2d Cir.1996); *Morales v. New York State Dep't of Corrections,* 842 F.2d 27, 30 (2d Cir.1988) (section 1983 does not encompass a cause of action sounding in negligence).

The Court finds that the claims against Bishop, Magee, Barton and McMahan should be dismissed.

C. Motion to Dismiss by Herman, Stewart and Stanford.

Plaintiff's claim against Stewart is that she failed to follow up and see whether plaintiff had arrived in South Carolina. Herman, he likewise asserts, failed to do his job because he did not investigate plaintiff's violation reports. Plaintiff has not alleged how these actions run afoul of the Constitution; and again, these claims seem to be grounded in negligence, which is not actionable under § 1983. *Hayes,* 84 F.3d at 620.

Plaintiff's claim against Stanford must fail because his complaint literally fails to state a claim against that defendant. Aside from naming Stanford as a defendant, and alleging that he was the appointed Senior Parole Officer at plaintiff's September 30, 1993 revocation hearing at Riker's Island, plaintiff does not detail how Stanford violated his constitutional rights. Absent some personal involvement by Stanford in the allegedly constitutionally infirm conduct of his subordinates, he cannot be held liable under § 1983. *Gill,* 824 F.2d at 196.

***7** Accordingly, the Court finds that Stanford, Stewart and Herman's motion to dismiss should be granted.

D. Plaintiff's "John Doe" Claims.

In so far as neither John Doe # 1 nor John Doe # 2 have been identified and served in this matter, the Court does not have jurisdiction over these parties and does not reach the merits of plaintiff's claims against them.

E. Discovery Motions.

Defendants Bishop, Magee and McMahan have filed a motion to stay discovery until the Court has made a ruling on their motion to dismiss. Plaintiff has filed a motion to extend the time in which he may file opposition to defendants' motion. Plaintiff, however, has filed his opposing response (dkt.47), therefore his instant discovery motion is denied as moot. In that the Court recommends granting defendants' motion to dismiss, discovery in this matter would be fruitless. Accordingly, defendants' motion for a stay of discovery pending the resolution of their motion to dismiss is granted.

## CONCLUSION

WHEREFORE, based upon the foregoing analysis, it is hereby

ORDERED, that plaintiff's motion to extend the time to file an opposing reply (dkt.44) is denied as moot; and it is further

ORDERED, that defendants Bishop, Magee and McMahan's motion to stay discovery until their motion to dismiss is decided (dkt.41) is granted; and it is further

RECOMMENDED, that defendants Peters and Williams' motion to dismiss (dkt.13) be granted; and it is further

RECOMMENDED, that defendants Bishop, Magee, Barton and McMahan's motion to dismiss (dkt.20) be granted; and it is further

RECOMMENDED, that defendants Herman, Stewart and Stanford's motion to dismiss (dkt.34) be granted.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); FED.R.CIV.P. 6(a), 6(e) and 72.

**All Citations**

Not Reported in F.Supp., 1997 WL 599355

## Footnotes

1 I note, however, that the report-recommendation would survive even *de novo* review.

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2007 WL 607341
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Paul CIPRIANI, Plaintiff,
v.
Harry C. BUFFARDI, Sheriff; Schenectady County Jail; Cheryl Clark, M.D.; Kevin J. O'Connor, Defendants.

No. 9:06-CV-0889(LEK/DRH).
|
Feb. 20, 2007.

**Attorneys and Law Firms**

Paul Cipriani, Plaintiff, pro se.

***DECISION and ORDER***

LAWRENCE E. KAHN, U.S. District Judge.

***1** Presently before the Court is an amended complaint filed by Plaintiff Paul Cipriani ("Plaintiff"). Amended Compl. (Dkt. No. 10). This amended complaint was submitted in compliance with the Memorandum-Decision and Order issued by this Court on November 27, 2006 ("November Order"). Mem.-Decision and Order (Dkt. No. 7).

In its November Order, the Court advised plaintiff that he must set forth facts demonstrating that Defendants were personally involved in a violation of Plaintiff's rights. *Id.* at 4. Plaintiff was also advised that in order to establish the liability of a municipality, he must allege a custom or policy which is the moving force behind the violation. *Id.*

In his amended complaint, Plaintiff names thirteen defendants and asserts numerous claims against them arising from his confinement at Schenectady County Jail. Amended Compl. (Dkt. No. 10).

The Court notes that plaintiff has not named "Schenectady County Jail," "Cheryl Clark," or "Kevin J. O'Connor" in his amended Complaint. Therefore, "Schenectady County Jail," "Cheryl Clark," and "Kevin J. O'Connor" are hereby dismissed as defendants in this action.

The Court also notes that Plaintiff's amended Complaint mentions "Mr. Booth" and "Mr. Purdy" only in the caption, and fails to allege any act or omission by these individuals. Dismissal is appropriate where a defendant is listed in the caption, but the body of the complaint fails to indicate what the defendant did to the plaintiff. *Gonzalez v. City of New York,* No. 97 CIV. 2246(MGC), 1998 WL 382055, at *2 (S.D.N.Y. July 9, 1998) (citing *Crown v. Wagenstein,* No. 96 CIV. 3895(MGC), 1998 WL 118169, at *1 (S.D.N.Y.Mar.16, 1998) (mere inclusion of warden's name in complaint insufficient to allege personal involvement) and *Taylor v. City of New York,* 953 F.Supp. 95, 99 (S.D.N.Y.1997)). Because plaintiff has failed to allege any personal involvement on the part of defendants "Mr. Booth" and "Mr. Purdy", they are hereby dismissed as defendants in this action.

In his amended Complaint, Plaintiff alleges that the remaining Defendants committed various violations of his constitutional rights, including inadequate medical care, breach of doctor-patient confidentiality, excessive force, denial of due process in a disciplinary proceeding, and interference with the grievance process. Amended Compl. (Dkt. No. 10).

Based on the foregoing, Plaintiff's amended complaint as against the remaining Defendants is accepted for filing.

Plaintiff is advised, however, that the U.S. Marshals cannot effect service on a "John Doe" defendant. In the event that plaintiff wishes to pursue this claim against the "John Doe" defendants named in the amended Complaint, he must take reasonable steps to ascertain their identities. Plaintiff may then file a Motion to amend his complaint and seek leave of the Court to add such individuals, by name, as defendants to this lawsuit. Plaintiff is further advised that if these individuals are not timely served, the action will be against them will be dismissed.

***2** WHEREFORE, it is hereby

**ORDERED,** that "Mr. Booth," "Mr. Purdy," "Schenectady County Jail," "Cheryl Clark," and "Kevin J. O'Connor" are **DISMISSED** as defendants in this action, and it is further

**ORDERED,** that the Clerk revise the docket to add "Schenectady County," "Mr. Burns," "Mr. Jones," "Mr. Adams," "Ms. Jones," "Ms. Hull," "John Doe # 1," "John Doe # 7," "John Doe # 10," and "Loraine Walker" as defendants in this action, and it is further

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

**ORDERED,** that the Clerk issue summonses naming the remaining defendants and forward them, along with copies of the amended Complaint (Dkt. No. 10), to the United States Marshal for service upon the defendants, together with a copy of this Order. [1] The Clerk shall also forward a copy of the summons and amended Complaint by mail to the County Attorney for Schenectady County, together with a copy of this Order, and it is further

**ORDERED,** that a formal response to Plaintiff's amended Complaint be filed by Defendants or their counsel as provided for in Rule 12 of *the Federal Rules of Civil Procedure* subsequent to service of process on Defendants, and it is further

**ORDERED,** that Plaintiff take reasonable steps to ascertain the identities of any other individual(s) that purportedly violated Plaintiff's civil and/or constitutional rights and, if appropriate, file a Motion to amend his complaint and add such individuals, by name, as defendants to this lawsuit, and it is further

**ORDERED,** that all pleadings, motions and other documents relating to this action must bear the case number assigned to this action and be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New York 13261-7367. ***Any paper sent by a party to the Court or the Clerk must be accompanied by a certificate showing that a true and correct copy of it was mailed to all opposing parties or their counsel. Any document received by the Clerk or the Court which does not include a proper certificate of service will be returned, without processing.*** Plaintiff must comply with requests by the Clerk's Office for any documents that are necessary to maintain this action. All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions, which must be returnable before the assigned Magistrate Judge with proper allowance for notice as required by the Rules. ***Plaintiff is also required to promptly notify the Clerk's Office and all parties or their counsel of any change in his address; his failure to do so will result in the dismissal of this action.*** All motions will be decided on submitted papers without oral argument unless otherwise ordered by the Court; and it is further

**ORDERED,** that the Clerk serve a copy of this Order on plaintiff by regular mail.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 607341

## Footnotes

1 Plaintiff was granted leave to proceed with this action *in forma pauperis.* Mem.-Decision and Order (Dkt. No. 7).

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 12690120
Only the Westlaw citation is currently available.
United States District Court, M.D. Florida,
Orlando Division.

Michael CORIAM and Ann Coriam, Plaintiffs,
v.
MAGICAL CRUISE COMPANY, LIMITED, Defendant.

Case No: 6:14–cv–398–Orl–22DAB
|
Signed 11/21/2014
|
Filed 11/24/2014

**Attorneys and Law Firms**

James M. Walker, Walker & O'Neill, PA, Jonathan B. Aronson, Aronson Law Firm, Miami, FL, for Plaintiffs.

Elizabeth Anne Martin, Jerry Dean Hamilton, Hector V. Ramirez, Hamilton, Miller & Birthisel, LLP, Miami, FL, for Defendant.

## ORDER

ANNE C. CONWAY, United States District Judge

***1** This matter comes before the Court on Magical Cruise Company, Ltd. ("MCC")'s Motion to Dismiss (Doc. No. 28), filed on September 11, 2014; Plaintiffs Michael and Ann Coriam's ("Plaintiffs") Response in Opposition (Doc. No. 29), filed on September 25, 2014; and MCC's Reply (Doc. 32), filed on October 16, 2014. Upon consideration, the Court holds that MCC's Motion to Dismiss is granted in part and denied in part.

### I. BACKGROUND

Plaintiffs bring this maritime and admiralty suit as individuals and as representatives of the estate of Rebecca Coriam ("Rebecca"). (Doc. No. 27 ¶ 9). According to the allegations of the Amended Complaint, which are accepted in pertinent part as true for purposes of resolving the instant motions, Rebecca was a seaman employed on M/V Disney Wonder. (*Id.* ¶ 5). M/V Disney Wonder is owned and operated by MCC. (*Id.* ¶ 4). On or about March 22, 2011, at 9:00 a.m. Pacific Standard Time, Rebecca was discovered to be missing from her place of work onboard M/V Disney Wonder. (*Id.* ¶ 12). Around 10:30 a.m. MCC began searching for Rebecca, and about an hour after searching for Rebecca, MCC's ship security officer was notified of Rebecca's disappearance. (*Id.* ¶¶ 13–14). On or about 11:50 a.m., MCC announced in the crew areas that Rebecca was missing. (*Id.* ¶ 15). When MCC reviewed its closed circuit video, it noticed that around 5:45a.m. Rebecca was speaking with another crew member on the telephone and she appeared to be in a state of duress and turmoil. (*Id.* ¶ 16).

Around 12:10 p.m. MCC notified its shore-side office that Rebecca was missing, and at 12:45 p.m. it also made a public announcement to the entire ship. (*Id.* ¶¶ 17–18). MCC did not contact United States Coast Guard or the Mexican Navy base in Cabo San Lucas, until about 1:20 p.m. and 1:50 p.m., respectively. (*Id.* ¶¶ 19–20). MCC reported the incident to the Bahamas Maritime Authority on or about 2:55 p.m., and to the Federal Bureau of Investigation ("FBI") on or about 4:00 p.m. (*Id.*¶¶ 21–22). Finally, around 10:45 p.m. (UK time), MCC contacted the Plaintiffs and notified them that their daughter (Rebecca) was missing. (*Id.* ¶ 23).

Plaintiffs allege that upon finally realizing that Rebecca was missing, MCC refused and failed to promptly turn the vessel around and search in the location where she likely went overboard. (*Id.* ¶ 34). They further allege that MCC violated every emergency protocol and man overboard rule and regulation in the maritime industry by continuing to sail on. (*Id.*). MCC also negligently and/or intentionally provided false and misleading information to U.S. and Mexican maritime authorities, further compounding the effects of its negligence. (*Id.*)

Plaintiffs assert that although MCC was on notice of many incidents of people disappearing from cruise ships, it refused to install surveillance cameras, closed circuit television cameras, and infrared systems to safely deal with this danger and to provide reasonable protection to its crew and guests. (*Id.* ¶ 30). As result of MCC's negligence and malfeasance, Plaintiffs allege that Rebecca went overboard, was not rescued, suffered and eventually died at sea. (*Id.* ¶ 35).

***2** Plaintiffs are bringing the following claims against MCC: Jones Act negligence (Count I), unseaworthiness (Count II), Death on the High Seas Act (Count III), fraudulent misrepresentation (Count IV), intentional infliction of emotional distress (Count V), and spoliation of evidence (Count VI).

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

## II. STANDARD

For purposes of deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the Court accepts as true the factual allegations in the complaint and draws all reasonable inferences in the light most favorable to the plaintiff. *Randall v. Scott*, 610 F.3d 701, 705 (11th Cir. 2010). "Generally, under the Federal Rules of Civil Procedure, a complaint need only contain 'a short and plain statement of the claim showing that the pleader is entitled to relief.' " *Id.* (quoting Fed. R. Civ. P. 8(a)(2)). However, the plaintiff's complaint must provide "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009) (citing *Twombly*, 550 U.S. at 556). Thus, the Court is not required to accept as true a legal conclusion merely because it is labeled a "factual allegation" in the complaint; it must also meet the threshold inquiry of facial plausibility. *Id.*

## III. ANALYSIS

### A. Jones Act Negligence

The Jones Act creates a federal negligence action for injured seamen. *Skye v. Maersk Line Corp.*, 751 F.3d 1262, 1264 (11th Cir. **2014**); *Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331, 335 (5th Cir.1997). Specifically, the act provides that [a]ny seaman who shall suffer personal injury in the course of his employment may ... maintain an action for damages at law." 46 U.S.C. § 30104. To state a Jones Act negligence claim against an employer, a seaman must allege a personal injury in the course of her employment, which resulted in whole or in part from negligence by her employer or an officer, agent, or employee of her employer. *See Gautreaux*, 107 F.3d at 335; *Skye*, 751 F.3d at 1262. An employer has the duty to act with reasonable care and to maintain a reasonably safe work environment for a seaman. *Ober v. Penrod Drilling Co.*, 726 F.2d 1035, 1037 (5th Cir. 1984); *Dempsey v. Mac Towing, Inc.*, 876 F.2d 1538, 1542 (11th Cir. 1989). An employer will bear responsibility if its negligence played even the slightest part in producing a seaman's injury. *Id.*; *Chisholm v. Sabine Towing & Transp. Co., Inc.*, 679 F.2d 60 (5th Cir.1982).

Plaintiffs' claim for negligence is predicated upon a laundry list of duties allegedly owed by MCC. (Doc. 27 ¶ 49(a)–(tt)). MCC argues that it does not owe Rebecca several of the duties alleged by Plaintiffs, therefore those allegations should be dismissed with prejudice. (Doc. No 28 at 3–8).

Although MCC argues that Plaintiffs' claim is grounded on nonexistent legal duties, at least one of the duties alleged by Plaintiffs supports a plausible claim for negligence against MCC. Plaintiffs assert that MCC was negligent in failing to initiate a prompt search and rescue once it realized Rebecca was missing (Doc. No. ¶¶ 49(jj)). It is indisputable that a shipowner has a duty to rescue a seaman and to "effect a search of the area traversed by the ship so long as it is reasonably possible that the seaman remains alive in the water." *See Reyes v. Vantage S.S. Co.*, 609 F.2d 140, 142 (5th Cir. 1980); [1] *Cortes v. Baltimore Insular Lines*, 287 U.S. 367, 377 (1932), *overruled on other grounds*, *Miles v. Apex Marine Corp.*, 498 U.S. 19, 33 (1990). The precise boundaries of MCC's duty to search for and rescue Rebecca depends on the resolution of questions of fact that need not and cannot be answered at this stage.

***3** Plaintiffs alleged that MCC breached its duty to search for and rescue Rebecca because upon finally realizing that she was missing, MCC refused and failed to promptly turn the vessel around and search in the location where she likely went overboard. [2] (Doc. No. ¶¶ 34). Further, MCC did not promptly alert security and U.S. and Mexican authorities that Rebecca was missing. (*Id.*). As a result of MCC's negligence, Plaintiffs allege that when Rebecca went overboard, she suffered and eventually died. (*Id.* ¶ 35). Taken in the light most favorable to Plaintiffs, these allegations are sufficient to raise a right to relief and indicate the presence of the required elements for a negligence claim under the Jones Act.

Because Plaintiffs have sufficiently plead facts to support at least one of their theories of liability, it is unnecessary to determine if the other theories survive at this stage of the litigation. *Caldwell v. Carnival Corp.*, 944 F. Supp. 2d 1219, 1224 (S.D. Fla. 2013) (Even though "certain of the alleged breaches of Carnival's duty of reasonable care may not adequately state a negligence claim, the Court will not strike the alleged breaches in line-item fashion as Carnival requests.") (citing *McLaren v. Celebrity **Cruises**, Inc.*, No. 11–23924–CIV, 2012 **WL** 1792632, at *5 (S.D. Fla. May 16, 2012). Furthermore, judicial economy will be best served by waiting to see if Plaintiffs decide to proceed with the litany of theories advanced in their Amended Complaint, or if they decide to proceed only on a select few, after discovery is

conducted. For the reasons stated above, the Court will deny MCC's Motion to Dismiss to Count I. [3]

**B. Unseaworthiness**

Unseaworthiness is a claim based on an employer's duty to ensure that its vessel is reasonably fit to be at sea. *Lewis v. Lewis & Clark Marine*, Inc., 531 U.S. 438, 441 (2001) (citation omitted). To state a claim for unseaworthiness, a seaman must show that the unseaworthy condition of the vessel was the proximate cause of his injury. *McClow v. Warrior & Gulf Navigation Co.*, 842 F.2d 1250, 1251 (11th Cir. 1988).

MCC contends that the Death on the High Seas Act ("DOHSA") precludes Plaintiffs' unseaworthiness claim. (Doc. 28 at 9). The Court disagrees. DOHSA does not preclude a claim for unseaworthiness. *See* James E. Rooks, Jr., *Recovery for Wrongful Death* § 1:8 (4th ed. **2014**). A claim for wrongful death resulting from unseaworthiness on the high seas may be brought under DOHSA. *Bodden v. Am. Offshore, Inc.*, 681 F.2d 319, 333 (5th Cir. 1982); *Miller v. Am. President Lines, Ltd.*, 989 F.2d 1450, 1455 (6th Cir. 1993) ("The Death on the High Seas Act provide[s] wrongful death actions in unseaworthiness and negligence to anyone killed more than three miles from shore."); *see also* Thomas M. DiBiagio, *Fostering Uniform Substantive Law and Recovery—the Demise of Punitive Damages in Admiralty and Maritime Personal Injury and Death Claims,* 25 U. BALT. L. REV. 1, 18 (1995) (explaining the causes of actions that may be brought under DOHSA). The Court finds that Plaintiffs have sufficiently stated a claim for unseaworthiness, and MCC does not contend that their complaint is otherwise deficient. Thus, the Court will deny MCC's motion to dismiss Count II. [4]

**C. Fraudulent Misrepresentation**

***4** To state a claim for fraudulent misrepresentation, a plaintiff must allege "(1) a false statement concerning a material fact; (2) the representor's knowledge that the representation is false; (3) an intention that the representation induce another to act on it; and (4) consequent injury by the party acting in reliance on the representation." *Johnson v. Davis*, 480 So.2d 625, 627 (Fla.1985). MCC argues that Plaintiffs' fraudulent misrepresentation claim should be dismissed because it is preempted by DOHSA and "seeks to supplement DOHSA's recovery scheme, which only allows recovery of pecuniary loss, with non-pecuniary damages." (Doc. No. 28 at 9–10). In support of its argument, MCC cites *Dooley v. Korean Air Lines Co., Ltd.*, 524 U.S. 116, 124 (1998) and two federal district court cases. (*Id.*) Neither *Dooley* nor the district court cases support MCC's argument that fraudulent representation claims are a preempted under DOHSA; rather, all three cases primarily reflect that state wrongful death statute remedies are preempted by DOHSA.

MCC has not provided the Court with any authority which supports the proposition that claims which are independent from a death occurring at sea, such as fraudulent misrepresentation, are preempted by DOHSA. At least one federal court has held a claim independent from death occurring at sea is not barred by DOHSA. *See Ostrowiecki v. Aggressor Fleet, Ltd.*, No. CIV. A. 07–6598, 2008 **WL** 3874609, at *6 (E.D. La. Aug. 15, 2008) (finding that emotional distress claims asserted by plaintiffs of the estate were not preempted by DOHSA). Although fraudulent misrepresentation is not a claim dealing with emotional distress, the Court finds *Ostrowieck* instructive. The causes of action barred by the Supreme Court in cases such as *Dooley* involve state law claims which "provide remedies for injuries flowing from the death itself", not claims that are independent from the decedent's death. *Ostrowiecki*, 2008 **WL** 3874609, at *6. Put simply, DOHSA does not prevent a plaintiff from recovering for injuries suffered as a result of independent, separable acts of a defendant, who may have also caused the death of the decedent. *Id.*

"Were this Court to accept [MCC's] argument, [a corporation] could engage in any manner of deplorable conduct without incurring legal liability, so long as their conduct arose out of or was somehow related to a death on the high seas. The Court does not interpret DOHSA to have such sweeping preemptive effect." *Id.* Plaintiffs' claim for fraudulent misrepresentation arises from conduct that is independent and separate from Rebecca's death. Thus, the Court finds that Plaintiffs' claim is not preempted by DOHSA. MCC's motion to dismiss Count IV will be denied. [5]

**D. Intentional Infliction of Emotional Distress**

To state a claim for Intentional Infliction of Emotional Distress ("IIED"), a plaintiff must allege that (1) the wrongdoer's conduct was intentional or reckless, that is, he intended his behavior and he knew or should have known that emotional distress would likely result; (2) the conduct was outrageous, that is, went beyond all bounds of decency, and is to be regarded as odious and utterly intolerable in a civilized

community; (3) the conduct caused emotional distress; and (4) the emotional distress was severe. *LeGrande v. Emmanuel,* 889 So.2d 991, 994 (Fla. 3d DCA 2004).

MCC contends that Plaintiffs' claim for intentional infliction of emotional distress is barred by DOHSA. (Doc. No. 28 at 10). MCC asserts that *Rux v. Republic of Sudan*, 495 F. Supp. 2d 541 (E.D. Va. 2007) and *Howard v. Crystal Cruises, Inc.*, No. 91–642, 1992 WL 194659 (E.D. Cal. Mar. 13, 1992) forecloses any potential separate claim for Plaintiffs' own emotional distress. (*Id.*). However, *Rux* and *Howard* are distinguishable from the case at hand. The plaintiffs in *Rux* and *Howard* were claiming emotional distress damages flowing from the defendants' actions which caused the deaths on the high seas. This issue in this instant case is more analogous to *Ostrowiecki*, 2008 WL 3874609 and *Smith v. Carnival Corp.,* 584 F. Supp. 2d 1343, 1353 (S.D. Fla. 2008).

***5** In *Ostrowiecki* and *Smith*, plaintiffs brought emotional distress claims against defendant cruise lines for the death of their relative/spouse. *Ostrowiecki*, 2008 WL 3874609, at *1; *Smith,* 584 F. Supp. 2d at 1343. Both courts determined that plaintiffs' emotional distress claims were not preempted by DOHSA. *Ostrowiecki*, 2008 WL 3874609, at *6; *Smith,* 584 F. Supp. 2d at 1353. The courts found that plaintiffs' emotional distress claims were not preempted by DOHSA because the plaintiffs were not seeking recovery for the decedent's death, but for the emotional distress that resulted from a separate and independent injury to the plaintiffs. *Id.* Here, Plaintiffs do not seek to recover for Rebecca's death on the high seas, but instead "for emotional injuries suffered as a result of independent, separable acts of" MCC. *Ostrowiecki*, 2008 WL 3874609, at *6. Specifically, their claim is based on events which occurred after Rebecca's demise: the purported cover-up of the circumstances surrounding her disappearance and death and the provision of false information to the Plaintiffs. Thus, the Court finds that Plaintiffs' IIED claim is not preempted by DOHSA.

MCC argues that even if Plaintiffs' claim is not preempted by DOHSA, their claim should be dismissed because they have failed to allege that MCC's conduct was intentional and because MCC's alleged conduct is not sufficiently "outrageous" to sustain a claim for IIED. First, in order to establish that a "defendant intended to inflict severe mental or emotional distress ... all that need be shown is that he intended his specific behavior and knew or should have known that the distress would follow." *Williams v. City of Minneola*, 575 So. 2d 683, 690 (Fla. 5th DCA 1991). Plaintiffs have alleged sufficient facts from which the Court can reasonably infer that MCC intended its conduct and knew or should have known that emotional distress stress could result from its behavior. (*See* Doc. No. 27 ¶ 36–45; 76)

Second, whether MCC's alleged conduct is sufficiently outrageous to support an IIED claim depends on whether that conduct was "so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Metro. Life Ins. Co. v. McCarson*, 467 So. 2d 277, 278–79 (Fla. 1985). While "the standard for outrageous conduct is particularly high in Florida," *Patterson v. Downtown Med. & Diagnostic Ctr., Inc.*, 866 F.Supp. 1379, 1383 (M.D.Fla.1994), Florida courts have nonetheless shown "a particular solicitude for the emotional vulnerability of survivors regarding improper behavior toward the dead body of a loved one." *Williams v. City of Minneola*, 575 So. 2d 683, 691 (Fla. 5th DCA 1991).

As the court stated in *Williams*, upon the loss of a loved one, "[t]he potential for severe emotional distress is enormously increased" because "the bereaved are already suffering psychic trauma." *Id.* at 691. Consequently, in this "unique" area, "behavior which in other circumstances might be merely insulting, frivolous, or careless becomes indecent, outrageous and intolerable." *Id*; *see also* Restatement (Second) of Torts § 46 cmt. f (1965)). In this instant case, where Plaintiffs' daughter Rebecca had allegedly fallen overboard, suffered, and died, it would be apparent that Plaintiffs would be extremely susceptible to emotional stress. Therefore, MCC's decision to provide false information and withhold certain information concerning Rebecca's death could have conceivably been outrageous enough to cause Plaintiffs severe emotional stress. The record must be further developed to determine whether MCC's actions amounted to the type of conduct regarded as atrocious and utterly intolerable in a civilized community. Since it cannot be said that Plaintiffs' complaint does not state a plausible claim for relief at this stage of the proceedings, the Court will not dismiss Count V.

### E. Spoliation of Evidence

"Spoliation encompasses two related but distinct concepts—an independent cause of action and evidentiary sanctions." *In re Elec. Mach. Enters., Inc.*, 416 B.R. 801, 872 (Bankr. M.D. Fla. 2009) *aff'd in part, In re Elec. Mach. Enters., Inc.,* 474 B.R. 778 (M.D. Fla. 2012). A federal law claim for spoliation of evidence does not exist. *Id.* (citation omitted). Florida law recognizes an independent cause of action for spoliation of evidence; however the action must be a third-party cause of

action brought against a non-party, rather than a first-party cause of action brought against a party to the underlying lawsuit. *See Martino v. Wal–Mart Stores, Inc.,* 908 So.2d 342, 346 n. 2 (Fla. 2005); *Jimenez v. Cmty. Asphalt Corp.,* 968 So.2d 668, 671 (Fla. 4th DCA 2007).

***6** Plaintiffs have pled a claim of spoliation of evidence against MCC, which is the underlying defendant in this maritime action. Plaintiffs cannot bring an independent cause of action for spoliation against MCC because it would constitute a first-party spoliation claim which the Florida Supreme Court has held is not an independent cause of action. *Martino, Inc.*, 908 So. 2d 342, 346–47. "[T]he issue of spoliation can be better resolved, if necessary, through the use of litigation sanctions, adverse inferences and other means within the Court's authority" in the underlying case. *James v. U.S. Airways, Inc.*, 375 F. Supp. 2d 1352, 1355 (M.D. Fla. 2005). Thus, to the extent that Plaintiffs are attempting to assert an independent claim for spoliation of evidence against MCC, their claim will be dismissed with prejudice.

## IV. CONCLUSION

1. Defendant **Magical Cruise** Company, Limited's Motion to Dismiss (Doc. No. 28) is **GRANTED IN PART** and **DENIED IN PART** as follows:

a. Insofar as Plaintiffs are attempting to assert an independent claim for spoliation of evidence the Motion to Dismiss is **GRANTED** as to Count VI. This Count is dismissed **WITH PREJUDICE**.

b. The motion is **DENIED** as to Counts I, II, III, IV, and V.

2. Defendant **Magical Cruise** Company, Limited shall file its Answer to Plaintiffs' Amended Complaint within **fourteen (14) days** of the date of this Order.

DONE and ORDERED in Orlando, Florida on November 21, **2014**.

### All Citations

Not Reported in Fed. Supp., 2014 WL 12690120

## Footnotes

1 In *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir.1981) (en banc), the Eleventh Circuit accepted as binding precedent all Fifth Circuit cases decided before October 1, 1981.

2 Plaintiffs alleged that Rebecca was in top physical condition as a fitness enthusiast and runner and had excellent swimming skills and cardiovascular endurance, and the weather and water conditions at the time of her disappearance were such that a person could survive in the water for a period of 12 to 14 hours.

3 To the extent that the same allegations from Count I are alleged in Plaintiffs' claim under Death on High Seas Act ("DOHSA") (Count III), MCC has also moved to dismiss the allegations in Count III. (Doc. No. 28 at 3 n. 1). Under DOHSA, "when the death of a person is caused by wrongful act, neglect, or default occurring on the high seas beyond three nautical miles from the shore of the United States, the personal representative of the decedent may bring a civil action in admiralty against the person or vessel responsible." 46 U.S.C. § 30302. Plaintiffs' DOHSA claim is also predicated on MCC's alleged negligent conduct. (Doc. 27 ¶¶ 58–61). As stated above, Plaintiff has sufficiently alleged facts which create a reasonable inference that in MCC was negligent in failing to initiate a prompt search and rescue. (Doc. No. 27 ¶¶ 60(jj), 58–61). Since Plaintiffs have sufficiently met the standards under *Iqbal* and *Twombly* by stating a claim to relief that is plausible on its face, the Court will also deny MCC's request to engage in line-item dismissal of allegations from Count III.

4 Although Plaintiffs' claim for unseaworthiness may be brought under DOHSA, damages are limited to pecuniary damages. 46 U.S.C. § 30303.

5 The Court also finds that Plaintiffs have otherwise pled sufficient allegations to state a claim for fraudulent misrepresentation, and MCC does not contend otherwise.

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

1998 WL 118169
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Lakim CROWN, Plaintiff,
v.
Warden WAGENSTEIN; Parker T. # 10639 of Emergency Response Unit, et al., Defendants.

No. 96 CIV. 3895(MGC).
|
March 16, 1998.

**Attorneys and Law Firms**

Lakim Crown, Brooklyn, for Plaintiff, Pro Se.

Paul A. Crotty, Esq., Corporation Counsel of the City of New York, Attorney for Defendants Wangenstein and Parker, New York, By Renee R. Nebens, Esq.

OPINION AND ORDER

CEDARBAUM, J.

***1** This is an action for damages brought by a pro se plaintiff pursuant to 42 U.S.C. § 1983. Defendant Wangenstein moves, pursuant to Fed.R.Civ.P. 12(b)(6), to dismiss the complaint for failure to state a claim upon which relief can be granted against him in either his personal or official capacity. For the reasons discussed below, defendant's motion is granted.

The complaint alleges that on November 28, 1995, while plaintiff was incarcerated at New York City's Otis Bantum Correctional Center ("OBCC"), plaintiff was assaulted by a number of correction officers. (Compl. at 3–4). As a result, plaintiff alleges that he sustained injuries to his head, neck, back, and right leg. (Compl. at 4). In addition to the officers involved in the assault, plaintiff sues Wangenstein, the warden of OBCC at the time of the alleged assault.

Discussion

A motion to dismiss for failure to state a claim must be granted if, when viewed in the light most favorable to the plaintiff and when all allegations of the complaint are accepted as true, it appears beyond doubt that the plaintiff can prove no set of facts in support of the claim which would entitle him to relief. *Bolt Electric, Inc. v. City of New York,* 53 F.3d 465, 469 (2d Cir.1995). In addition, a complaint and supporting papers prepared by a pro se plaintiff must be read liberally and interpreted to "raise the strongest arguments they suggest." *Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995).

When an individual defendant is sued under § 1983, that defendant's personal involvement in the alleged constitutional deprivation is a prerequisite to an award of damages. *See Wright v.. Smith,* 21 F.3d 496, 501 (2d Cir.1994). For a claim under § 1983, a complaint sufficiently alleges personal involvement of a supervisory official if it alleges one of the following: (a) direct participation in the alleged wrong; (b) failure to remedy a violation after receiving notice of it; (c) creation of a policy or custom under which unconstitutional practices occur; or (d) grossly negligent management of subordinates who cause the constitutional violation. *See Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996).

A § 1983 claim against a municipal official in his official capacity is treated as a claim against the municipality itself. *Brandon v. Holt,* 469 U.S. 464, 471–72, 105 S.Ct. 873, 83 L.Ed.2d 878 (1985). Section 1983 imposes liability on municipalities only when the action that is alleged to be unconstitutional implements or executes an official policy or custom. *See Monell v. Department of Social Services,* 436 U.S. 658, 690–91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

From the complaint, it is unclear whether Wangenstein is being sued in his personal or official capacity. However, pro se complaints, if possible, should be construed as asserting both claims. *Jackson v. Dinkins,* 1995 WL 657075 at *1 (S.D.N.Y. Nov.8, 1995)(citing *Frank v. Relin,* 1 F.3d 1317, 1326 (2d Cir.)("a plaintiff who has not clearly identified in her complaint the capacity in which the defendant is sued should not have the complaint automatically construed as focusing on one capacity to the exclusion of the other"), *cert. denied,* 510 U.S. 1012, 114 S.Ct. 604, 126 L.Ed.2d 569 (1993)).

***2** The complaint does allege an assault by certain members of the OBCC Emergency Response Unit. (Compl. at 3–4). It alleges that while the plaintiff was making a telephone call, members of the Emergency Response Unit entered housing area 1N and defendant Parker verbally harassed the plaintiff, and with the assistance of other members of the Emergency Response Unit, assaulted him. (Compl. at 3–4). However, the complaint does not allege the personal involvement of Warden Wangenstein. The complaint mentions Warden

Wangenstein only in the caption, and fails to allege any act or omission by Wangenstein. *See Taylor v. City of New York,* 953 F.Supp. 95, 99 (S.D.N.Y.1997)(Edelstein, J.)(finding mere inclusion of warden's name in a complaint insufficient to allege personal involvement).

As for Warden Wangenstein's liability in his official capacity, the complaint fails to allege a municipal policy or custom that defendant was executing, or that such a policy or custom caused the alleged violation of the plaintiff's constitutional rights, as required by *Monell.* The absence of any such allegation prevents a finding of liability for defendant Wangenstein in his official capacity. *See Monell,* 436 U.S. at 694.

Conclusion

Because the complaint fails to state a claim against Warden Wangenstein upon which relief can be granted, the motion to dismiss defendant Wangenstein is granted.

SO ORDERED

**All Citations**

Not Reported in F.Supp., 1998 WL 118169

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2025 WL 753949
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Jane DOE, Plaintiff,
v.
Joshua JACKSON, Deguene Keita, Fatoumata Keita a/k/a Naomi Keita, Jeoffrey Janvier, and Lowell Ulmer, Defendant.

23-cv-04910 (ALC)
|
Signed March 10, 2025

**Attorneys and Law Firms**

Mark Taylor, Derek Smith Law Group, PLLC, New York, NY, Seamus Barrett, Phillips & Associates, New York, NY, for Plaintiff.

John F. Lauro, Filzah Pavalon, John F. Lauro, P.A., Tampa, FL, for Defendant.

## OPINION AND ORDER

ANDREW L. CARTER, JR., United States District Judge:

***1** Plaintiff Jane Doe brings this action against Defendants Joshua Jackson, Deguene Keita, Fatoumata Keita a/k/a Naomi Keita, Jeoffrey Janvier, and Lowell Ulmer based on violations of the Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. §§ 1591, 1595, the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962, and various New York state laws. Plaintiff alleges that Defendant Jackson enticed her to come to his hotel room and then raped her. After Plaintiff left Defendant Jackson's room, the Defendants engaged in a pattern of racketeering activity against Plaintiff, including robbery, assault, battery, and harassment.

To date, Plaintiff has not served Defendants Deguene Keita, Naomi Keita, Janvier, and Ulmer. Defendant Jackson waived service and now moves to dismiss Plaintiff's Amended Complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). For the reasons outlined below, Defendant Jackson's motion to dismiss is GRANTED in part and DENIED in part.

## BACKGROUND

### I. Factual Background

On February 13, 2022, Plaintiff went with an acquaintance, Debbie Torres, to a Super Bowl afterparty that several NBA players, including Defendant Jackson, also attended. ECF No. 52 ("Am. Compl.") ¶ 22. Plaintiff was invited to the party by another NBA player in whom she had a romantic interest. *Id.* ¶ 24. During the afterparty, Plaintiff asked Defendant Jackson to call her phone because she had misplaced it. *Id.* ¶ 26.

After Plaintiff went home, she received text messages in the early morning of February 14, 2022 from Defendant Jackson telling Plaintiff "COME THROUGH" and "I GOT $1500 FOR YOU IF YOU PULL UP." *Id.* ¶¶ 30–31. Plaintiff was under the impression that there was still a party and that party attendees were gathered in Defendant Jackson's hotel room. *Id.* ¶ 32. After arriving at Defendant Jackson's hotel room, Plaintiff realized that there was no one else in the room and that Defendant Jackson was shirtless and wearing only a pair of basketball shorts. *Id.* ¶¶ 41–42. Plaintiff told Defendant Jackson that he should not expect sex. *Id.* ¶ 43. Defendant Jackson told Plaintiff that he used money to help him have sex with girls, to which Plaintiff responded that she would never do that. *Id.* ¶¶ 48–49. Plaintiff then laid on the bed with her back to Defendant Jackson and fell asleep. *Id.* ¶¶ 50–51.

Later, Plaintiff woke up to Defendant Jackson ripping her clothes off, climbing on top of her, and exposing his penis to her, to which she shouted, "NO!" *Id.* ¶¶ 53–55. Despite her efforts to push him away, Defendant Jackson overpowered her as he penetrated her vagina with his penis and raped her. *Id.* ¶ 57. Plaintiff fainted and woke up sometime around 8:00 a.m. *Id.* ¶¶ 59–60. When Plaintiff tried to leave the room, Defendant Jackson climbed back on top of Plaintiff and touched her breasts. *Id.* ¶ 61. Plaintiff broke free and started screaming at Defendant Jackson, who aggressively told Plaintiff to lower her voice or he would call security. *Id.* ¶¶ 62–68. As Plaintiff was getting ready to leave, she heard Defendant Jackson speaking on the phone with someone and saying, "SHE WILL NOT FUCKING LEAVE MY ROOM!" *Id.* ¶ 72.

***2** Plaintiff left the room and, by around 10:03 a.m., she had begun receiving texts from Defendant Janvier accusing her of stealing a watch from Defendant Jackson's room. *Id.* ¶ 76. Plaintiff alleges that one of the Defendants intimidated or threatened Torres—the acquaintance with whom Plaintiff

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

attended the Super Bowl party—into providing Plaintiff's address and apartment number. *Id.* ¶ 79. Plaintiff responded to the texts claiming that she did not know anything about the missing watch. *Id.* ¶ 83. Defendant Janvier continued texting Plaintiff repeatedly asking for the watch, threatening to take further action if she did not return it, and texting Plaintiff "JOSH [JACKSON] IS NOT GONNA LET THIS SHIT GO TRUST ME!" *Id.* ¶ 87.

By around 11:07 a.m., Plaintiff began allegedly receiving texts from other numbers, presumably from Defendants Ulmer, Degeune Keita, or Naomi Keita, who continued to threaten her and texted her address back to her. *Id.* ¶¶ 90–96. At around 2:00 p.m., Plaintiff woke up to Defendants Degeune Keita and Naomi Keita (one of whom appeared to hold a gun) breaking into her apartment through her front door. *Id.* ¶ 100–01. One of the intruders allegedly yelled out that Defendant Jackson had sent them and that they were there to collect "collateral." *Id.* ¶ 104. The intruders then grabbed Plaintiff's cell phone—preventing her from calling for help —and began rounding up Plaintiff's expensive handbags to steal them. *Id.* ¶¶ 105–06. Plaintiff screamed for help and the intruders pulled her into the hallway and elevator. *Id.* ¶¶ 108–10. The intruders then pulled Plaintiff into the lobby and two doormen tackled one of the intruders and pinned them to the floor. *Id.* ¶¶ 111–14. NYPD officers then arrived at the scene and arrested Defendants Degeune Keita and Naomi Keita. *Id.* ¶ 114.

### II. Procedural Background

On June 12, 2023, Plaintiff filed her Complaint. ECF No. 1. On October 12, 2023, Plaintiff requested additional time to serve Defendants and, on October 13, 2023, the Court granted Plaintiff a 90-day extension. ECF Nos. 35–36. On December 12, 2023, Defendant Jackson waived service. ECF No. 43. On December 18, 2023, Defendant Jackson filed a letter requesting a premotion conference and setting forth the bases for his anticipated motion to dismiss the Complaint. ECF No. 45. On December 28, 2023, Plaintiff responded to the letter. ECF No. 48. On January 18, 2024, the Court granted Defendant Jackson leave to file his motion to dismiss. ECF No. 49.

On March 1, 2024, after Defendant Jackson had filed his motion to dismiss, Plaintiff filed an Amended Complaint and its opposition to the motion to dismiss. ECF Nos. 50, 52–53. On March 5, 2024, Defendant Jackson filed another letter requesting a premotion conference and asked the Court whether he should reply to Plaintiff's opposition or seek a renewed motion to dismiss. On March 16, 2024, Defendant Jackson filed a letter requesting a premotion conference and setting forth the bases for his anticipated motion to dismiss the Amended Complaint. ECF No. 55. On March 21, 2024, the Court granted Defendant leave to file their motion to dismiss the Amended Complaint. ECF No. 58. On April 11, 2024, Defendant Jackson filed his motion. ECF No. 60. On May 9, 2024, Plaintiff filed her opposition. ECF No. 65. On May 28, 2024, Defendant Jackson filed his reply. ECF No. 66.

## STANDARD OF REVIEW

To survive a motion to dismiss, a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The pleading "need not include detailed factual allegations, but must contain sufficient factual matter ... to state a claim to relief that is plausible on its face." *Corona Realty Holding, LLC v. Town of N. Hempstead*, 382 F. App'x 70, 71 (2d Cir. 2010) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)) (internal quotations omitted). When considering a motion to dismiss, the Court accepts as true all factual allegations in the complaint and draws all reasonable inferences in the plaintiff's favor. *See Famous Horse Inc. v. 5th Ave. Photo Inc.*, 624 F.3d 106, 108 (2d Cir. 2010). However, the incantation of the elements of a cause of action, "supported by mere conclusory statements," is not enough to show plausibility. *Id.* at 72. Instead, "[f]actual allegations must be enough to raise the right of relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007).

## DISCUSSION

***3** Plaintiff alleges federal question jurisdiction because she has filed claims under the TVPA and RICO; she also alleges supplemental jurisdiction over her state law claims. Am. Compl. ¶ 7. The Court first considers Plaintiff's TVPA claim and finds that Plaintiff has plausibly stated a claim. The Court next weighs Plaintiff's state law claims and finds that Plaintiff has properly pleaded all but one claim. The Court then turns to Plaintiff's RICO claim and concludes that Plaintiff abandoned the claim, warranting dismissal.

### I. Plaintiff's TVPA Claim Survives

Plaintiff brings her first cause of action against Defendant Jackson under Section 1591 of the TVPA. The TVPA provides that:

Whoever knowingly—

> (1) in or affecting interstate or foreign commerce ... recruits, *entices*, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person; or
>
> (2) benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1)
>
> *knowing* ... that means of *force*, threats of *force, fraud*, coercion ..., or any combination of such means will be used to cause the person to engage in a *commercial sex act*, ... shall be punished ....

18 U.S.C. § 1591 (emphasis added). For her claim to survive, Plaintiff must show that Defendant Jackson (1) enticed Plaintiff and (2) by means of force and threats of force (3) caused Plaintiff to engage in a commercial sex act. *See Eckhart v. Fox News Network, LLC*, No. 20-CV-5593, 2021 WL 4124616, at *8–11 (S.D.N.Y. Sept. 9, 2021), *on reconsideration in part*, No. 20-CV-5593, 2022 WL 4579121 (S.D.N.Y. Sept. 29, 2022) (collecting cases).

The archetypical example of sex trafficking includes "prostitution, pornography, sex tourism, and other commercial sexual services." 22 U.S.C § 7101(b)(2); *see also Eckhart, 2021* WL 4124616, at *7 (collecting cases). However, the numerous allegations brought against film producer Harvey Weinstein in recent years have led courts to defer to the plain meaning of the TVPA: "[I]n light of the plain text of the statute, numerous courts in this Circuit —including this one—have also applied the TVPA to cases where a victim claims to have been forced or defrauded into sexual activity with the promise of career advancement." *Id.* (citing *David v. Weinstein Co. LLC*, 431 F. Supp. 3d 290, 299 (S.D.N.Y. 2019); *Geiss v. Weinstein Holdings LLC*, 383 F. Supp. 3d 156 (S.D.N.Y. 2019); *Noble v. Weinstein*, 335 F. Supp. 3d 504 (S.D.N.Y. 2018); *Canosa v. Ziff*, 18-CV-4115, 2019 WL 498865 (S.D.N.Y. Jan. 28, 2019) (collectively, "the Weinstein cases")).

Defendant Jackson seeks to differentiate the instant case from both the "archetypical" sex trafficking cases and the line of Weinstein cases in this district. Defendant Jackson centers on the commerciality prong under the TVPA, arguing that Plaintiff has not alleged that "anything of value" was exchanged "on account of" forced sex. ECF No. 61 ("Def. Br.") at 10. Defendant Jackson argues that even if he had raped Plaintiff—which he denies—Plaintiff has not alleged that the sex acts were premeditated and commercial in nature. *Id.* at 11.

In turn, Plaintiff argues that she was lured by Plaintiff with the false promises of $1,500 and an opportunity to network with athletes, emphasizing that courts have found a commercial sex act to have occurred even if the "benefit ... did not materialize." ECF No. 65 ("Pl. Opp.") at 4 (citing *Eckhart*, 2021 WL 4124616, at *9). Indeed, Plaintiff alleges that "Defendant [Jackson's] offer of time spent with a professional athlete was successful in enticing and maintaining Plaintiff in [Defendant Jackson's] hotel room for a short time." Am. Compl. ¶ 134.

***4** In his reply, Defendant Jackson continues to distinguish the facts from the Weinstein cases because here "the alleged promise was not for sex, but instead 'to make an appearance.' " ECF No. 66 ("Def. Reply") at 2. Defendant Jackson argues that Plaintiff conflates the enticement and commercial exchange prongs under the TVPA. But with all inferences drawn in Plaintiff's favor, and considering the TVPA case law in this circuit, Plaintiff has adequately alleged the three elements for a TVPA claim.

#### a. Defendant Jackson Enticed Plaintiff

"For the purposes of a Section 1591 claim, courts have interpreted the word 'entice' based on its ordinary meaning, which is to attract artfully or adroitly or by arousing hope or desire, and [to] attract or tempt by offering pleasure or advantage." *David*, 431 F. Supp. 3d at 300 (cleaned up) (citing *Noble*, 335 F. Supp. 3d at 517); *see also Ardolf v. Weber*, 332 F.R.D. 467, 474 (S.D.N.Y. 2019) ("[T]he use of the term 'entice' in the TVPA means that the perpetrator attracts the victim by offering something that arouses hope or desire.").

Defendant Jackson argues that Plaintiff has not satisfied this element because the promise was not conditioned on sex, but rather on Plaintiff making an appearance at Defendant Jackson's hotel room. Def. Reply at 2. He also argues that Plaintiff does not claim she was "tricked into having sex" by Defendant Jackson but rather that he raped her after she had fallen asleep. Def. Br. at 11. However, courts in this district

have allowed claims based on similar facts. In *Eckhart*, the court found that defendant "lure[d] [the plaintiff] back to his hotel room, [inviting] her to 'further discuss her career opportunities at his hotel.' " *Eckhart*, 2021 WL 4124616, at *8. Immediately after plaintiff arrived at the hotel room, the defendant raped the plaintiff. *See id.* at *3, *9. In *David*, the court found that plaintiff met with Harvey Weinstein on a few occasions on which he dangled the promise of future work, thereby arousing hope and desire in plaintiff. *David*, 431 F. Supp. 3d at 301. In the instant case, too, the Court finds that regardless of whether the promise was for money or an appearance in Defendant Jackson's hotel room, Plaintiff plausibly alleges that she was enticed by Defendant Jackson.

**b. Defendant Jackson Knew Means of Force or Fraud Would Be Used**

Plaintiff must also "plausibly allege knowledge, or a modus operandi, associated with [the] 'enticement,' that [Defendant Jackson] enticed Plaintiff with knowledge that means of force or fraud would be used to cause a commercial sex act to take place." *Noble*, 335 F. Supp. 3d at 517–18. "In other words, Plaintiff must allege that [Defendant Jackson] had an awareness or understanding that 'if things go as he has planned, force, fraud or coercion will be employed to cause his victim to engage in a commercial sex transaction.' " *David*, 431 F. Supp. 3d at 301 (quoting *United States v. Todd*, 627 F.3d 329, 334 (9th Cir. 2010)). Plaintiff must also allege that this knowledge existed "at the initial recruitment or enticement stage." *Noble*, 335 F. Supp. 3d at 518.

Plaintiff has plausibly alleged that Defendant Jackson knew that means of force or fraud would be used when he first attempted to entice her. Plaintiff states that "Defendant [Jackson] knew that the promise of time spending with him or the use of his influence and notoriety would entice Plaintiff into his hotel room and knew that once there he was in a position to force the sexual activity he desired." Am. Compl. ¶ 134. Moreover, she alleges that "Defendant [Jackson] actively had no intention of following through with his promise of just time spent together. Instead, he used this ploy as a fraudulent means of obtaining sexual gratification." *Id.* ¶ 137. Most plainly, Plaintiff has alleged that Defendant Jackson used force to cause a sexual act to take place. *See* Am. Compl. ¶ 54 ("Defendant [Jackson] ripped open Plaintiff's clothing, exposed his erect penis and forced himself on top of Plaintiff."); ¶ 57 ("Defendant [Jackson] overpowered Plaintiff and held down both of Plaintiff's hands as he penetrated her vagina with his penis and raped her."); ¶ 61 ("Defendant [Jackson] overpowered Plaintiff and held down both of Plaintiff's hands as he penetrated her vagina with his penis and raped her.").

***5** Further supporting this element is Plaintiff's allegation that "Defendant [Jackson] has engaged in similar sexual assaults of other women in the past, where the women were intoxicated, unable or unwilling to consent to sex, then the [sic] he forcibly raped them, and in at least one case causing the victim to become impregnated." *Id.* ¶ 75. When Plaintiff's principal allegations are "viewed in combination with the allegations that [Defendant Jackson] had engaged in a pattern of doing the same with other women" it is "plausible [to infer] that [Defendant Jackson] knew that force and fraud would be used to cause Plaintiff to engage in a commercial sex act." *See David*, 431 F. Supp. 3d at 301.

**c. Plaintiff Engaged in a Commercial Sex Act**

Here, Defendant Jackson enticed Plaintiff to visit his hotel room by promising a payment and the "opportunity to network with famous sports stars." Pl. Opp. at 4. Defendant Jackson rests on the argument that the TVPA requires Plaintiff to "allege that Jackson sold her for sex or that there was an exchange of 'anything of value' 'on account of' allegedly forced sex[,]" which he claims Plaintiff failed to do. *See* Def. Br. at 10. Indeed, under the TVPA a "commercial sex act" is defined as "any sex act, on account of which anything of value is given to or received by any person." 18 U.S.C. § 1591(e)(3).

But "Congress's use of expansive language in defining commercial sex act—using such terms as 'any sex act,' 'anything of value,' 'given to or received by any person'—requires a liberal reading." *Noble*, 335 F. Supp. 3d at 521. "In fact, the sex act itself need not occur to state a cause of action under the TVPA." *David*, 451 F. Supp. 3d. at 303 (citing *United States v. Alvarez*, 601 F. App'x 16, 18 (2d Cir. 2015) ("The [TVPA] criminalizes certain means when they are 'used to cause' an act, and thus is concerned with the means and not with the result.")) "A plaintiff's sex trafficking claim thus survives if she pleads that the defendant enticed her while knowing that he would cause her to engage in a commercial sex act, regardless of whether that act ultimately occurs." *Id.* (citing *United States v. Corley*, 679 F. App'x 1, 7 (2d Cir. 2017) ("[T]he plain meaning of the statute ... requires only that the defendant 'know' that the victim 'will be caused' to

engage in a commercial sex act; the statute does not require that an actual commercial sex act have occurred.”).

Moreover, Defendant Jackson's promises qualify as “thing[s] of value” under the TVPA. *See Noble*, 2019 WL 3940125, at *4 (“Indeed, on Defendant's account, the promise of money for a sex act would not constitute a ‘thing of value’ if the individual soliciting the sex never intended to pay and acted accordingly. It is hard to square such a reading with the statute's purpose of punishing sex trafficking, which may often involve deceitful actors and false promises. It also runs counter to Congress's intent to cast a wide net by employing the term ‘any.’ ”); *Geiss*, 383 F. Supp. 3d at 168 (holding that “the TVPA extends to enticement of victims by means of fraudulent promises of career advancement, for the purpose of engaging them in consensual or ... non-consensual sexual activity”); *David*, 431 F. Supp. 3d at 304 (concluding that plaintiff received a “thing of value” from a meeting to discuss a role she ultimately did not receive).

The Court finds that although Defendant Jackson did not explicitly promise something of value in exchange for sex, the cases in this district have not required “an explicit *quid pro quo* in order to establish that a sex act was ‘commercial.’ Indeed, in none of the Weinstein cases was the defendant accused of offering the plaintiffs movie roles only on the condition that they have sex with him, and the courts in those cases did not find this lack of explicit quid pro quo fatal to the plaintiffs' claim.” *See Eckhart*, 2021 WL 4124616, at *9. The Court therefore finds that Plaintiff has met this element, thereby plausibly alleging a TVPA claim.

## II. Plaintiff's State Law Claims Survive

***6** The Court now turns to Plaintiff's state law claims over which the court may exercise supplemental jurisdiction. Under 28 U.S.C. § 1367, federal courts enjoy “a broad grant of supplemental jurisdiction over other claims within the same case or controversy, as long as the action is one in which the district courts would have original jurisdiction.” *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 558 (2005). Where “all federal-law claims are eliminated before trial, the balance of factors ... will point toward declining to exercise jurisdiction over the remaining state-law claims.” *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. at 350 n. 7 (1988). Because Plaintiff's TVPA claim stands, the Court must consider whether Plaintiff has properly pleaded all her state law claims against Defendant Jackson.

### a. Assault and Battery

Plaintiff's second cause of action is for assault and battery. In New York, a “civil ‘assault’ is the intentional placing of another in apprehension of imminent harmful or offensive contact. The elements of civil ‘battery’ are (1) bodily contact, which is (2) harmful or offensive in nature, and (3) made with intent.” *Biggs v. City of N.Y.*, No. 08-CV-8123, 2010 WL 4628360, at *7 (S.D.N.Y. Nov. 16, 2010) (quoting *Merzon v. Cty. of Suffolk*, 767 F.Supp. 432, 448 (E.D.N.Y. 1991)). To establish a prima facie claim of assault under New York law, a plaintiff must prove “physical conduct placing the plaintiff in imminent apprehension of harmful contact”; to establish a prima facie claim of battery, a plaintiff must prove “that there was bodily contact, that the contact was offensive, and that the defendant intended to make the contact without the plaintiff's consent.” *Bastein v. Sotto*, 299 A.D.2d 432, 433, 749 N.Y.S.2d 538 (2d Dep't 2002); *see also Villanueva v. Comparetto*, 180 A.D.2d 627, 629, 580 N.Y.S.2d 30 (2d Dep't 1992) (“[A] plaintiff seeking to establish a civil battery need only prove that the defendant intentionally touched [her] person without ... her consent.”). Plaintiff alleged that Defendant Jackson forcibly assaulted and touched her without consent, thereby satisfying the elements of her civil assault and battery claims.

### b. Intentional Infliction of Emotional Distress

In her third cause of action, Plaintiff alleges intentional infliction of emotional distress (“IIED”). Under New York law, a cause of action for IIED has four elements: (i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress.” *Howell v. New York Post Co.*, 81 N.Y.2d 115, 121 (1993); see also *Johns v. Home Depot USA, Inc.*, No. 03-CV-4522, 2005 WL 545210, at *7 (S.D.N.Y. Mar. 8, 2005), *aff'd sub nom. Johns v. Home Depot USA, Inc.*, 180 F. App'x 190 (2d Cir. 2006) (same). Plaintiff alleges that Defenant Jackson assaulted and raped her in his hotel room which caused her to suffer “severe emotional distress and anguish[.]” Am. Compl. ¶ 168. As a result, the elements of Plaintiff's IIED claim are met and the claim stands.

**c. Violation of C.P.L.R. § 213-C**

In her fourth cause of action, Plaintiff references various statutes under which an action can be brought pursuant to C.P.L.R. § 213-c, which permits civil claims against an individual who could be charged with criminal liability for certain enumerated sexual offenses. *See* N.Y. C.P.L.R. § 213-c. In the Amended Complaint, Plaintiff specifically references two sections of the New York Penal Law: 130.50 (criminal sexual act in the first degree, which deals with unlawful oral and anal sexual conduct) and 130.70 (aggravated sexual abuse in the first degree, which deals with insertion of foreign objects into the vagina, urethra, penis, rectum, or anus of another person causing physical injury). Am. Compl. ¶¶ 153–54; *see also* N.Y. Penal Law § 130.50, 130.70.

***7** Plaintiff then notes the enumerated sexual offenses under N.Y. C.P.L.R. § 213-c, which reference these sections, as well as section 130.35 (rape). Am. Compl. ¶ 155; *see also* N.Y. Penal Law § 130.35. Under New York Penal Law Section 130.35, "[a] person is guilty of rape in the first degree when he or she engages in sexual intercourse with another person ... [w]ho is incapable of consent by reason of being physically helpless[.]" N.Y. Penal Law § 130.35.

Here, Plaintiff plainly alleges that she woke up to Defendant Jackson raping her. The Court thus concludes that the rape claim stands. On the other hand, the Amended Complaint is bereft of any factual allegations to give rise to civil liability under sections 130.50 and 130.70. Plaintiff alleges neither any oral or anal sexual conduct by Defendant Jackson, nor his insertion of any foreign object into her body. [1] Accordingly, the Court grants (without prejudice) Defendant's motion to dismiss the cause of action to the extent Plaintiff relies on a theory of aggravated sexual abuse in the first degree or of a criminal sexual act in the first degree.

**d. Violation of the New York Gender Motivated Violence Protection Act**

As a fifth cause of action, Plaintiff alleges violations of the New York Gender Motivated Violence Protection Act ("GMVPA"). The GMVPA provides a cause of action for "any person claiming to be injured by a party who commits, directs, enables, participates in, or conspires in the commission of a crime of violence motivated by gender." N.Y.C. Admin. Code § 10-1104. The GMVPA defines a "crime of violence motivated by gender" as "a crime of violence committed because of gender or on the basis of gender, and due, at least in part, to an animus based on the victim's gender." *Id.* § 10-1103. A "crime of violence," in turn, is defined as

> [A]n act or series of acts that would constitute a misdemeanor or felony against the person as defined in state or federal law or that would constitute a misdemeanor or felony against property as defined in state or federal law if the conduct presents a serious risk of physical injury to another, whether or not those acts have actually resulted in criminal charges, prosecution, or conviction.

*Id.* To state a claim under the GMVPA, Plaintiff must show that "(1) the alleged act constitutes a misdemeanor or felony against the person; (2) that was perpetrated because of plaintiff's gender; (3) in part because of animus against plaintiff's gender; and (4) resulted in injury." *Baldwin v. TMPL Lexington LLC*, No. 23-CV-9899, 2024 WL 3862150, at *12 (S.D.N.Y. Aug. 19, 2024).

Defendant Jackson complains that "[P]laintiff's claim for gender-motivated violence (count 5) does not specify the allegedly discriminatory conduct at issue." Def. Br. at 18. But for the reasons detailed above, the Court concludes that Plaintiff adequately pleaded that Defendant Jackson committed rape, an archetypical crime of gender-motivated violence. *See Baldwin*, 2024 WL 3862150, at *13 ("[A]llegations of rape and sexual assault state a claim under the GMVPA because '[m]alice or ill will based on gender is apparent from the alleged commission of the act itself.' ") (quoting *Breest v. Haggis*, 180 A.D.3d 83, 94 (1st Dep't 2019)); *see also Doe v. Gooding*, No. 20-CV-6569, 2021 WL 5991819, at *5 (S.D.N.Y. July 29, 2021) (granting default judgment to plaintiff on GMVPA claim based on rape).

***8** Gender-based animus is also inferred by Defendant Jackson's alleged commission of rape. *See Breest*, 180 A.D.3d at 94 ("Without consent, sexual acts such as [rape or sexual assault] are a violation of the victim's bodily autonomy and an expression of the perpetrator's contempt for that autonomy.... Animus inheres where consent is absent."). Additionally,

Plaintiff's allegations of emotional distress are sufficient to plead injury in the GMVPA context. *See Doe v. Olive Leaves, Inc.*, No. 18-CV-5734, 2024 WL 3048373, at *11 (E.D.N.Y. Feb. 16, 2024) (complaint pled injury under the GMVPA in alleging emotional distress). The GMVPA claim as to Defendant Jackson therefore survives.

**e. Sexual Assault and Sexual Abuse**

Last, the Court considers Plaintiff's sixth cause of action, titled simply "Sexual Assault/Sexual Abuse." In opposing this cause of action, Defendant Jackson asks the Court to dismiss these claims by arguing that they "would be duplicate rather than permissible alternative claims under Fed. R. Civ. P. 8(d) and would 'rise and fall together.' ") Def. Br. at 18. (citing *Doe v. Indyke*, 465 F. Supp. 3d 452, 459 (S.D.N.Y. 2020) (dismissing sexual assault claim as duplicative of battery claim). In response, Plaintiff argues that "[t]he second claim for assault/battery and the third claim for intentional infliction of emotional distress do not contain any sexual component, thus making them non-duplicative since the plaintiff could prevail by proving conduct not involving unlawful sexual contact. According [sic] the claims are alternative and not duplicative." Pl. Opp. at 8.

The case finds that dismissal of any claim as duplicative is premature at this stage. While a sexual assault or sexual abuse common law claim appears to arise from Count Four (rape under N.Y. C.P.L.R. § 213-C), the Court declines to dismiss the claim at the motion to dismiss stage, finding "no basis to force [P]laintiff to elect one theory of recovery over the other at this time." *U.S. Network Servs., Inc. v. Frontier Comm'ns of the W., Inc.*, 115 F. Supp. 2d 353, 358 (W.D.N.Y. 2000) (declining to dismiss the plaintiff's breach of warranty claim as duplicative of the breach of contract claim even though the plaintiff "clearly cannot obtain duplicative damage awards"); *see also Roelcke v. Zip Aviation, LCC*, No. 15-CV-6284, 2018 WL 1792374, at *9, 13–14 (S.D.N.Y. Mar. 26, 2018) (allowing a claim under GMVPA and a claim under N.Y. C.P.L.R. § 213-C for rape and sexual abuse against the same defendant to proceed at the motion to dismiss stage).

**III. Plaintiff's RICO Claim is Dismissed**

The Court next considers whether Plaintiff's RICO claim against Defendant Jackson can be sustained and concludes that it cannot. Defendant Jackson argued in his opening that Plaintiff failed to state a claim under RICO "because she did she did not adequately allege, inter alia: (1) the existence of an 'enterprise,' which must be pled through facts showing common purpose and ongoing organization among the defendants; (2) a "pattern" of racketeering activities, characterized by at least two predicate acts posing a threat of continued criminal activity; or (3) facts supporting a RICO conspiracy." Def. Reply at 1 (citing Def. Br. at 11–15). However, Plaintiff did not respond to any of Defendant Jackson's arguments against the RICO claim. Therefore, the Court concludes that Plaintiff has abandoned her RICO claim and dismisses the RICO action without prejudice. *See Fantozzi v. City of New York*, 343 F.R.D. 19, 32 (S.D.N.Y. 2022) ("Courts may, and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed.") (cleaned up); *see also Romeo & Juliette Laser Hair Removal, Inc. v. Assara I LLC*, No. 08-CV-442, 2014 WL 4723299, at *7 (S.D.N.Y. Sept. 23, 2014) ("At the motion to dismiss stage ... a plaintiff abandons a claim by failing to address the defendant's arguments in support of dismissing that claim.").

**IV. Leave to Amend**

***9** Lastly, the Court grants Plaintiff leave to file a Second Amended Complaint. While Plaintiff has already amended her Complaint once, Plaintiff could presumably plead facts that cure the Amended Complaint's defects. Because this case "is still in its infancy, there would be minimal prejudice to Defendant" in granting leave to amend. *Morales v. Kimberly-Clark Corp.*, No. 18-CV-7401, 2020 WL 2766050, at *10 (S.D.N.Y. May 27, 2020). Moreover, Plaintiff should amend only if she is able to rectify the pleading deficiencies outlined in the Opinion and Order. Plaintiff is cautioned that, absent good cause shown, further leave to amend will not be granted.

**CONCLUSION**

For the foregoing reasons, Defendant Jackson's motion to dismiss the Amended Complaint is GRANTED in part and DENIED in part. The Court grants Plaintiff leave to file a Second Amended Complaint and ORDERS Plaintiff to file the Second Amended Complaint in thirty (30) days.

**SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2025 WL 753949

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

## Footnotes

1 For the purposes of applying Section 130.70 of the New York Penal Law, the Court considers that any foreign object that was inserted must be a detached, inanimate object. *See* *People v. Peet*, 64 N.Y.2d 914, 915 (1985) (affirming appellate court's conclusion that a defendant's finger did not constitute a foreign object in part because the terminology used in the statute "connotes something inanimate, detached and separate from any other structure").

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2025 WL 753949
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Jane DOE, Plaintiff,
v.
Joshua JACKSON, Deguene Keita, Fatoumata Keita a/k/a Naomi Keita, Jeoffrey Janvier, and Lowell Ulmer, Defendant.

23-cv-04910 (ALC)
|
Signed March 10, 2025

**Attorneys and Law Firms**

Mark Taylor, Derek Smith Law Group, PLLC, New York, NY, Seamus Barrett, Phillips & Associates, New York, NY, for Plaintiff.

John F. Lauro, Filzah Pavalon, John F. Lauro, P.A., Tampa, FL, for Defendant.

## OPINION AND ORDER

ANDREW L. CARTER, JR., United States District Judge:

***1** Plaintiff Jane Doe brings this action against Defendants Joshua Jackson, Deguene Keita, Fatoumata Keita a/k/a Naomi Keita, Jeoffrey Janvier, and Lowell Ulmer based on violations of the Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. §§ 1591, 1595, the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962, and various New York state laws. Plaintiff alleges that Defendant Jackson enticed her to come to his hotel room and then raped her. After Plaintiff left Defendant Jackson's room, the Defendants engaged in a pattern of racketeering activity against Plaintiff, including robbery, assault, battery, and harassment.

To date, Plaintiff has not served Defendants Deguene Keita, Naomi Keita, Janvier, and Ulmer. Defendant Jackson waived service and now moves to dismiss Plaintiff's Amended Complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). For the reasons outlined below, Defendant Jackson's motion to dismiss is GRANTED in part and DENIED in part.

## BACKGROUND

### I. Factual Background

On February 13, 2022, Plaintiff went with an acquaintance, Debbie Torres, to a Super Bowl afterparty that several NBA players, including Defendant Jackson, also attended. ECF No. 52 ("Am. Compl.") ¶ 22. Plaintiff was invited to the party by another NBA player in whom she had a romantic interest. *Id.* ¶ 24. During the afterparty, Plaintiff asked Defendant Jackson to call her phone because she had misplaced it. *Id.* ¶ 26.

After Plaintiff went home, she received text messages in the early morning of February 14, 2022 from Defendant Jackson telling Plaintiff "COME THROUGH" and "I GOT $1500 FOR YOU IF YOU PULL UP." *Id.* ¶¶ 30–31. Plaintiff was under the impression that there was still a party and that party attendees were gathered in Defendant Jackson's hotel room. *Id.* ¶ 32. After arriving at Defendant Jackson's hotel room, Plaintiff realized that there was no one else in the room and that Defendant Jackson was shirtless and wearing only a pair of basketball shorts. *Id.* ¶¶ 41–42. Plaintiff told Defendant Jackson that he should not expect sex. *Id.* ¶ 43. Defendant Jackson told Plaintiff that he used money to help him have sex with girls, to which Plaintiff responded that she would never do that. *Id.* ¶¶ 48–49. Plaintiff then laid on the bed with her back to Defendant Jackson and fell asleep. *Id.* ¶¶ 50–51.

Later, Plaintiff woke up to Defendant Jackson ripping her clothes off, climbing on top of her, and exposing his penis to her, to which she shouted, "NO!" *Id.* ¶¶ 53–55. Despite her efforts to push him away, Defendant Jackson overpowered her as he penetrated her vagina with his penis and raped her. *Id.* ¶ 57. Plaintiff fainted and woke up sometime around 8:00 a.m. *Id.* ¶¶ 59–60. When Plaintiff tried to leave the room, Defendant Jackson climbed back on top of Plaintiff and touched her breasts. *Id.* ¶ 61. Plaintiff broke free and started screaming at Defendant Jackson, who aggressively told Plaintiff to lower her voice or he would call security. *Id.* ¶¶ 62–68. As Plaintiff was getting ready to leave, she heard Defendant Jackson speaking on the phone with someone and saying, "SHE WILL NOT FUCKING LEAVE MY ROOM!" *Id.* ¶ 72.

***2** Plaintiff left the room and, by around 10:03 a.m., she had begun receiving texts from Defendant Janvier accusing her of stealing a watch from Defendant Jackson's room. *Id.* ¶ 76. Plaintiff alleges that one of the Defendants intimidated or threatened Torres—the acquaintance with whom Plaintiff


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

attended the Super Bowl party—into providing Plaintiff's address and apartment number. *Id.* ¶ 79. Plaintiff responded to the texts claiming that she did not know anything about the missing watch. *Id.* ¶ 83. Defendant Janvier continued texting Plaintiff repeatedly asking for the watch, threatening to take further action if she did not return it, and texting Plaintiff "JOSH [JACKSON] IS NOT GONNA LET THIS SHIT GO TRUST ME!" *Id.* ¶ 87.

By around 11:07 a.m., Plaintiff began allegedly receiving texts from other numbers, presumably from Defendants Ulmer, Degeune Keita, or Naomi Keita, who continued to threaten her and texted her address back to her. *Id.* ¶¶ 90–96. At around 2:00 p.m., Plaintiff woke up to Defendants Degeune Keita and Naomi Keita (one of whom appeared to hold a gun) breaking into her apartment through her front door. *Id.* ¶ 100–01. One of the intruders allegedly yelled out that Defendant Jackson had sent them and that they were there to collect "collateral." *Id.* ¶ 104. The intruders then grabbed Plaintiff's cell phone—preventing her from calling for help—and began rounding up Plaintiff's expensive handbags to steal them. *Id.* ¶¶ 105–06. Plaintiff screamed for help and the intruders pulled her into the hallway and elevator. *Id.* ¶¶ 108–10. The intruders then pulled Plaintiff into the lobby and two doormen tackled one of the intruders and pinned them to the floor. *Id.* ¶¶ 111–14. NYPD officers then arrived at the scene and arrested Defendants Degeune Keita and Naomi Keita. *Id.* ¶ 114.

**II. Procedural Background**

On June 12, 2023, Plaintiff filed her Complaint. ECF No. 1. On October 12, 2023, Plaintiff requested additional time to serve Defendants and, on October 13, 2023, the Court granted Plaintiff a 90-day extension. ECF Nos. 35–36. On December 12, 2023, Defendant Jackson waived service. ECF No. 43. On December 18, 2023, Defendant Jackson filed a letter requesting a premotion conference and setting forth the bases for his anticipated motion to dismiss the Complaint. ECF No. 45. On December 28, 2023, Plaintiff responded to the letter. ECF No. 48. On January 18, 2024, the Court granted Defendant Jackson leave to file his motion to dismiss. ECF No. 49.

On March 1, 2024, after Defendant Jackson had filed his motion to dismiss, Plaintiff filed an Amended Complaint and its opposition to the motion to dismiss. ECF Nos. 50, 52–53. On March 5, 2024, Defendant Jackson filed another letter requesting a premotion conference and asked the Court whether he should reply to Plaintiff's opposition or seek a renewed motion to dismiss. On March 16, 2024, Defendant Jackson filed a letter requesting a premotion conference and setting forth the bases for his anticipated motion to dismiss the Amended Complaint. ECF No. 55. On March 21, 2024, the Court granted Defendant leave to file their motion to dismiss the Amended Complaint. ECF No. 58. On April 11, 2024, Defendant Jackson filed his motion. ECF No. 60. On May 9, 2024, Plaintiff filed her opposition. ECF No. 65. On May 28, 2024, Defendant Jackson filed his reply. ECF No. 66.

**STANDARD OF REVIEW**

To survive a motion to dismiss, a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The pleading "need not include detailed factual allegations, but must contain sufficient factual matter ... to state a claim to relief that is plausible on its face." *Corona Realty Holding, LLC v. Town of N. Hempstead*, 382 F. App'x 70, 71 (2d Cir. 2010) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)) (internal quotations omitted). When considering a motion to dismiss, the Court accepts as true all factual allegations in the complaint and draws all reasonable inferences in the plaintiff's favor. *See Famous Horse Inc. v. 5th Ave. Photo Inc.*, 624 F.3d 106, 108 (2d Cir. 2010). However, the incantation of the elements of a cause of action, "supported by mere conclusory statements," is not enough to show plausibility. *Id.* at 72. Instead, "[f]actual allegations must be enough to raise the right of relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007).

**DISCUSSION**

***3** Plaintiff alleges federal question jurisdiction because she has filed claims under the TVPA and RICO; she also alleges supplemental jurisdiction over her state law claims. Am. Compl. ¶ 7. The Court first considers Plaintiff's TVPA claim and finds that Plaintiff has plausibly stated a claim. The Court next weighs Plaintiff's state law claims and finds that Plaintiff has properly pleaded all but one claim. The Court then turns to Plaintiff's RICO claim and concludes that Plaintiff abandoned the claim, warranting dismissal.

**I. Plaintiff's TVPA Claim Survives**

Plaintiff brings her first cause of action against Defendant Jackson under Section 1591 of the TVPA. The TVPA provides that:

Whoever knowingly—

> (1) in or affecting interstate or foreign commerce ... recruits, *entices*, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person; or
>
> (2) benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1)
>
> *knowing* ... that means of *force*, threats of *force, fraud*, coercion ..., or any combination of such means will be used to cause the person to engage in a *commercial sex act*, ... shall be punished ....

18 U.S.C. § 1591 (emphasis added). For her claim to survive, Plaintiff must show that Defendant Jackson (1) enticed Plaintiff and (2) by means of force and threats of force (3) caused Plaintiff to engage in a commercial sex act. *See Eckhart v. Fox News Network, LLC*, No. 20-CV-5593, 2021 WL 4124616, at *8–11 (S.D.N.Y. Sept. 9, 2021), *on reconsideration in part*, No. 20-CV-5593, 2022 WL 4579121 (S.D.N.Y. Sept. 29, 2022) (collecting cases).

The archetypical example of sex trafficking includes "prostitution, pornography, sex tourism, and other commercial sexual services." 22 U.S.C § 7101(b)(2); *see also Eckhart, 2021* WL 4124616, at *7 (collecting cases). However, the numerous allegations brought against film producer Harvey Weinstein in recent years have led courts to defer to the plain meaning of the TVPA: "[I]n light of the plain text of the statute, numerous courts in this Circuit —including this one—have also applied the TVPA to cases where a victim claims to have been forced or defrauded into sexual activity with the promise of career advancement." *Id.* (citing *David v. Weinstein Co. LLC*, 431 F. Supp. 3d 290, 299 (S.D.N.Y. 2019); *Geiss v. Weinstein Holdings LLC*, 383 F. Supp. 3d 156 (S.D.N.Y. 2019); *Noble v. Weinstein*, 335 F. Supp. 3d 504 (S.D.N.Y. 2018); *Canosa v. Ziff*, 18-CV-4115, 2019 WL 498865 (S.D.N.Y. Jan. 28, 2019) (collectively, "the Weinstein cases")).

Defendant Jackson seeks to differentiate the instant case from both the "archetypical" sex trafficking cases and the line of Weinstein cases in this district. Defendant Jackson centers on the commerciality prong under the TVPA, arguing that Plaintiff has not alleged that "anything of value" was exchanged "on account of" forced sex. ECF No. 61 ("Def. Br.") at 10. Defendant Jackson argues that even if he had raped Plaintiff—which he denies—Plaintiff has not alleged that the sex acts were premeditated and commercial in nature. *Id.* at 11.

In turn, Plaintiff argues that she was lured by Plaintiff with the false promises of $1,500 and an opportunity to network with athletes, emphasizing that courts have found a commercial sex act to have occurred even if the "benefit ... did not materialize." ECF No. 65 ("Pl. Opp.") at 4 (citing *Eckhart*, 2021 WL 4124616, at *9). Indeed, Plaintiff alleges that "Defendant [Jackson's] offer of time spent with a professional athlete was successful in enticing and maintaining Plaintiff in [Defendant Jackson's] hotel room for a short time." Am. Compl. ¶ 134.

***4** In his reply, Defendant Jackson continues to distinguish the facts from the Weinstein cases because here "the alleged promise was not for sex, but instead 'to make an appearance.' " ECF No. 66 ("Def. Reply") at 2. Defendant Jackson argues that Plaintiff conflates the enticement and commercial exchange prongs under the TVPA. But with all inferences drawn in Plaintiff's favor, and considering the TVPA case law in this circuit, Plaintiff has adequately alleged the three elements for a TVPA claim.

**a. Defendant Jackson Enticed Plaintiff**

"For the purposes of a Section 1591 claim, courts have interpreted the word 'entice' based on its ordinary meaning, which is to attract artfully or adroitly or by arousing hope or desire, and [to] attract or tempt by offering pleasure or advantage." *David*, 431 F. Supp. 3d at 300 (cleaned up) (citing *Noble*, 335 F. Supp. 3d at 517); *see also Ardolf v. Weber*, 332 F.R.D. 467, 474 (S.D.N.Y. 2019) ("[T]he use of the term 'entice' in the TVPA means that the perpetrator attracts the victim by offering something that arouses hope or desire.").

Defendant Jackson argues that Plaintiff has not satisfied this element because the promise was not conditioned on sex, but rather on Plaintiff making an appearance at Defendant Jackson's hotel room. Def. Reply at 2. He also argues that Plaintiff does not claim she was "tricked into having sex" by Defendant Jackson but rather that he raped her after she had fallen asleep. Def. Br. at 11. However, courts in this district

have allowed claims based on similar facts. In *Eckhart*, the court found that defendant "lure[d] [the plaintiff] back to his hotel room, [inviting] her to 'further discuss her career opportunities at his hotel.' " *Eckhart*, 2021 WL 4124616, at *8. Immediately after plaintiff arrived at the hotel room, the defendant raped the plaintiff. *See id.* at *3, *9. In *David*, the court found that plaintiff met with Harvey Weinstein on a few occasions on which he dangled the promise of future work, thereby arousing hope and desire in plaintiff. *David*, 431 F. Supp. 3d at 301. In the instant case, too, the Court finds that regardless of whether the promise was for money or an appearance in Defendant Jackson's hotel room, Plaintiff plausibly alleges that she was enticed by Defendant Jackson.

### b. Defendant Jackson Knew Means of Force or Fraud Would Be Used

Plaintiff must also "plausibly allege knowledge, or a modus operandi, associated with [the] 'enticement,' that [Defendant Jackson] enticed Plaintiff with knowledge that means of force or fraud would be used to cause a commercial sex act to take place." *Noble*, 335 F. Supp. 3d at 517–18. "In other words, Plaintiff must allege that [Defendant Jackson] had an awareness or understanding that 'if things go as he has planned, force, fraud or coercion will be employed to cause his victim to engage in a commercial sex transaction.' " *David*, 431 F. Supp. 3d at 301 (quoting *United States v. Todd*, 627 F.3d 329, 334 (9th Cir. 2010)). Plaintiff must also allege that this knowledge existed "at the initial recruitment or enticement stage." *Noble*, 335 F. Supp. 3d at 518.

Plaintiff has plausibly alleged that Defendant Jackson knew that means of force or fraud would be used when he first attempted to entice her. Plaintiff states that "Defendant [Jackson] knew that the promise of time spending with him or the use of his influence and notoriety would entice Plaintiff into his hotel room and knew that once there he was in a position to force the sexual activity he desired." Am. Compl. ¶ 134. Moreover, she alleges that "Defendant [Jackson] actively had no intention of following through with his promise of just time spent together. Instead, he used this ploy as a fraudulent means of obtaining sexual gratification." *Id.* ¶ 137. Most plainly, Plaintiff has alleged that Defendant Jackson used force to cause a sexual act to take place. *See* Am. Compl. ¶ 54 ("Defendant [Jackson] ripped open Plaintiff's clothing, exposed his erect penis and forced himself on top of Plaintiff."); ¶ 57 ("Defendant [Jackson] overpowered Plaintiff and held down both of Plaintiff's hands as he penetrated her vagina with his penis and raped her."); ¶ 61 ("Defendant [Jackson] overpowered Plaintiff and held down both of Plaintiff's hands as he penetrated her vagina with his penis and raped her.").

***5** Further supporting this element is Plaintiff's allegation that "Defendant [Jackson] has engaged in similar sexual assaults of other women in the past, where the women were intoxicated, unable or unwilling to consent to sex, then the [sic] he forcibly raped them, and in at least one case causing the victim to become impregnated." *Id.* ¶ 75. When Plaintiff's principal allegations are "viewed in combination with the allegations that [Defendant Jackson] had engaged in a pattern of doing the same with other women" it is "plausible [to infer] that [Defendant Jackson] knew that force and fraud would be used to cause Plaintiff to engage in a commercial sex act." *See* *David*, 431 F. Supp. 3d at 301.

### c. Plaintiff Engaged in a Commercial Sex Act

Here, Defendant Jackson enticed Plaintiff to visit his hotel room by promising a payment and the "opportunity to network with famous sports stars." Pl. Opp. at 4. Defendant Jackson rests on the argument that the TVPA requires Plaintiff to "allege that Jackson sold her for sex or that there was an exchange of 'anything of value' 'on account of' allegedly forced sex[,]" which he claims Plaintiff failed to do. *See* Def. Br. at 10. Indeed, under the TVPA a "commercial sex act" is defined as "any sex act, on account of which anything of value is given to or received by any person." 18 U.S.C. § 1591(e)(3).

But "Congress's use of expansive language in defining commercial sex act—using such terms as 'any sex act,' 'anything of value,' 'given to or received by any person'—requires a liberal reading." *Noble*, 335 F. Supp. 3d at 521. "In fact, the sex act itself need not occur to state a cause of action under the TVPA." *David*, 451 F. Supp. 3d. at 303 (citing *United States v. Alvarez*, 601 F. App'x 16, 18 (2d Cir. 2015) ("The [TVPA] criminalizes certain means when they are 'used to cause' an act, and thus is concerned with the means and not with the result.")) "A plaintiff's sex trafficking claim thus survives if she pleads that the defendant enticed her while knowing that he would cause her to engage in a commercial sex act, regardless of whether that act ultimately occurs." *Id.* (citing *United States v. Corley*, 679 F. App'x 1, 7 (2d Cir. 2017) ("[T]he plain meaning of the statute ... requires only that the defendant 'know' that the victim 'will be caused' to

engage in a commercial sex act; the statute does not require that an actual commercial sex act have occurred.”).

Moreover, Defendant Jackson's promises qualify as “thing[s] of value” under the TVPA. *See Noble*, 2019 WL 3940125, at *4 (“Indeed, on Defendant's account, the promise of money for a sex act would not constitute a ‘thing of value’ if the individual soliciting the sex never intended to pay and acted accordingly. It is hard to square such a reading with the statute's purpose of punishing sex trafficking, which may often involve deceitful actors and false promises. It also runs counter to Congress's intent to cast a wide net by employing the term ‘any.’ ”); *Geiss*, 383 F. Supp. 3d at 168 (holding that “the TVPA extends to enticement of victims by means of fraudulent promises of career advancement, for the purpose of engaging them in consensual or ... non-consensual sexual activity”); *David*, 431 F. Supp. 3d at 304 (concluding that plaintiff received a “thing of value” from a meeting to discuss a role she ultimately did not receive).

The Court finds that although Defendant Jackson did not explicitly promise something of value in exchange for sex, the cases in this district have not required “an explicit *quid pro quo* in order to establish that a sex act was ‘commercial.’ Indeed, in none of the Weinstein cases was the defendant accused of offering the plaintiffs movie roles only on the condition that they have sex with him, and the courts in those cases did not find this lack of explicit quid pro quo fatal to the plaintiffs' claim.” *See Eckhart*, 2021 WL 4124616, at *9. The Court therefore finds that Plaintiff has met this element, thereby plausibly alleging a TVPA claim.

## II. Plaintiff's State Law Claims Survive

***6** The Court now turns to Plaintiff's state law claims over which the court may exercise supplemental jurisdiction. Under 28 U.S.C. § 1367, federal courts enjoy “a broad grant of supplemental jurisdiction over other claims within the same case or controversy, as long as the action is one in which the district courts would have original jurisdiction.” *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 558 (2005). Where “all federal-law claims are eliminated before trial, the balance of factors ... will point toward declining to exercise jurisdiction over the remaining state-law claims.” *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. at 350 n. 7 (1988). Because Plaintiff's TVPA claim stands, the Court must consider whether Plaintiff has properly pleaded all her state law claims against Defendant Jackson.

### a. Assault and Battery

Plaintiff's second cause of action is for assault and battery. In New York, a “civil ‘assault’ is the intentional placing of another in apprehension of imminent harmful or offensive contact. The elements of civil ‘battery’ are (1) bodily contact, which is (2) harmful or offensive in nature, and (3) made with intent.” *Biggs v. City of N.Y.*, No. 08-CV-8123, 2010 WL 4628360, at *7 (S.D.N.Y. Nov. 16, 2010) (quoting *Merzon v. Cty. of Suffolk*, 767 F.Supp. 432, 448 (E.D.N.Y. 1991)). To establish a prima facie claim of assault under New York law, a plaintiff must prove “physical conduct placing the plaintiff in imminent apprehension of harmful contact”; to establish a prima facie claim of battery, a plaintiff must prove “that there was bodily contact, that the contact was offensive, and that the defendant intended to make the contact without the plaintiff's consent.” *Bastein v. Sotto*, 299 A.D.2d 432, 433, 749 N.Y.S.2d 538 (2d Dep't 2002); *see also Villanueva v. Comparetto*, 180 A.D.2d 627, 629, 580 N.Y.S.2d 30 (2d Dep't 1992) (“[A] plaintiff seeking to establish a civil battery need only prove that the defendant intentionally touched [her] person without ... her consent.”). Plaintiff alleged that Defendant Jackson forcibly assaulted and touched her without consent, thereby satisfying the elements of her civil assault and battery claims.

### b. Intentional Infliction of Emotional Distress

In her third cause of action, Plaintiff alleges intentional infliction of emotional distress (“IIED”). Under New York law, a cause of action for IIED has four elements: (i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress.” *Howell v. New York Post Co.*, 81 N.Y.2d 115, 121 (1993); see also *Johns v. Home Depot USA, Inc.*, No. 03-CV-4522, 2005 WL 545210, at *7 (S.D.N.Y. Mar. 8, 2005), *aff'd sub nom. Johns v. Home Depot USA, Inc.*, 180 F. App'x 190 (2d Cir. 2006) (same). Plaintiff alleges that Defenant Jackson assaulted and raped her in his hotel room which caused her to suffer “severe emotional distress and anguish[.]” Am. Compl. ¶ 168. As a result, the elements of Plaintiff's IIED claim are met and the claim stands.

### c. Violation of C.P.L.R. § 213-C

In her fourth cause of action, Plaintiff references various statutes under which an action can be brought pursuant to C.P.L.R. § 213-c, which permits civil claims against an individual who could be charged with criminal liability for certain enumerated sexual offenses. *See* N.Y. C.P.L.R. § 213-c. In the Amended Complaint, Plaintiff specifically references two sections of the New York Penal Law: 130.50 (criminal sexual act in the first degree, which deals with unlawful oral and anal sexual conduct) and 130.70 (aggravated sexual abuse in the first degree, which deals with insertion of foreign objects into the vagina, urethra, penis, rectum, or anus of another person causing physical injury). Am. Compl. ¶¶ 153–54; *see also* N.Y. Penal Law § 130.50, 130.70.

***7** Plaintiff then notes the enumerated sexual offenses under N.Y. C.P.L.R. § 213-c, which reference these sections, as well as section 130.35 (rape). Am. Compl. ¶ 155; *see also* N.Y. Penal Law § 130.35. Under New York Penal Law Section 130.35, "[a] person is guilty of rape in the first degree when he or she engages in sexual intercourse with another person ... [w]ho is incapable of consent by reason of being physically helpless[.]" N.Y. Penal Law § 130.35.

Here, Plaintiff plainly alleges that she woke up to Defendant Jackson raping her. The Court thus concludes that the rape claim stands. On the other hand, the Amended Complaint is bereft of any factual allegations to give rise to civil liability under sections 130.50 and 130.70. Plaintiff alleges neither any oral or anal sexual conduct by Defendant Jackson, nor his insertion of any foreign object into her body. [1] Accordingly, the Court grants (without prejudice) Defendant's motion to dismiss the cause of action to the extent Plaintiff relies on a theory of aggravated sexual abuse in the first degree or of a criminal sexual act in the first degree.

### d. Violation of the New York Gender Motivated Violence Protection Act

As a fifth cause of action, Plaintiff alleges violations of the New York Gender Motivated Violence Protection Act ("GMVPA"). The GMVPA provides a cause of action for "any person claiming to be injured by a party who commits, directs, enables, participates in, or conspires in the commission of a crime of violence motivated by gender." N.Y.C. Admin. Code § 10-1104. The GMVPA defines a "crime of violence motivated by gender" as "a crime of violence committed because of gender or on the basis of gender, and due, at least in part, to an animus based on the victim's gender." *Id.* § 10-1103. A "crime of violence," in turn, is defined as

> [A]n act or series of acts that would constitute a misdemeanor or felony against the person as defined in state or federal law or that would constitute a misdemeanor or felony against property as defined in state or federal law if the conduct presents a serious risk of physical injury to another, whether or not those acts have actually resulted in criminal charges, prosecution, or conviction.

*Id.* To state a claim under the GMVPA, Plaintiff must show that "(1) the alleged act constitutes a misdemeanor or felony against the person; (2) that was perpetrated because of plaintiff's gender; (3) in part because of animus against plaintiff's gender; and (4) resulted in injury." *Baldwin v. TMPL Lexington LLC*, No. 23-CV-9899, 2024 WL 3862150, at *12 (S.D.N.Y. Aug. 19, 2024).

Defendant Jackson complains that "[P]laintiff's claim for gender-motivated violence (count 5) does not specify the allegedly discriminatory conduct at issue." Def. Br. at 18. But for the reasons detailed above, the Court concludes that Plaintiff adequately pleaded that Defendant Jackson committed rape, an archetypical crime of gender-motivated violence. *See Baldwin*, 2024 WL 3862150, at *13 ("[A]llegations of rape and sexual assault state a claim under the GMVPA because '[m]alice or ill will based on gender is apparent from the alleged commission of the act itself.' ") (quoting *Breest v. Haggis*, 180 A.D.3d 83, 94 (1st Dep't 2019)); *see also Doe v. Gooding*, No. 20-CV-6569, 2021 WL 5991819, at *5 (S.D.N.Y. July 29, 2021) (granting default judgment to plaintiff on GMVPA claim based on rape).

***8** Gender-based animus is also inferred by Defendant Jackson's alleged commission of rape. *See Breest*, 180 A.D.3d at 94 ("Without consent, sexual acts such as [rape or sexual assault] are a violation of the victim's bodily autonomy and an expression of the perpetrator's contempt for that autonomy.... Animus inheres where consent is absent."). Additionally,

Plaintiff's allegations of emotional distress are sufficient to plead injury in the GMVPA context. *See Doe v. Olive Leaves, Inc.*, No. 18-CV-5734, 2024 WL 3048373, at *11 (E.D.N.Y. Feb. 16, 2024) (complaint pled injury under the GMVPA in alleging emotional distress). The GMVPA claim as to Defendant Jackson therefore survives.

### e. Sexual Assault and Sexual Abuse

Last, the Court considers Plaintiff's sixth cause of action, titled simply "Sexual Assault/Sexual Abuse." In opposing this cause of action, Defendant Jackson asks the Court to dismiss these claims by arguing that they "would be duplicate rather than permissible alternative claims under Fed. R. Civ. P. 8(d) and would 'rise and fall together.' ") Def. Br. at 18. (citing *Doe v. Indyke*, 465 F. Supp. 3d 452, 459 (S.D.N.Y. 2020) (dismissing sexual assault claim as duplicative of battery claim). In response, Plaintiff argues that "[t]he second claim for assault/battery and the third claim for intentional infliction of emotional distress do not contain any sexual component, thus making them non-duplicative since the plaintiff could prevail by proving conduct not involving unlawful sexual contact. According [sic] the claims are alternative and not duplicative." Pl. Opp. at 8.

The case finds that dismissal of any claim as duplicative is premature at this stage. While a sexual assault or sexual abuse common law claim appears to arise from Count Four (rape under N.Y. C.P.L.R. § 213-C), the Court declines to dismiss the claim at the motion to dismiss stage, finding "no basis to force [P]laintiff to elect one theory of recovery over the other at this time." *U.S. Network Servs., Inc. v. Frontier Comm'ns of the W., Inc.*, 115 F. Supp. 2d 353, 358 (W.D.N.Y. 2000) (declining to dismiss the plaintiff's breach of warranty claim as duplicative of the breach of contract claim even though the plaintiff "clearly cannot obtain duplicative damage awards"); *see also Roelcke v. Zip Aviation, LCC*, No. 15-CV-6284, 2018 WL 1792374, at *9, 13–14 (S.D.N.Y. Mar. 26, 2018) (allowing a claim under GMVPA and a claim under N.Y. C.P.L.R. § 213-C for rape and sexual abuse against the same defendant to proceed at the motion to dismiss stage).

## III. Plaintiff's RICO Claim is Dismissed

The Court next considers whether Plaintiff's RICO claim against Defendant Jackson can be sustained and concludes that it cannot. Defendant Jackson argued in his opening that Plaintiff failed to state a claim under RICO "because she did she did not adequately allege, inter alia: (1) the existence of an 'enterprise,' which must be pled through facts showing common purpose and ongoing organization among the defendants; (2) a "pattern" of racketeering activities, characterized by at least two predicate acts posing a threat of continued criminal activity; or (3) facts supporting a RICO conspiracy." Def. Reply at 1 (citing Def. Br. at 11–15). However, Plaintiff did not respond to any of Defendant Jackson's arguments against the RICO claim. Therefore, the Court concludes that Plaintiff has abandoned her RICO claim and dismisses the RICO action without prejudice. *See Fantozzi v. City of New York*, 343 F.R.D. 19, 32 (S.D.N.Y. 2022) ("Courts may, and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed.") (cleaned up); *see also Romeo & Juliette Laser Hair Removal, Inc. v. Assara I LLC*, No. 08-CV-442, 2014 WL 4723299, at *7 (S.D.N.Y. Sept. 23, 2014) ("At the motion to dismiss stage ... a plaintiff abandons a claim by failing to address the defendant's arguments in support of dismissing that claim.").

## IV. Leave to Amend

***9** Lastly, the Court grants Plaintiff leave to file a Second Amended Complaint. While Plaintiff has already amended her Complaint once, Plaintiff could presumably plead facts that cure the Amended Complaint's defects. Because this case "is still in its infancy, there would be minimal prejudice to Defendant" in granting leave to amend. *Morales v. Kimberly-Clark Corp.*, No. 18-CV-7401, 2020 WL 2766050, at *10 (S.D.N.Y. May 27, 2020). Moreover, Plaintiff should amend only if she is able to rectify the pleading deficiencies outlined in the Opinion and Order. Plaintiff is cautioned that, absent good cause shown, further leave to amend will not be granted.

## CONCLUSION

For the foregoing reasons, Defendant Jackson's motion to dismiss the Amended Complaint is GRANTED in part and DENIED in part. The Court grants Plaintiff leave to file a Second Amended Complaint and ORDERS Plaintiff to file the Second Amended Complaint in thirty (30) days.

**SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2025 WL 753949

## Footnotes

1 For the purposes of applying Section 130.70 of the New York Penal Law, the Court considers that any foreign object that was inserted must be a detached, inanimate object. *See* *People v. Peet*, 64 N.Y.2d 914, 915 (1985) (affirming appellate court's conclusion that a defendant's finger did not constitute a foreign object in part because the terminology used in the statute "connotes something inanimate, detached and separate from any other structure").

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 1699985
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Delia M. FARQUHARSON, Plaintiff,
v.
Reginald A. LAFAYETTE, Douglas A. Colety, Jeanine L. Palazola, Dorothy L. DiPalo, and Westchester County Board of Election, Defendants.

No. 19-cv-3446 (NSR)
|
Signed 04/07/2020

**Attorneys and Law Firms**

Lenworth Lester Williams, Law Office of Lenworth Williams, Mount Vernon, NY, Pierre Gooding, Pierre Gooding PLLC, New York, NY, for Plaintiff.

Frederick Mark Sullivan, Melissa-Jean Rotini, Haylei Peart, Westchester County Attorney's Office, White Plains, NY, for Defendants.

OPINION & ORDER

NELSON S. ROMÁN, United States District Judge:

***1** Plaintiff Delia M. Farquharson ("Plaintiff") brings this action, pursuant to 42 U.S.C. § 1983 ("Section 1983") against Defendants Reginald A. Lafayette ("Lafayette"), Douglas A. Colety, Jeannie L. Palazola, s/h/a Jeanine L. Palazola, Dorothy L. DiPalo (together, the "Individual Defendants"), and Westchester County Board of Elections ("BOE") (collectively, "Defendants"). (Compl., ECF No. 1.) Plaintiff alleges that Defendants denied her an opportunity to run for Mayor of Mount Vernon, New York, in deprivation of her First, Fourth, Fifth and Fourteenth Amendment rights. (*Id.*) Plaintiff also asserts several state-law claims. (*Id.*)

Presently before the Court is Defendants' motion to dismiss. (ECF No. 32.) For the following reasons, Defendants' motion is GRANTED with leave to amend.

## BACKGROUND

The following facts are taken from Plaintiffs' complaint and accompanying exhibits and are accepted as true for purposes of this motion.

### A. Lafayette's Alleged History of Targeting Plaintiff

The allegations underlying Plaintiff's complaint primarily center around a long running and contentious relationship between Plaintiff and Lafayette. To this end, Plaintiff is a City Councilor in Mount Vernon and of Jamaican descent, while Lafayette is the Chairman and Commissioner of the BOE and the Chairman of the Mount Vernon Democratic Committee ("MVDC"). (Compl. ¶ 4.)

According to Plaintiff, Lafayette wields tremendous power as Commissioner of MVDC. For example, Plaintiff avers that, on July 27, 2015, Maria Caraballo, a two-time City Council candidate in Mount Vernon, stated in "Black Westchester Magazine" that Lafayette "[c]ontrols Mt. Vernon Politics." (*Id.* ¶ 11 (internal quotations omitted).) Caraballo explained that "if you are not liked by Reggie Lafayette, you are not going to be elected. There will never be an election in Mt. Vernon[ ] that will not be fixed as long as Reggie Lafayette is in office." (*Id.* (internal quotations omitted).) According to Plaintiff, during his time as commissioner, Lafayette has made disparaging remarks regarding individuals of West Indian descent (particularly Jamaicans) during public meetings. (*Id.* ¶¶ 5, 11.[1])

Plaintiff contends that Lafayette also routinely targeted Plaintiff during political events and nomination processes. (*Id.* ¶ 12.) For example, during the 2017 MVDC nomination process, Lafayette succeeded in installing Marcus Griffith in Plaintiff's place, even though Plaintiff had already been voted to be a nominee. (*Id.* ¶ 13.) The next year, in 2018, Lafayette delivered a message about "people wanting to be elected but not understanding how things work" in response to Plaintiff's expressing an intention to assume the role of City Council President. (*Id.* ¶ 14.)

Plaintiff and Lafayette's contentious history persisted into 2019. Specifically, on January 2, 2019, at a City Council committee meeting attended by Plaintiff and Lafayette (who is not a City Council member), Lafayette "looked directly at Plaintiff" as she entered the meeting and asked, "[A]re we going to have a smooth night[?]" (*Id.* ¶ 15.) This question was purportedly in reference to Plaintiff's plan to speak about the political properness of some of the City Council nominations. (*Id.*) When asked for clarification, Lafayette

responded, "[A]m I going to have to respond to anything as commissioner." (*Id.*) Then, during the meeting, Lafayette "placed himself in the direct vicinity of Plaintiff," thereby making her feel uncomfortable both in her official and personal capacity. (*Id.*)

### B. Plaintiff Files Untimely Petitions and Defendants Refuse to Return Them

***2** On or around February 7, 2019, Plaintiff completed all filing requirements to run for Mayor of Mount Vernon. (*Id.* ¶ 16.) Thereafter, in conjunction with at least six team members, Plaintiff collected 985 signatures from members of the Mount Vernon community (the "Petitions"). (*Id.* ¶ 17.)

On March 19, 2019 Plaintiff went to BOE with her Petitions. (*Id.* ¶ 18.) When she arrived, the clerk informed Plaintiff that the filing period in New York was from April 1, to April 4, 2019. (*Id.*) In response, Plaintiff asked the clerk if BOE would accept Plaintiff's Petitions for review, notwithstanding the deadline. (*Id.*) The clerk called Lafayette, who was in a back office of BOE, and informed him that Plaintiff was "here to submit petitions." (*Id.*) The clerk took the Petitions and went to the back office to meet with Lafayette. (*Id.*) At some point, either during the call or meeting, Lafayette decided, or authorized the clerk to decide, to take Plaintiff's Petitions. (*Id.* ¶ 19.) The clerk stamped the Petitions and made copies to distribute to Plaintiff. (*Id.*)

Shortly after, Plaintiff heard from community members that BOE planned to invalidate the Petitions. (*Id.* ¶ 20.) She further learned that BOE was planning to invalidate any signatures on the Petitions. (*Id.* ¶ 27.) As a result, on March 25, 2019, Plaintiff returned to BOE to obtain her Petitions.[2] (*Id.* ¶ 21.) Then, on March 27, 2019, Plaintiff received a call from Taijan Nelson, which informed Plaintiff that BOE had sent a letter, dated March 25, 2019, to Plaintiff. (*Id.* ¶ 22.)

In that letter, BOE informed Plaintiff that "[a]fter a prima facie examination of [the Petitions] purporting to nominate [Plaintiff] as a candidate for Mayor in the City of Mount Vernon, it was determined that the Petition ... was not timely filed." (*Id.* Ex. A; *see also id.* ¶ 23.) BOE cited Section 6-158(1) of the New York State Election Law ("N.Y.E.L."), which established April 1, 2019 as the earliest date to file designating petitions. (*Id.* Ex. I.) BOE then noted that failure to file a petition within this timeframe "[was] a fatal defect." (*Id.*) BOE thus determined that Plaintiff's Petitions were "invalid" and informed her that her name would not appear on the Democratic Party ballot for Mayor of Mount Vernon primary election. (*Id.*) Plaintiff contends that, notwithstanding the letter's conclusion, BOE was not aware of what Plaintiff was going to do with her Petitions on or before April 1, 2019. (*Id.* ¶ 25.)

Plaintiff responded to BOE's letter on March 27, 2019. (*Id.* ¶ 26.) Plaintiff, through her counsel, informed BOE that the letter had "legal issues" and, in turn, urged for the BOE to reconsider its decision or provide Plaintiff with a hearing. (*Id.*) In the letter, Plaintiff acknowledged that Plaintiff's "Petitions were filed early" but argued that she nevertheless had a "timely claim to cure the violation[ ] and [was] entitled to attempt to do so."[3] (*Id.* Ex. II.)

***3** The next day, on March 28, 2019, Plaintiff, her team members, and her attorney went to BOE in person. (*Id.* ¶ 28.) During the meeting, Lafayette laid out his concern with accepting Plaintiff's untimely Petition, explaining that "a major problem, [which] nobody can get a handle on, is a lot of people backdate signatures." (*Id.* ¶ 29.) Plaintiff then asked Lafayette why BOE accepted her Petitions if it knew it would later invalidate them. (*Id.* ¶ 30.) Lafayette explained that the Petitions were "already turned in by the time [the clerk] went to the back to speak with [him]." (*Id.*) Plaintiff, however, corrected him, noting that the Petitions were "unstamped" at that moment. (*Id.*) Although Plaintiff does not provide further details, she notes that "[n]o BOE hearing was ever scheduled by the BOE" regarding the Petitions. (*Id.* ¶ 31.)

### C. Plaintiff Files an Amended Cover Sheet but Remains Off the Primary Ballot

Notwithstanding her untimely March filing, Plaintiff timely filed an amended cover sheet for her Petitions on April 1, 2019. (*Id.* ¶ 32.) Upon this now-timely filing, Specific Objections ("Specs") to Plaintiff's petitions were lodged, some allegedly after the filing deadline was complete. (*Id.* ¶ 33.) Plaintiff maintains that these Specs came from individuals "affiliated with Lafayette." (*Id.*)

Plaintiff and her attorney eventually confronted Lafayette and told him that they believed BOE was engaged in illegal activity. (*Id.*) Plaintiff then asked Lafayette what dates he was using to determine whether the Specs were timely filed. (*Id.*) In that conversation, Plaintiff and Lafayette disputed whether one Spec at issue was filed on the fourth or eighth of April. (*Id.*) As it relates to this Spec, Lafayette explained that, although there was a Spec dated April 4th, a new Spec


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

was timely filed on April 8th after Plaintiff again amended her Petition cover sheet. (*Id.*) Lafayette insisted that this was proper because "[o]nce [Plaintiff] amend[e]d [her Petition], [the time to file Specs] starts all over again." (*Id.*) At some point during this conversation, Lafayette then noted that Plaintiff had "time to even correct [her] mistakes" but the filing had to be kept by BOE. (*Id.*)

Plaintiff argues that Lafayette admitted that "Plaintiff's process of amending the cover sheet for [her] Petitions was proper, and that the process that the BOE engaged in prior to April 1, 2019 regarding the attempt to rule the Petitions out of the elections before giving an opportunity to amend the cover letter or cure the petitions was per se illegal." (*Id.* ¶ 34.) Plaintiff further avers that Lafayette "understood more than any other person" how a candidate could modify petitions until the filing deadline concluded but nevertheless "blocked" Plaintiff from running for office. (*Id.* ¶ 35.) BOE, according to Plaintiff, was "complicit" by failing to stop Lafayette's activity. (*Id.*)

## LEGAL STANDARDS

### I. 12(b)(1)

When a court lacks the statutory or constitutional power to adjudicate a case, it should dismiss the case for lack of subject matter jurisdiction under Rule 12(b)(1). *Nike, Inc. v. Already, LLC*, 663 F.3d 89, 94 (2d Cir. 2011). "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (quoting *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)). In assessing whether there is subject matter jurisdiction, the Court must accept as true all material facts alleged in the complaint, *Conyers v. Rossides*, 558 F.3d 137, 143 (2d Cir. 2009), but "the court may resolve [any] disputed jurisdictional fact issue by referring to evidence outside of the pleadings." *Zappia Middle E. Const. Co. v. Emirate of Abu Dhabi*, 215 F.3d 247, 253 (2d Cir. 2000).

One example of when a court lacks subject matter jurisdiction is when the case becomes moot. *See Doyle v. Midland Credit Mgmt., Inc.*, 722 F.3d 78, 81 (2d Cir. 2013). Similarly, lack of standing may be grounds for dismissal under Rule 12(b)(1). *Buonasera v. Honest Co.*, 208 F. Supp. 3d 555, 560 (S.D.N.Y. 2016).

### II. 12(b)(6)

***4** The relevant inquiry under Rule 12(b)(6) is whether a complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 570 (2007)). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* at 679. To this end, to survive a motion to dismiss, a complaint must supply "factual allegations sufficient 'to raise a right to relief above the speculative level.' " *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). The Court must take all material factual allegations as true and draw reasonable inferences in the non-moving party's favor, but the Court is " 'not bound to accept as true a legal conclusion couched as a factual allegation,' " or to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

The critical inquiry is whether the plaintiff has pled sufficient facts to nudge the claims "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 555. A district court must consider the context and "draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. Ultimately, the allegations must "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678.

### III. Section 1983

Under Section 1983, "[e]very person who, under the color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." 42 U.S.C. § 1983. Section 1983 "is not itself the source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes it describes." *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979). To state a claim under Section 1983, a plaintiff must allege (1) the challenged conduct was attributable to a person who was acting under color of state law and (2) "the conduct deprived the plaintiff of a right guaranteed by the U.S. Constitution." *Castilla v. City of New York*, No. 09 Civ. 5446(SHS), 2013 WL 1803896, at *2 (S.D.N.Y. Apr. 25, 2013); *see also Cornejo v. Bell*, 592 F.3d 121, 127 (2d Cir. 2010).

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

## DISCUSSION

### I. Defendants' Mootness and Standing Challenges

Defendants proffer two challenges to this Court's jurisdiction to hear Plaintiff's claims. *First*, Defendants argue that, because the primary election has already taken place, Plaintiff's claims related to the validity of the March Designating Petition are moot. (Defs. Mem. of Law in Supp. of Mot. to Dismiss ("Defs. Mot."), ECF No. 32, at 3.) *Second*, Defendants contend that Plaintiff lacks standing to assert her claims because she has failed to establish that she suffered an injury in fact, that her alleged harm is fairly traceable to Defendants' conduct, or that a favorable decision can redress her purported harm. (*Id.* at 5-7.) In response, Plaintiff argues that her claims are not moot because, even though the election has passed, the Court can still award, *inter alia*, damages related to her claims. (Pl. Opp. to Defs. Mot. (Pl. Opp.), ECF No. 37, at 4.) She further argues that she has standing to maintain her claims. (*Id.* at 6.)

As this Court must determine whether it has subject matter jurisdiction before it can rule on the merits of any claim, the Court assesses Defendants' challenges below. As will be explained, the Court concludes that, although Plaintiff's claims for injunctive and declaratory relief have been mooted by the passage of the primary election, her claims are not moot to the extent she seeks damages for Defendants' alleged constitutional violations. The Court further concludes that Plaintiff has easily established standing to pursue her claims, regardless of their ultimate merits.

#### A. Mootness

***5** "The mootness doctrine, which is mandated by the 'case or controversy' requirement of Article III of the United States Constitution, requires that federal courts may not adjudicate matters that no longer present an actual dispute between parties." *Catanzano v. Wing*, 277 F.3d 99, 107 (2d Cir. 2001) (citing *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477-78 (1990)). "A case is moot 'when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome,' " such that a court cannot provide any relief to redress a plaintiff's claimed injuries. *Piccolo v. N.Y.C. Campaign Fin. Bd.*, No. 05 CV 7040(GBD)(MHD), 2007 WL 2844939, at *7 (S.D.N.Y. Sept. 28, 2007) (internal quotations and citations omitted).

As is relevant here, the "passage of an election does not necessarily render an election-related case moot." *Freedom Party of N.Y. v. N.Y.S. Bd. of Elections*, 77 F.3d 660, 662 (2d Cir. 1996) (citing *Storer v. Brown*, 415 U.S. 724 (1974)). The question courts must address in an election-related context is whether the issues alleged are "capable of repetition, yet evading review." *See Lerman v. Bd. of Elections in City of N.Y.*, 232 F.3d 135, 142 (2d Cir. 2000). "[A] controversy is capable of repetition, yet evading review where both of the following two requirements are met: '(1) the challenged action [is] in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party [will] be subjected to the same action again.' " *Van Wie v. Pataki*, 267 F.3d 109, 113-14 (2d Cir. 2001) (quoting *Weinstein v. Bradford*, 423 U.S. 147, 149 (1975)). Regardless of this inquiry, if a plaintiff seeks money damages, that claim will not be deemed moot. *See id.* at 115 n.4 ("We note that had the plaintiffs sought money damages in addition to their request for injunctive relief, this controversy would not be moot. Indeed, for suits alleging constitutional violations under 42 U.S.C. § 1983, it is enough that the parties merely request nominal damages.").

Here, Plaintiff seeks injunctive and declaratory relief that would declare Plaintiff's filing timely and deem the "amended petition date [as] determinative for filing." (Compl. ¶ 78.) However, the mayoral primary was held on June 25, 2019. (Defs. Mot. 3.) Accordingly, as Plaintiff can no longer run for mayor in this election cycle, the passage of the primary has "eradicated the effects of the defendant's act or omission" regarding the validity of the Petitions. *See Van Wie*, 267 F.3d at 113 ("We conclude that this appeal is moot because the March 2000 primary election, in which the appellants sought to participate, has passed."). And, although a moot case may still be justiciable if the dispute is capable of repetition, yet evading review, Plaintiff here has failed to make any showing that there is a reasonable expectation that she would be subjected to the same action again by Defendants in future elections. The Court hence has no basis to conclude that Plaintiff's claims for injunctive and declaratory relief remains justiciable.

To avoid this outcome, Plaintiff relies on *Arbor Hill Concerned Citizens v. Cty. of Albany*, 357 F.3d 260 (2d Cir. 2004) to contend that the Court could "call for a special election." (Pl. Opp. 4.) In citing *Arbor Hill*, Plaintiff quotes the Second Circuit's holding as follows: "it is within the scope of [the court's] equity powers to order a governmental

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

body to hold special elections." (*Id.*) (quoting *Arbor Hill*, 357 F.3d at 262.) Plaintiff's reliance on *Arbor Hill*, however, is misplaced. The Second Circuit made it clear that this equity power relates to violations of the Voting Rights Act (a portion of the *Arbor Hill* quotation that Plaintiff noticeably omits). Plaintiff points to no other authority that establishes that the Court could order a special election as a remedy for a Section 1983 constitutional violation. The Court GRANTS Defendants' motion to dismiss Plaintiff's claims for injunctive and declaratory relief as moot, without prejudice.

***6** Plaintiff, however, has also sought damages as part of her requested relief for her various constitutional and state claims. (Compl. ¶ 78.) As a result, Plaintiff continues to maintain a legally cognizable interest in the outcome of this case, notwithstanding the passing of the mayoral primary election. *See, e.g.*, *Marin v. Town of Southeast*, 136 F. Supp. 3d 548 (S.D.N.Y. 2015) ("[I]n general 'so long as the plaintiff has a cause of action for damages, a defendant's change in conduct will not moot the case.' "); *Sugarman v. Vill. of Chester*, 192 F. Supp. 2d 282, 290 (S.D.N.Y. 2002) ("Plaintiff has asserted a proper claim for nominal damages under § 1983 for the alleged constitutional violation. It therefore follows that plaintiff has a legally cognizable interest in the outcome of the dispute, and that her claims are not moot."). Thus, the Court concludes that Plaintiff's claims are not mooted to the extent that she seeks damages related to Defendants' purported constitutional violations.

The Court next turns to whether Plaintiff has standing to bring her claims.

### B. Standing

To ensure that there is a case or controversy, the Supreme Court has held that parties before federal courts must have standing to bring their claims. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). A plaintiff has standing if he or she has suffered "(1) an injury that is (2) 'fairly traceable to a defendant's allegedly unlawful conduct' and that is (3) 'likely to be redressed by the requested relief.' " *Id.* 560-61 (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)). For purposes of standing, an injury must be an injury in fact, meaning "an invasion of a legally protected interest which is (a) concrete and particularized ... and (b) actual or imminent, not 'conjectural' or 'hypothetical.' " *Id.* at 560 (internal citations and quotations omitted). On a motion to dismiss, "the plaintiff has no evidentiary burden" and the "task of the district court is to determine whether the [p]leading 'allege[s] facts that affirmatively and plausibly suggest that [the plaintiff] has standing to sue.' " *Am. Bird Conservancy v. Harvey*, 232 F. Supp. 3d 292, 301 (E.D.N.Y. 2017) (quoting *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016)).

Here, regardless of the ultimate merits of her claims, Plaintiff has established her standing to sue. *First*, Plaintiff has alleged an injury-in-fact that is concrete and particularized and actual, not conjectural. Specifically, Plaintiff has alleged that she was deprived of an opportunity to run for mayor because of purported impropriety related to the handling of her Petitions. *Second*, Plaintiff's harms, as alleged, were "fairly traceable" to Defendants' conduct, regardless of whether her claims are legally viable on the merits. As Plaintiff's pleadings aver, Defendants' decision making regarding Plaintiff's Petitions —whether or not unlawful or even the proximate cause of her harm—fall within the chain of causation leading to Plaintiff's absence from the mayoral primary ballot.[4] *See* *Fulani v. League of Women Voters Educ. Fund*, 882 F.2d 621, 627-28 (2d Cir. 1989) (explaining that plaintiff's injury did not "derive solely from the fact that she ultimately failed to win the presidency" but rather "the asserted harm also flow[ed] from [non-federal defendant's] allegedly partisan restriction of her opportunities to communicate her political ideas to the voting public at large" as well as the "federal defendants' tax treatment of the [non-federal defendant]"); *Harvey*, 232 F. Supp. 3d at 305 (explaining that, although there were several links in the causation chain, defendant's causal connection to Plaintiffs' claims were "neither hypothetical nor tenuous"). *Finally*, as to redressability, the Court again notes that Plaintiff seeks damages. As such, even without the injunctive and declaratory component of her requested relief, Plaintiff, if meritorious, could be redressed by a favorable ruling. Defendants' challenge to Plaintiff's standing fails.

***7** The Court now turns to the merits of Plaintiff's Section 1983 claims.

## II. Plaintiff's Section 1983 Claims

Plaintiff has brought four separate causes of action under Section 1983. *First*, Plaintiff asserts a violation of her right to due process under the Fifth and Fourteenth Amendment. (Compl. ¶¶ 51-56.) *Second*, Plaintiff alleges "discrimination" under the First and Fourteenth Amendment. (*Id.* ¶¶ 61-64.) *Third*, Plaintiff asserts a claim for "disparate impact" under the First and Fourteenth Amendment. (*Id.* ¶¶ 65-68.) *Finally*, Plaintiff avers that Defendants' violated her "right to be secure from unreasonable seizures" under the Fourth

Amendment. (*Id.* ¶¶ 42-51.) The Court considers each of these four causes of action below.

**A. Due Process Claim**

Plaintiff maintains that Defendants violated her due process rights by failing to schedule a hearing related to the retention and propriety of Plaintiff's Petitions. (Pl. Opp. 11; Compl. ¶¶ 52-55.) Defendants counter that Plaintiff has failed to establish a due process violation, in part because she failed to avail herself to New York's state court review process under the N.Y.E.L. (Defs. Mot. 12-13.) The Court agrees.

The Fourteenth Amendment provides that "[n]o state shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. "The Due Process Clause does not protect against all deprivations of constitutionally protected interests in life, liberty, or property, only against deprivations without due process of law." To maintain a due process claim, a plaintiff must first establish that he or she had a protected property or liberty interest. *White Plains Towing Corp. v Patterson*, 991 F.2d 1049, 1061-62 (2d Cir. 1976). Thereafter, to assess whether a due process violation occurred, courts must "ask what process the State provided[ ] and whether it was constitutionally adequate." *Rivera-Powell v. N.Y.C. Bd. of Elections*, 470 F.3d 458, 465 (2d Cir. 2006) (quoting *Zinermon v. Burch*, 494 U.S. 113, 126 (1990)).

To determine whether a state or local government has complied with procedural due process, courts "distinguish between (1) claims based on established governmental procedures, and (2) claims based on random or unauthorized acts by public employees." *Vaher v. Town of Orangetown, N.Y.*, 133 F. Supp. 3d 574, 604 (S.D.N.Y. 2015) (quoting *G.I. Home Developing Corp. v. Weis*, 499 F. App'x 87, 88 (2d Cir. 2012)). "When the state conduct in question is random and unauthorized, the state satisfies procedural due process requirements so long as it provides meaningful post-deprivation remedy." *Rivera-Powell*, 470 F.3d at 465. Conversely, when the deprivation is pursuant to an established state procedure, "the availability of post-deprivation procedures will not, *ipso facto*, satisfy due process." *Id.* (quoting *Hellenic Am. Neighborhood Action Comm. v. City of New York*, 101 F.3d 877, 880 (2d Cir. 1996)). Rather, in such cases, courts must evaluate the adequacy of the post-deprivation remedy by considering the following factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

***8** *Murawski v. Pataki*, 514 F. Supp. 2d 577, 585 (S.D.N.Y. 2007) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).

Here, the Court need not assess whether Defendants' conduct was characterized as random and unauthorized or the product of an established state procedure. As an initial matter (and although not addressed by either party), it is unclear that Plaintiff even has a property or liberty interest in her mayoral candidacy. Courts have routinely concluded that "a candidate for political office holds no property or liberty interest in an elected position." *Leroy v. N.Y.C. Bd. of Elections*, 793 F. Supp. 2d 533, 537 (E.D.N.Y. 2011) (candidate's due process claim, alleging that the board of elections violated her due process rights when they failed to certify her name for the ballot, failed because she had no property interest in her candidacy); *Douglas v. Niagara Cty. Bd. of Elections*, No. 07-CV-609A, 2007 WL 3036809, at *4 (W.D.N.Y. Oct. 16, 2007) (no property interest where board of elections invalidated petition upon a finding of insufficient number of valid signatures); *Cornett v. Sheldon*, 894 F. Supp. 715, 725-26 (S.D.N.Y. 1995) (no property interest, and therefore no due process violation, where plaintiff had alleged that defendants failed to give him notice of the specifications to objections to his petition prior to a board of elections hearing). In the absence of a protected property or liberty interest, there is no due process violation.

In any event, the process accorded to Plaintiff easily passes Constitutional muster regardless of whether the conduct issue was random or pursuant to established state procedure.[5] As Defendants note, N.Y.E.L. § 16-102 ("Article 16") provides for expedited state-court proceedings to review the validity


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

of petition designations. (Defs Mot. 12-13.) Courts in this circuit, in turn, have repeatedly concluded that Article 16 "satisfies due process requirements," "[e]ven in the absence of an opportunity to be heard prior to a [board of election's] decision."[6] *Murawski*, 514 F. Supp. 2d at 586 n.5; *see also EH Fusion Party*, 401 F. Supp. 3d at 38 (" '[A]fter the Board's action, [there is] the opportunity to obtain full judicial review under New York Election Law section 16-102, which provides for expedited proceedings as to designations.' This is an adequate post-deprivation remedy that 'satisfies due process.' " (internal quotation omitted)); *Bal*, 2018 WL 6528766 at *8 ("Courts following *Rivera-Powell* have categorized the expedited review provided by N.Y. Election Law § 16-102 as both pre- and post-deprivation review adequate to satisfy due process concerns."); *Leroy*, 793 F. Supp. 2d at 540-41 ("In any case, New York Election Law § 16–102, if not a 'pre-deprivation' remedy, provided Leroy, as in *Rivera–Powell*, with the opportunity to obtain full 'post-deprivation' judicial review."); *Douglas*, 2007 WL 3036809 at *5 ("[E]ven if the Court were to hold that the plaintiff had a property interest in his candidacy, the availability of an expedited special proceeding under NYS Elec. Law § 16-102 to address the merits of his petition satisfies the requirements of procedural due process."); *Cornett*, 894 F. Supp. at 727 (describing Article 16 as a "comprehensive and expeditious state court process which attempts to adjudicate election law disputes promptly" and finding no due process violation where plaintiff failed to take advantage of it).

***9** As Plaintiff alleges here, she filed her Petitions on March 19, 2019, well before the April 1 to April 4, 2019 timeframe for filing petitions. (AC ¶ 18.) BOE then notified Plaintiff that her Petitions were not timely filed and that she would not appear on the ballot for this reason. (*Id.* ¶¶ 21-23; *see also id.* Ex. I.) Plaintiff wrote to BOE, demanding a hearing, but did not receive one at any point. (*Id.* ¶¶ 26, 31.) Although BOE never scheduled a hearing, Plaintiff had a comprehensive judicial mechanism, established by state law, at her disposal. That mechanism would have allowed her to challenge the BOE's determination, regardless of whether BOE provided her with the requested hearing. Plaintiff chose not to avail herself to the Article 16's procedure, but her decision has no impact on the adequacy of her due process rights in this case (to the extent they exist).[7] *See Bal*, 2018 WL 6528766 at *9 ("Although he did not avail himself of either opportunity, that is of no moment in evaluating whether he was afforded due process of law."). The Court GRANTS Defendants' motion to dismiss Plaintiff's due process claim, with prejudice.

### B. Equal Protection Claims/First Amendment Claims

#### 1. *Discrimination*

Plaintiff has brought a claim related to discrimination under the First and Fourteenth Amendment. (Compl. ¶¶ 61-64.) To this end, Plaintiff contends Defendants applied "policies that [were] neutral on their face" in a discriminatory manner. (*Id.* ¶ 62.) Defendants challenge these claims, contending that Plaintiff has failed to identify "the manner, type, or kind of alleged discrimination in processing her March Designating Petition." (Defs. Mot. 13.)

The Court initially notes that, although she frames her claims as sounding under both the First Amendment and Fourteenth Amendment, it does not appear as if Plaintiff is, in fact, pleading a First Amendment claim. It is true that "[c]ourts in this district have recognized that denial of ballot access can effect a deprivation of the First Amendment right to free association." *Marchant v. N.Y.C. Bd. of Elections*, 13 Civ. 5493(KPF), 2013 WL 4407098, at *4 (S.D.N.Y. Aug. 16, 2013). But Plaintiff's complaint is devoid of allegations that Defendants' decisions regarding her Petitions were premised on Plaintiff's political affiliation, associational conduct, or even her speech.[8] Instead, the gravamen of Plaintiff's discrimination claim focuses on how Defendants purportedly treated Plaintiff differently than other primary candidates in its application of New York's election laws. (Pl. Opp. 9-10.) Plaintiff further avers that one potential basis for discrimination was Plaintiff's West Indian heritage." (*Id.* at 10.) Under this framing, the Court concludes that Plaintiff's discrimination claim sounds solely under the Equal Protection clause. To this end, the Court discerns two Equal Protection challenges: selective enforcement and intentional discrimination. The Court considers each below.

***10** "The Equal Protection Clause of the Fourteenth Amendment directs that similarly situated individuals be treated alike." *Bal*, 2018 WL 6528766 at *10 (citing *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)). To establish an equal protection violation, a plaintiff must prove (1) "purposeful discrimination directed at an identifiable or suspect class," and (2) "that similarly situated people were treated differently." *Leroy*, 793 F. Supp. 2d at 542 (citing *Giano v. Senkowski*, 54 F.3d 1050, 1057 (2d Cir. 1995); *Powell v. Powell*, 436 F.2d 84, 88 (2d Cir. 1970); *Gagliardi v. Vill. of Pawling*, 18 F.3d 188, 193 (2d Cir. 1994)). Critically, "a § 1983 action to remedy errors in the election

process allegedly violating the equal protection clause does not exist unless the state action constituted 'intentional or purposeful discrimination.' " *Gold v. Feinberg*, 101 F.3d 796, 800 (2d Cir. 1996) (quoting *Powell*, 436 F.2d at 88 (internal quotations omitted)); *see also Gelb v. Bd. of Elections of City of N.Y.*, 224 F.3d 149, 154 (2d Cir. 2000) ("It is thirty-year-old doctrine in this Circuit that a § 1983 action invoking the Equal Protection Clause is not available to remedy election process errors in the absence of a showing of 'intentional or purposeful discrimination.' ").

An Equal Protection claim can be "sustained even if the plaintiff has not alleged class-based discrimination, but instead claims that she has been irrationally singled out." *Bal*, 2018 WL 6528766 at *11 (quoting *Engquist v. Oregon Dep't of Agr.*, 553 U.S. 591, 601 (2008)). Whether pursuing a "selective enforcement" or "class of one" theory, it is incumbent upon a plaintiff to sufficiently identify a similarly situated comparator and show that he or she was treated differently as compared to those others similarly situated. *Tower Props. LLC v. Vill. of Highland Falls*, No. 14 Civ. 4502 (NSR), 2017 WL 519267, at *4 (S.D.N.Y. Feb. 7, 2017).

Where discrimination is premised on a protected characteristic (such as race or national origin), a plaintiff must show that a defendant "intentionally discriminated against [him or her], either by adopting out of [ ] animus [to a protected characteristic] policies which are facially neutral but have a [ ] discriminatory effect, or by applying a facially neutral policy in a [ ] discriminatory manner." *Rivera-Powell*, 470 F.3d at 470 (citing *Hayden v. Cty. of Nassau*, 180 F.3d 42, 48 (2d Cir. 1999)). "[C]onclusory allegation[s] of discrimination, [ ] 'without evidentiary support or allegations of particularized incidents, do[ ] not state a valid claim' and [ ] cannot withstand a motion to dismiss." *Id.* at 470 (quoting *Kern v. City of Rochester*, 93 F.3d 38, 44 (2d Cir. 1996) (internal quotations omitted)).

Here, Plaintiff's discrimination claim fails for two separate reasons. To start, Plaintiff has not sufficiently pled a similarly situated comparator who was treated differently by Defendants. Rather, Plaintiff offers a single conclusory allegation that Defendants applied "policies that are neutral on their face" in a "discriminatory or punitive manner" and/or created policies to discriminate specifically against Plaintiff. (Compl. ¶ 62.) Such naked assertions plainly fail to sufficiently plead a discrimination claim. As a result, to seemingly cure this deficiency, Plaintiff substantially relies on state court's opinion in *Swiller v. Lecuona*, 56 Misc. 3d 1218(A) (N.Y. Sup. Ct. Westchester Cty. Aug. 16, 2017), to point to a "clear difference in how applicable time periods for filing Petitions were applied to candidates" other than Plaintiff. (Pl. Opp. 9.) The Court disagrees.

In *Swiller*, the respondents had filed a four-volume petition with cover sheets designating them as candidates in an upcoming Democratic Party primary election for the positions of Mayor and Common Council of the City of White Plains. 56 Misc. 3d 1218(A) at *1. Two days later, at the suggestion of a BOE member, the candidates re-filed the four petitions with amended cover sheets, this time providing (1) two volumes that listed all four candidates, (2) a volume listing only one candidate, and (3) volume listing the remaining three candidates. *Id.* at *1, *5. After BOE reviewed the designating petitions and accompanying objections, it concluded that the candidates had enough signatures to appear on the primary ballot. *Id.* at *1. The challenge to the amended cover sheets in *Swiller* related to whether the candidates could "unilaterally amend" them on the last day to file petitions after having filed the original cover sheets two days earlier. *Id.* at *5. Nothing in the *Swiller* opinion, however, suggests that the candidates filed their petitions *outside* of the statutorily prescribed timeframe detailed by N.Y.E.L. § 6-158 or that they were in anyway treated differently from Plaintiff during BOE's petition review process. [9] As such, the candidates in *Swiller* do not constitute similarly situated comparators for purposes of an Equal Protection violation.

***11** Plaintiff's discrimination claim also fails more fundamentally because she has not pleaded Defendants' intentional discrimination in their application of New York's otherwise facially neutral election law. Instead, Plaintiff merely contends, in conclusory fashion, that Lafayette "would not allow Plaintiff to exercise her constitutional and legal right to run for office free from discrimination." (Compl. ¶ 35.) Although Plaintiff claims that she was treated differently because she is of "West Indian" descent (Pl. Opp. 10), the complaint contains no allegations that suggest that this was a factor in any of the Defendants' decisions. Indeed, even factoring in Lafayette's historical disparagement of people of "West Indian" descent, the most charitable reading of Defendants complaint, as drafted, and its accompanying documents is that Defendants rejected Plaintiff's Petitions filed on March 19, 2019 because she failed to comply with N.Y.E.L. § 6-158—a "fatal defect" under the law—as opposed to some discriminatory purpose. [10] As such, the Court GRANTS Defendants' motion to dismiss Plaintiff's discrimination claims, without prejudice.

2. *Disparate Impact*

In addition to her discrimination claim under the First and Fourteenth Amendment, Plaintiff also brings a "disparate impact" claim under those same two Amendments. (Compl. ¶¶ 65-68.) The Court first notes that "First Amendment law does not recognize disparate impact claims." *United States v. Weslin*, 156 F.3d 292, 297 (2d Cir. 1998); *see also Incantalupo v. Lawrence Union Free Sch. Dist. No. 15*, 829 F. Supp. 2d 67, 74 (E.D.N.Y. 2010) ("[T]here is 'no disparate-impact theory in First Amendment law.' " (quoting *Terry v. Reno*, 101 F.3d 1412, 1419-20 (D.C. Cir. 1996); *United States v. Dinwiddie*, 76 F.3d 913, 923 (8th Cir. 1996))). Consequently, like Plaintiff's discrimination claim, her disparate impact claim is properly analyzed solely under the Equal Protection clause.

Plaintiff's disparate impact claim, however, fails for the same reason as her discrimination claim: she has not established that Defendants' challenged conduct "was undertaken with discriminatory intent." *Brown v. City of Oneonta, N.Y.*, 221 F.3d 329, 338 (2d Cir. 2000) (citing *Washington v. Davis*, 426 U.S. 229, 239-41 (1976)). "Although [d]isproportionate impact is not irrelevant, to violate the Fourteenth Amendment the disproportionate impact must be traced to a purpose to discriminate on the basis of a [protected characteristic]." *Hayden v. Paterson*, 594 F.3d 150, 162-63 (2d Cir. 2010). As Plaintiff has not established a requisite discriminatory intent underlying any purported disparate impact, the Court GRANTS Defendants' motion to dismiss Plaintiff's disparate impact claim, without prejudice.

**C. Fourth Amendment Claim**

Plaintiff asserts that Defendants violated the Fourth Amendment by "confiscating and then attempting to constructively and/or effectively destroy Plaintiff's valid Petitions." (Compl. ¶ 46.) Defendants retort that no Fourth Amendment seizure occurred, and that, in any event, retention of Plaintiff's Petitions that were filed in March was reasonable. (Defs. Mot. 11-12.) The Court agrees.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "A 'seizure' of property ... occurs when 'there is some meaningful interference with an individual's possessory interests in that property.' " *Soldal v. Cook Cty., Ill.*, 506 U.S. 56, 61 (1992) (quoting *United States v. Jacobsen*, 466 U.S 109, 113 (1984)). A seizure can occur "even where privacy or liberty is not implicated." *Ostensen v. Suffolk Cty.*, 378 F. Supp. 2d 140, 147 (E.D.N.Y. 2005). Nevertheless, " 'reasonableness is [ ] the ultimate standard' under the Fourth Amendment." *Soldal*, 506 U.S. at 71 (internal citation omitted). "Determining the reasonableness of a seizure requires balancing 'the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.' " *Kiyak v. Town of Fairfield*, No. 3:17-cv-1426(AWT), 2019 WL 2895640, at *3 (D. Conn. Mar. 25, 2019) (quoting *Scott v. Harris*, 550 U.S. 372, 3838 (2007)). And "[w]here ... an initial seizure of property was reasonable, defendants' failure to return [an] item[ ] does not, by itself, state a separate Fourth Amendment claim of unreasonable seizure." *Shaul v. Cherry Valley-Springfield Cent. Sch. Dist.*, 363 F.3d 177, 187 (2d Cir. 2004).

***12** Here, when she went to BOE on March 19, 2019, Plaintiff knowingly submitted her Petitions outside the statutorily prescribed timeframe of April 1 to April 4, 2019. (*See* Compl. ¶ 18; *id.* Ex. II ("It is clear from the information on the cover sheet that the Candidate's Petitions were filed early.").) In opposing Defendants' motion, Plaintiff does not dispute this. (*See* Pl. Opp. 7-8.) Instead, Plaintiff's conclusory position—raised for the first time in her opposition—is that she submitted the Petitions because she was misled into thinking that BOE would review them. (*Id.* at 8, 10.) Plaintiff's complaint, however, does not explicitly allege misleading conduct or give rise to that inference. Although Plaintiff later learned that BOE "was planning on invalidating every petition" submitted on March 19, the complaint does not indicate that Defendants engaged in any impropriety to convince Plaintiff to go to BOE and part ways with her Petitions prior to April 1, 2019.

Plaintiff's contention that Defendants failed to return her Petitions, thereby unreasonably seizing them, also fails under a Fourth Amendment analysis. As Defendants note, and Plaintiff does not dispute, N.Y.E.L. prevents the removal of petitions "from the office of the board of elections for copying or any other purpose while in the custody, or under the supervision of a member or employee or employee of such board." *See* N.Y.E.L. § 3-220(6-a). Plaintiff cannot, therefore, credibly contend that Defendants' continued "seizure" of her Petitions was unreasonable. In fact, Defendants were seemingly acting consistent with New York law.

Finally, to the extent Plaintiff premises her Fourth Amendment seizure claim on purported "constructive[ ] and/or effective[ ]" destruction of Plaintiff's valid petitions," Plaintiff has represented that she was able to "timely file an amended cover sheet for the Petitions on April 1, 2019." (Compl. ¶ 32). As she acknowledges in her opposition, at least implicitly, this timely filing "revive[d] her Designating Petition." (Pl. Opp. 6, 8.) Plainly, any purported "constructive destruction" is belied by Plaintiff's own factual representations. [11]

In conclusion, even accepting all facts as true, the Court cannot conclude that Plaintiff has pled a Fourth Amendment claim that "raise[s] a right to relief above the speculative level." *See ATSI Commc'ns*, 493 F.3d at 98. The Court GRANTS Defendants' motion to dismiss Plaintiff's Fourth Amendment claim.

### III. Plaintiff's State Law Claims

In addition to her federal claims, Plaintiff also brings several causes of action under state law, namely civil theft, conversion, and spoliation. The Court preliminarily notes that Plaintiff's civil theft claim is duplicative of her conversion claim. *See Smith Barney, Harris Upham & Co. Inc. v. Luckie*, 245 A.D.2d 17, 19 (1st Dep't 1997) (noting that the "New York analogue" for civil theft is conversion). Moreover, although Plaintiff asserts a spoliation claim, New York does not recognize spoliation of evidence as an actionable tort. *See Ortega v. City of New York*, 9 N.Y.3d 69, 83 (2007) ("[W]e join the majority of jurisdictions to consider the issue and decline to recognize spoliation of evidence as an independent tort claim." (internal citation omitted)); *see also Kamdem-Ouaffo v. Balchem Corp.*, No. 17-CV-2810 (KMK), 2018 WL 4386092, at *18 (S.D.N.Y. Sept. 14, 2018) ("New York State law does not recognize an independent cause of action for spoliation."); *Gardner v. Verizon Commc'ns*, No. 16-CV-814 (RRM) (RML), 2018 WL 1513636, at *1 (E.D.N.Y. Mar. 26, 2018) ("Spoliation is not a stand-alone cause of action in New York"). Accordingly, Plaintiff's only cognizable state cause of action is her conversion claim.

***13** The Court notes two issues that must be addressed related to this conversion claim. *First*, the Court will assess the impact of Plaintiff's failure to file a notice of claim as it relates to her conversion claim against BOE and the Individual Defendants in their official capacity. *Second*, because Plaintiff's federal claims are dismissed, there is a question about whether this Court should retain jurisdiction over that conversion claim. 28 U.S.C. § 1367(c)(3).

#### A. Plaintiff's Failure to File a Notice of Claim

Under New York law, a notice of claim is a condition precedent to bringing a tort lawsuit against a municipal corporation, or any of its officers, agents, or employees. N.Y. Gen. Mun. Law §§ 50-e(1), 50-i(1); *see Parise v. N.Y.C. Dep't of Sanitation*, 306 F. App'x 695, 697 (2d Cir. 2009); *Hardy v. N.Y.C. Health & Hosp. Corp.*, 164 F.3d 789, 793 (2d Cir. 1999). The "[n]otice of claim requirements are construed strictly by New York state courts, and failure to abide by their terms mandates dismissal of the action for lack of subject-matter jurisdiction." *Tulino v. City of New York*, No. 15-CV-7106 (JMF), 2016 WL 2967847, at *3 (S.D.N.Y. May 19, 2016) (internal quotation marks omitted); *see Hardy*, 164 F.3d at 793-94 ("Notice of claim requirements are construed strictly by New York state courts. Failure to comply with these requirements ordinarily requires a dismissal for failure to state a cause of action.").

Here, Plaintiff concedes that she has not filed a notice of claim, such that conversion claim is seemingly subject to dismissal under New York law. (Pl. Opp. 13.) Plaintiff nevertheless argues that she may seek leave to serve a late notice of claim under New York General Municipal Law § 50-e(5), such that dismissal is not warranted. (*Id.*) It is true that, under Section 50-e(5), "[u]pon application, [a] court, in its discretion, may extend the time to serve a notice of claim." N.Y. Gen. Mun. Law § 50-e(5). However, New York's General Municipal Law has only vested the power to grant notice of claim extensions to the New York State supreme courts and county courts. *Id.* § 50-e(7). Federal courts are not authorized to grant such extensions. *See, e.g.*, *Davis v. City of New York*, No. 12 Civ. 3297 (PGG), 2018 WL 10070540, at *13 (S.D.N.Y. Mar. 30, 2018) ("New York has given the power to extend deadlines for serving notice of claim to state supreme courts and county courts, and federal courts are not authorized to grant such extensions."); *Dayton v. City of Middletown*, 786 F. Supp. 2d 809, 824-25 (S.D.N.Y. 2011) ("[T]his Court lacks jurisdiction, pursuant to § 50–e(7), to deem Plaintiffs' 5/30/09 Amended Notice of Claim for their state law claims against Orange County timely filed, or to grant an extension of time to file a late notice of claim"). As Plaintiff has neither filed a notice of claim nor indicated that she has applied to any state or county court to file a late notice of claim, the Court GRANTS Defendants' motion to dismiss Plaintiff's conversion claim against BOE and the Individual Defendants in their official capacity. The claim is dismissed

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

without prejudice upon a showing that Plaintiff has obtained leave to file a late notice.

**B. Supplemental Jurisdiction**

Once a court dismisses a claim over which it had original jurisdiction, § 1367(c) provides for "an occasion to decline to exercise supplemental jurisdiction." *Catzin v. Thank You & Good Luck Corp.*, 899 F.3d 77, 83 (2d Cir. 2018). "Under this prong, in a great many cases, the evaluation will usually result in the dismissal of the state-law claims." *Id.* (citing *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988); *see also Lievre v. JRM Constr. Mgmt., LLC*, No. 17-CV-4439 (BCM), 2019 WL 4572777, at *22 (S.D.N.Y. Sept. 20, 2019) ("In the 'usual case' in which 'all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine ... will point toward declining to exercise jurisdiction over the remaining state-law claims.")). Still, "the fact that a federal law claim has been eliminated prior to trial does not automatically render dismissal of state law claims appropriate." *See Colón v. N.Y.S. Dep't of Corrs. and Cmty. Supervision*, No. 15 Civ. 7432 (NSR), 2019 WL 5294935, at *11 (S.D.N.Y. Oct. 17, 2019). Instead, a court should assess whether exercising jurisdiction will promote "economy, convenience, fairness, and comity." *Jones v. Ford Motor Credit Co.*, 358 F.3d 205, 214 (2d Cir. 2004) (citation omitted); *Kolari v. N.Y. Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) ("Once a district court's discretion is triggered under § 1367(c)(3), it balances the traditional values of judicial economy, convenience, fairness, and comity." (quoting *Cohill*, 484 U.S. at 350)).

***14** Here, this case has yet to proceed beyond the pleading stage. Moreover, discovery has yet to be taken in any form. Courts have regularly exercised their discretion to decline supplemental jurisdiction in similar situations. *See, e.g.*, *Ruotolo v. Fannie Mae*, 933 F. Supp. 2d 512, 527 (S.D.N.Y. 2013) (declining to exercise supplemental jurisdiction where federal law claims were dismissed before trial upon defendants' motion to dismiss); *Dellutri v. Vill. of Elmsford*, 895 F. Supp. 2d 555, 575 (S.D.N.Y. 2012) ("[T]his case remains in its initial stages, and the Parties have not yet proceeded to discovery. As all of Plaintiff's federal claims have been dismissed, the Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims."); *Williams v. Berkshire Fin. Grp.*, Inc., 491 F. Supp. 2d 320, 329 (E.D.N.Y. 2007) (declining to supplemental jurisdiction where, inter alia, the "case ha[d] not progressed beyond the pleading stage[,] [n]o discovery has been taken[, and] [t]he parties ha[d] no investment in th[e] [c]ourt beyond the instant motions [to dismiss]."). On balance, the considerations of judicial economy, fairness, and comity militate in favor of this Court declining to exercise supplemental jurisdiction at this time. The Court GRANTS Defendants' motion to dismiss Plaintiff's conversion claim against the Individual Defendants, without prejudice. [12]

**IV. Leave to Amend**

It is within the Court's discretion to *sua sponte* grant leave to amend. *See Grain Traders, Inc. v. Citibank, N.A.*, 160 F.3d 97, 106 (2d Cir. 1998); *Witkowich v. Gonzales*, 541 F. Supp. 2d 572, 590 (S.D.N.Y. 2008). To this end, under Federal Rule of Civil Procedure 15(a)(2), courts "should freely give leave" to amend a complaint "when justice so requires." When exercising this discretion, courts will consider many factors, including undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies, undue prejudice to the opposing party, and futility. *Local 802, Associated Musicians of Greater N.Y. v. Parker Meridien Hotel*, 145 F.3d 85, 89 (2d Cir. 1998) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

Here, the Court will grant Plaintiff leave to file an amended complaint as to those claims not dismissed with prejudice. Specifically, it is the Court's view that, notwithstanding the above explained deficiencies, Plaintiff could potentially plead facts that cure her complaint's defects. To be sure, Plaintiff has high hurdles to overcome. Nevertheless, the Court concludes that granting leave to amend in this case would not necessarily be futile at this juncture. Furthermore, as this case is still in its infancy, there would be minimal prejudice to Defendants in permitting an amendment at this time. The Court reminds Plaintiff that her amended complaint must comport with this Court's Opinion and Order.

**CONCLUSION**

For the foregoing reasons, Defendants' motion is GRANTED. Plaintiff, however, is granted leave to file an amended complaint as to any claims that have not been dismissed with prejudice. If she chooses to do so, Plaintiff will have until May 29, 2020 to file her amended complaint. Defendants are then directed to answer or otherwise respond by July 13, 2020. Failure to file an amended complaint within the time allowed, and without good cause to excuse such failure, will result in the dismissal of Plaintiff's federal claims

with prejudice and dismissal of her state law claims without prejudice so that she may re-file in state court.

***15** The Court respectfully directs the Clerk of the Court to terminate the motion at ECF No. 32.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2020 WL 1699985

## Footnotes

1 The complaint contains two paragraphs numbered 11. This is a reference to the second paragraph 11.

2 The Complaint does not specify whether Plaintiff was able to re-obtain her Petitions. However, in her letter to BOE, dated March 27, 2019, Plaintiff notes BOE's "failure to return" her Petitions "for possible amendment." (Compl. Ex. II.)

3 BOE's counsel responded on April 1, 2019. (Compl. Ex. IV.) The letter reiterated the statutorily prescribed time period for submitting designating petitions for the 2019 primary election and noted that Plaintiff had submitted her Petitions outside of that period. (*Id.*) BOE further informed Plaintiff that she could not cure her Petitions' defects because the cure period would still conclude prior to the commencement of the statutorily mandated designating petition filing period. (*Id.*)

4 Defendants fiercely dispute causation, contending that it was the combination of Plaintiff's failure to timely file her Petition under N.Y.E.L., as well as the objections invalidating the signatures in the Petitions after she filed an amended cover sheet, that caused Plaintiff's alleged injuries. (Defs. Mot. 5-6; Defs. Reply in Supp. of Defs. Mot. ("Defs. Reply"), ECF No. 35, at 4-5.) Defendants' argument, however, ultimately goes to the merits and plausibility of Plaintiff's claims, rather than her standing to bring them. On this point, the Court emphasizes that "just because Plaintiff[ ] here ha[s] alleged an injury-in-fact that is 'fairly traceable to the challenged conduct and redressable by a favorable judicial decision[ ]' [ ] does not mean that Plaintiff[ ] ha[s] a valid claim on the merits." *Maslow v. Bd of Elections in City of N.Y.*, No. 06-CV-3683 (NGG)(SMG), 2018 WL 2185370, at *4 (E.D.N.Y. May 23, 2008), *aff'd*, 658 F.3d 291 (2d Cir. 2011).

5 This is true whether the property/liberty interest is characterized as Plaintiff's interest in being a primary candidate or if Plaintiff is attempting to maintain that the protected interest is in her Petitions.

6 Although both parties focused on Plaintiff's post-deprivation remedies, several courts that have considered the issue have concluded that Article 16 is more akin to a pre-deprivation remedy. *See, e.g.*, *Dekom v. Nassau Cty.*, No. 12-CV-3473 (JS)(ARL), 2013 WL 5278019, at *7 (E.D.N.Y. Sept. 18, 2013) ("courts have addressed this very issue, finding that Section 16-102 provides a pre-deprivation remedy and thus denying due process claims strikingly similar to those Plaintiffs now raise."); *Leroy*, 793 F. Supp. 2d at 539-40 (noting that "if the denial of ballot access is a deprivation within the ambit of due process, deprivation occurs at the first moment a voter can cast a ballot in the subject election contest, if the candidate has not yet been reinstated to the ballot); *Murawski*, 514 F. Supp. 2d at 586 n.5 (describing Article 16 as a pre-deprivation remedy); *Douglas*, 2007 WL 3036809 at *5 ("In the Court's view, the special proceeding [under Article 16] constitutes an adequate 'pre-deprivation' procedure."). Other courts, however, have classified Article 16 as a post-deprivation remedy. *See, e.g. EH Fusion Party v. Suffolk Cty. Bd. of Elections*, 401 F. Supp. 3d 376, 389 (E.D.N.Y. 2019) (describing Article 16 as a "post-deprivation remedy"). The distinction ultimately does

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

not impact the due process considerations outlined above. *See* *Bal v. Manhattan Democratic Party*, No. 16-cv-2416 (PKC), 2018 WL 6528766, at *8 (S.D.N.Y. Dec. 12, 2018)

7 Plaintiff does not contend that she lacked awareness of Article 16. Nor could she. As Plaintiff concedes, she availed herself to this judicial review when BOE's determination of viability of her amended Petitions. (Pl. Opp. 7.) Plaintiff cannot now be heard to argue that an “established state procedure” by Defendants destroyed her entitlement to being on the ballot for the June 2019 mayoral primary. (*See id.* 11.)

8 To the extent Plaintiff premises her First Amendment claims on Defendants’ purported failure to provide her with a hearing regarding her challenge to their March 25, 2019 decision, her claim fails for the same reasons her due process challenge failed. It is well settled that, where a plaintiff's “First Amendment claims are ‘virtually indistinguishable’ from” his or her due process claims,” a failure to state a due process claim “necessarily” means that plaintiff has failed to state a First Amendment claim.” *See* *Dekom*, 2013 WL 5278019 at *8 (citing *Rivera-Powell*, 470 F.3d at 468-69); *Marchant*, 2013 WL 4407098 at *4 (“Plaintiffs’ First Amendment claims are ‘virtually indistinguishable’ from their due process claims (and fail for the same reason), because they arise from the same alleged violation, namely, Plaintiff Lee's exclusion from the primary ballot due to errors in two cover sheets.”).

9 If anything, the procedures reflected in *Swiller* appear consistent with what occurred in this case. As the *Swiller* opinion explains, BOE reviewed the objections filed against the candidates’ designating petitions and, in turn, disqualified signatures as invalid. *Swiller*, 56 Misc. 3d 1218(A) at *1 (“Swiller and Walfish filed objections to the designating petitions with the Westchester County Board of Elections (“the Board”). The Board reviewed the objections and determined the Lecuona petitions contained 950 valid signatures, disqualifying 1,691 signatures as invalid.”). This appears to be the same process that transpired with Plaintiff's Petitions upon the filing of her amended cover sheet for the Petitions, notwithstanding Plaintiff's allegations of impropriety. (*See* Compl. ¶ 33.) The only difference is that, in *Swiller*, there were still enough valid signatures to allow the candidates to appear on the primary ballot. 56 Misc. 3d 1218(A) at *1.

10 *See* N.Y.E.L. § 1-106(2) (“The failure to file any petition or certificate relating to the designation or nomination of a candidate for party position or public office or to the acceptance or declination of such designation or nomination within the time prescribed by the provisions of this chapter shall be a fatal defect.”).

11 Plaintiff claims that this case presents an issue of first impression because “[n]o cited cases deal[ ] with a situation where a Candidate is [misled] into handing over Petitions[ ] and then not allowed, prior to any applicable deadline passing, to participate in the same process that other candidates used 2017 [a reference to the *Swiller* decision].” (Pl. Opp. 10.) However, as her complaint notes (Compl. ¶ 33), and Defendants observe (Defs. Reply 8), Plaintiff's failure to appear on the ballot related to objections to her Petitions that prevented her from meeting the election's signature requirement. As such, even assuming misleading conduct, Plaintiff provides no basis for this Court to conclude that her exclusion from the primary ballot was a Fourth Amendment violation.

12 Because the Court declines supplemental jurisdiction over the conversion claims, it will decline to adjudicate it on its merits. *See* *Monzert v. United Secrutiy, Inc.*, CV 14-3274, 2016 WL 3538368, at *1 n.3 (E.D.N.Y. June 21, 2016) (“Since the Court declines to exercise supplemental jurisdiction, it declines to comment or rule on the merits of Defendant's argument that Plaintiffs have failed to state a breach of contract claim.”). The Court, however, notes that much of the same reasoning underlying the dismissal of Plaintiff's Fourth Amendment claim would be relevant to an analysis of Plaintiff's conversion claim. *See* *Okyere v. Palisades Collection, LLC*, 961 F. Supp. 2d 522, 534 (S.D.N.Y. 2013) (“To make out a claim for conversion, a plaintiff must show ‘(1) plaintiff's possessory right or interest in the property and (2) defendant's dominion over the property or interference with it, in derogation of plaintiff's rights.’ ‘Where possession of property is initially

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

lawful, conversion occurs when there is a refusal to return the property upon demand.' " (internal quotations and citations omitted)).

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.

1998 WL 382055
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Angel GONZALEZ, Plaintiff,
v.
THE CITY OF NEW YORK; New York City Department of Correction; Warden, Otis Bantum Correctional Center; Corrections Officer Summer, Shield No. 11856, Defendants.

No. 97 CIV. 2246(MGC).
|
July 9, 1998.

## MEMORANDUM OPINION AND ORDER

CEDARBAUM, J.

***1** Plaintiff *pro se,* Angel Gonzalez, brings this action under 42 U.S.C. § 1983. He alleges that while in the custody of the New York City Department of Correction ("NYC DOC"), he was beaten by Correction Officer Summer. This is a motion to dismiss the complaint as against the City of New York, Warden of Otis Bantum Correctional Center (the "Warden") and NYC DOC pursuant to Fed.R.Civ.P. 12(b)(6).

On April 22, 1998, a letter was sent to Gonzalez directing him to respond to this motion by June 22, 1998. The letter advised Gonzalez that if he did not respond by June 22, the motion would be decided on the basis of the existing record, and the City of New York, New York City Department of Correction and Warden of Otis Bantum Correctional Facility might be dismissed from the action. Gonzalez has not responded. For the reasons that follow, the motion to dismiss is granted.

## BACKGROUND

The complaint alleges that plaintiff was assaulted by Correction Officer Summer while he was incarcerated at Otis Bantum Correctional Center on Rikers Island, New York City. According to the complaint, as plaintiff was coming into the facility's recreation area from the "yard," he passed through a metal detector which registered that he had a metal object on his person. Defendant Summer then swore at plaintiff and told him to hurry up. As plaintiff passed through the metal detector a second time, he said to Summer, "You don't have to act like that!" Summer then struck plaintiff in the face repeatedly until he lost consciousness. According to the complaint, when plaintiff regained consciousness, he found Summer "still abusing" him and swearing at him. Plaintiff left, found his way back to the housing area and felt as if he "had been hit with a bat to the face ." Plaintiff alleges that he suffered a cut under his left eye, serious swelling of his face and head, and lacerations of his scalp. He alleges that black and blue shadows still show under his eyes, and that he suffers from headaches. He seeks damages in the amount of three million dollars.

## DISCUSSION

On a motion to dismiss pursuant to Rule 12(b)(6), the factual allegations of the complaint must be accepted as true, *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 164, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993), and all reasonable inferences must be drawn in favor of the plaintiff, *Bolt Elec., Inc. v. City of New York,* 53 F.3d 465, 469 (2d Cir.1995). A complaint should not be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

1. NYC DOC and the City of New York
Defendants argue that Gonzalez cannot assert a claim against NYC DOC based on any legal theory because it is not a suable entity. They also contend that the complaint fails to state a claim against the City of New York because it does not allege that the actions complained of were the result of an official policy, custom or practice of the City of New York.

***2** In addition to the defect that NYC DOC is an agency of the City of New York that is not a suable entity,[1] the complaint fails to state a claim upon which relief can be granted against either NYC DOC or the City. To state a claim under § 1983, a plaintiff must allege that a person acting under color of state law deprived him of a right, privilege or immunity guaranteed by federal law. To state a claim against a municipality, a plaintiff must also plead that the wrongful action alleged was the result of an official policy, custom or practice of the municipality, and that that policy caused plaintiff's injury. *Monell v. Department of Social Services,* 436 U.S. 658, 690–95, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

The complaint, however, alleges no official policy, custom or practice resulting in injury to Gonzalez. Indeed, the complaint does not even mention the City of New York or NYC DOC, except to the extent that they are listed as parties.

2. Warden of Otis Bantum Correctional Center

Defendants also urge dismissal of the complaint against the Warden, on the ground that there are no allegations in the complaint concerning that defendant. When an individual defendant is sued under § 1983, that defendant's personal involvement in the alleged constitutional deprivation is a prerequisite to an award of damages. *See Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994). For a claim under § 1983, a complaint sufficiently alleges personal involvement of a supervisory official if it alleges one of the following: (a) direct participation in the alleged wrong; (b) failure to remedy a violation after receiving notice of it; (c) creation of a policy or custom under which unconstitutional practices occur; or, (d) grossly negligent management of subordinates who cause the constitutional violation. *See Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996).

A § 1983 claim against a municipal official in his official capacity is treated as a claim against the municipality itself. *Brandon v. Holt,* 469 U.S. 464, 471–72, 105 S.Ct. 873, 83 L.Ed.2d 878 (1985). As noted above, § 1983 imposes liability on a municipality only when the action that is alleged to be unconstitutional implements or executes an official policy or custom. *See Monell,* 436 U.S. at 690–91.

From the complaint, it is unclear whether the warden is being sued in his personal or official capacity. However, *pro se* complaints, if possible, should be construed as asserting both claims. *Jackson v. Dinkins,* 1995 WL 657075, at *1 (S.D.N.Y. Nov.8, 1995) (citing *Frank v. Relin,* 1 F.3d 1317, 1326 (2d Cir.), *cert. denied,* 510 U.S. 1012, 114 S.Ct. 604, 126 L.Ed.2d 569 (1993)).

The complaint does not allege the personal involvement of the Warden. The complaint mentions the Warden only in the caption, and fails to allege any act or omission by that party. *See Crown v. Wagenstein,* 1998 WL 118169, at *1 (S.D.N.Y. Mar.16, 1998) (mere inclusion of warden's name in complaint insufficient to allege personal involvement); *Taylor v. City of New York,* 953 F.Supp. 95, 99 (S.D.N.Y.1997) (same).

***3** Finally, to the extent that the complaint asserts an official-capacity claim against the Warden, the claim fails for the same reason that the claims against the City of New York and NYC DOC fail. There are no allegations of any municipal policy or custom that the Warden was executing, or that such a policy or custom caused the alleged violation of the plaintiff's constitutional rights, as required by *Monell.* The absence of any such allegation precludes a finding of liability against the Warden in his official capacity.

Accordingly, the complaint fails to the state a claim against the Warden upon which relief can be granted.

## CONCLUSION

For the foregoing reasons, the motion to dismiss the complaint as against defendants the City of New York, New York City Department of Correction, and Warden of Otis Bantum Correctional Facility is granted.

SO ORDERED.

**All Citations**

Not Reported in F.Supp., 1998 WL 382055

## Footnotes

1 Defendants correctly point out that New York City agencies, such as NYC DOC, are organizational subdivisions of the City of New York lacking independent legal existence and are not themselves subject to suit. *See, e.g., Adams v. Galletta,* 966 F.Supp. 210, 212 (S.D.N.Y.1997) (“where a plaintiff has named the Department of Corrections as a defendant, he has sued a non-suable entity”).

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 902370
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Chitra KARUNAKARAN, Plaintiff,
v.
BOROUGH OF MANHATTAN COMMUNITY COLLEGE, City University of New York, Antonio Perez, Karin Wilks, Sangeeta Bishop, Rifat Salam, Antionette McKain, Robert Diaz, Ian Wentworth, Michael Hutmaker, and Marva Craig, Defendants.

18 Civ. 10723 (ER)
|
Signed 03/28/2022

**Attorneys and Law Firms**

Chitra Karunakaran, New York, NY, Pro Se.

Jack Kevin Shaffer, IRS Office of Chief Counsel, New York, NY, for Defendants Antonio Perez, Sangeeta Bishop, Rifat Salam, Antionette McKain, Robert Diaz, Ian Wentworth, Borough of Manhattan Community College, City University of New York, Karin Wilks, Michael Hutmaker, Marva Craig.

**OPINION AND ORDER**

Ramos, D.J.:

***1** Chitra Karunakaran, who was a Professor at the Borough of Manhattan Community College ("BMCC"), which is part of the City University of New York ("CUNY"), brings this action against CUNY, BMCC, and several current and former employees of BMCC[1] (collectively, the "Defendants"), for violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), the Age Discrimination in Employment Act ("ADEA"), the New York State Human Rights Law ("NYSHRL"), and the New York City Human Rights Law ("NYCHRL"). *See* Doc. 62. In particular, Karunakaran alleges that Defendants discriminated against her on the basis of her race, national origin, and age, and retaliated against her. *See id.*

Karunakaran, proceeding *pro se*, first filed her complaint on November 15, 2018. *See* Doc. 2. On September 6, 2019, after retaining counsel, Karunakaran filed an amended complaint ("First Amended Complaint" or "FAC"). *See* Doc. 7. Defendants moved to dismiss the FAC on May 7, 2020. *See* Doc. 45. On February 12, 2021, the Court granted Defendants' motion, dismissing Karunakaran's federal claims without prejudice to replead, and declining to exercise supplemental jurisdiction over Karunakaran's NYSHRL and NYCHRL claims. *See* Doc. 55. On March 26 and 27, 2021, Karunakaran's counsel filed letter motions seeking to withdraw. See Docs. 57-58. The Court granted counsel's requests to withdraw. *See* Doc. 59.

On April 30, 2021, Karunakaran, again proceeding *pro se*, filed a second amended complaint ("SAC"). *See* Doc. 62. Defendants now move to dismiss the SAC pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons discussed below, the motion is GRANTED.

## I. BACKGROUND

Karunakaran, a 75-year-old Indian woman, was employed by CUNY at BMCC for approximately 20 years as a professor of psychology and sociology. Doc. 62 ¶¶ 13, 37. Karunakaran alleges that on February 27, 2018, a student (the "Student") in her class became verbally and physically aggressive towards her and disrupted class. *Id.* ¶ 41. Specifically, Karunakaran alleges that the Student told her, "You suck. You don't know anything." *Id.* ¶ 42. According to Karunakaran, the Student repeated these comments on two other occasions. *Id.* Karunakaran argues that the Student's behavior was racially motivated because, when she had previously taught the Student in online classes, the Student had not been disruptive. *Id.* Karunakaran also argues that the Student relied on "prevailing racialized stereotypes ... about Asians" and assumed Karunakaran would remain silent "in the face of her mocking verbal abuse" and would not confront her or call security. *Id.* at 23.

Karunakaran alleges she complained to Defendants about the Student's behavior, and, in particular, that in emails to Defendants, she offered to speak with the Student, suggested that the Student take her class online, and requested that BMCC's Office of Student Affairs remove the Student from her class. *Id.* ¶¶ 42, 43. According to Karunakaran, Defendants did not respond to her emails and did not otherwise intervene to address the Student's behavior. *Id.* Specifically, Karunakaran alleges Defendant Ian Wentworth, who at the time worked in the Office of Student Affairs, took no action in response to the Student's behavior and in so doing allowed the behavior to re-occur. *Id.* ¶ 43.

***2** On March 18, 2018, Karunakaran filed a complaint, titled "A Hostile Work Environment," with Defendant Antonio Perez, who was at the time President of BMCC. *Id.* ¶¶ 18, 49; Doc. 2 at 19. In her complaint, Karunakaran alleged that BMCC maintained a "covert, ad hoc/post hoc mode of organizational dysfunction resulting in a generally unchallenged racialized, ageist hostile work environment for contingent academic labor." Doc. 2 at 19.

Karunakaran alleges that on March 27, 2018, the Student, after learning she had failed the midterm, tried to grab papers and other materials from her and ran from her office. Doc. 62 ¶ 45. Karunakaran alleges she continued to complain to Defendants about the Student's conduct but, as before, they took no action. *Id.* ¶ 46. Karunakaran argues that Defendants, in "completely disregarding their job responsibilities ... and at no point attempting to remedy the ongoing and dangerous situation caused by [the] Student," discriminated against her on the basis of her race, national origin, and age. *Id.* ¶ 47.

Karunakaran also alleges that she participated in various whistleblowing and union activities throughout her tenure, *id.* ¶¶ 40, 52, and lists a number of examples of these activities. *Id.* at 50. Specifically, Karunakaran alleges that she emailed Perez to encourage him to program every department printer to print double-sided; she asked Perez why online classes could not be taught through "Peer faculty mentoring;" she asked Defendant Sangeeta Bishop whether she could serve on an equity and inclusion task force but was told that adjunct professors were not included; she asked whether faculty needed to include attendance information in their syllabi; she complained about Defendants' failure to manage the Student's conduct; and she asked why hard copies of mail had not been delivered to BMCC's uptown campus. *Id.* at 50-51.

On May 11, 2018, Karunakaran was denied reappointment for the Fall 2018 semester. *Id.* ¶¶ 39, 51. Karunakaran argues this denial resulted from discrimination and retaliation on the basis of her race, national origin, and age. *Id.* ¶ 40. Karunakaran alleges that she was replaced by a younger professor with "less age-defined seniority ... [and] possibly without a doctorate...." *Id.* at 39-40.

On August 13, 2018, Karunakaran filed a charge of discrimination with the New York State Division of Human Rights. *Id.* ¶ 3. The charge was subsequently sent to the Equal Employment Opportunity Commission ("EEOC"), and on August 21, 2018, the EEOC issued a Right to Sue letter. *Id.* ¶ 4.

As stated above, Karunakaran filed a *pro se* complaint in this Court on November 15, 2018. Doc. 2. With the assistance of counsel, she filed an FAC on September 6, 2019. Doc. 7. Defendants moved to dismiss the FAC on May 7, 2020, and the Court granted Defendants' motion on February 12, 2021, dismissing Karunakaran's federal claims without prejudice to replead, and declining to exercise supplemental jurisdiction over Karunakaran's NYSHRL and NYCHRL claims. *See* Docs. 45, 55. On April 30, 2021, Karunakaran —again proceeding *pro se*—filed the instant complaint., alleging substantially the same facts she alleged in her FAC.

## II. LEGAL STANDARD

When ruling on a motion to dismiss pursuant to Rule 12(b)(6), district courts are required to accept as true all factual allegations in the complaint and to draw all reasonable inferences in the plaintiff's favor. *Walker v. Schult*, 717 F.3d 119, 124 (2d Cir. 2013). However, this requirement does not apply to legal conclusions, bare assertions, or conclusory allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 681 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). In order to satisfy the pleading standard set forth in Rule 8, a complaint must contain sufficient factual matter to state a claim for relief that is plausible on its face. *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 570). Accordingly, a plaintiff is required to support her claims with sufficient factual allegations to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (quoting *Twombly*, 550 U.S. at 557) (internal quotation marks omitted).

***3** "Because [Karunakaran] is a *pro se* litigant, we read h[er] supporting papers liberally, and will interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). When a plaintiff's claims involve civil rights violations, the Court applies this standard "with particular force." *Jackson v. NYS Dep't of Lab.*, 709 F. Supp. 2d 218, 224 (S.D.N.Y. 2010) (citing *McEachin v. McGuinnis*, 357 F.3d 197, 200 (2d Cir. 2004)). "However, even *pro se* plaintiffs asserting civil right claims cannot withstand a motion to dismiss unless their pleadings contain factual allegations sufficient to raise a 'right to relief above the speculative level.' " *Id.* (quoting *Twombly*, 550 U.S. at 555). Lastly, "[a] district court deciding a motion to dismiss may consider factual allegations made by a *pro se* party in his papers opposing the motion." *Walker*, 717 F.3d at 122 n.1.

## III. DISCUSSION

### a. Title VII and ADEA Claims

#### i. Discrimination

Karunakaran alleges that Defendants discriminated against her when they failed to address the Student's behavior and when they denied her reappointment. Doc. 62 ¶¶ 47, 55. Karunakaran also alleges Defendants treated her less favorably than similarly situated co-workers. *Id.* ¶ 55.

Discrimination claims under Title VII or the ADEA are analyzed under the three-step burden-shifting framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Kovaco v. Rockbestos-Surprenant Cable Corp.*, 834 F.3d 128, 136 (2d Cir. 2016). Under the *McDonnell* framework, a plaintiff first must establish a *prima facie* case of discrimination. *McDonnell*, 411 U.S. at 802. Once the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to offer a legitimate, nondiscriminatory reason for its actions. *Id.* at 802-03. If the defendant satisfies its burden, the burden shifts back to the plaintiff to demonstrate that the proffered reason is pretextual. *Id.* at 804. Ultimately, the plaintiff will be required to prove that the defendant acted with discriminatory motivation. *See Littlejohn v. City of New York*, 795 F.3d 297, 307 (2d Cir. 2015). At the pleading stage, however, the facts alleged must merely “give plausible support to the reduced requirements that arise under *McDonnell Douglas* in the initial phase of ... litigation.” *Id.* at 311. Thus, the question on a motion to dismiss is whether the plaintiff has adequately pleaded a *prima facie* case.

To establish a *prima facie* case of discrimination under either Title VII or the ADEA, a plaintiff must show that (1) she belonged to a protected class, (2) she was qualified for the position, (3) she suffered an adverse employment action, and (4) the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent. *See Terry v. Ashcroft*, 336 F.3d 128, 137-38 (2d. Cir. 2003). Although a plaintiff is not required to plead facts proving each element of a *prima facie* case of discrimination at the pleading stage, her allegations must provide “plausible support” for a “minimal inference” that the employer was motivated by discriminatory intent.” *Littlejohn*, 795 F.3d at 311. Further, those allegations must be fact-specific. *See Grimes v. Fremont General Corp.*, 785 F. Supp. 2d 269, 296 (S.D.N.Y. 2011). Conclusory or naked allegations will not do. *See id.*

Here, as was the case in her first amended complaint, Karunakaran fails to plead allegations that support a minimal inference of discriminatory motivation. As Defendants point out, Karunakaran's SAC “suffers from the same flaws” as her FAC. *See* Doc. 69 at 10. Again, beyond conclusory statements that she was denied reappointment as a result of discrimination, Karunakaran does not allege any specific facts showing that the denial was related to discrimination on the basis of her race, national origin, or age. *See, e.g.*, *Marcus v. Leviton Mfg. Co.*, 661 F. App'x 29, 32-33 (2d Cir. 2016) (“plaintiff must supply sufficient factual material, and not just legal conclusions, to push the misconduct alleged in the pleading beyond he realm of the ‘conceivable’ to the ‘plausible’ ”).

***4** Beyond this, Karunakaran again does not provide any information about similarly situated employees. When a plaintiff seeks to meet her *prima facie* case by reference to the disparate treatment of an allegedly similarly situated employee, “the plaintiff must show that she shared sufficient employment characteristics with that comparator so that they could be considered similarly situated.” *McGuinness v. Lincoln Hall*, 263 F.3d 49, 53 (2d Cir. 2001). A plaintiff need not show that a comparator was an “*identically* situated employee,” just that she was “similarly situated in all *material* respects.” *Id.* at 53-4 (quoting *Shumway v. United Parcel Service*, 118 F.3d 60, 64 (2d Cir. 1997)) (emphasis in original). Further, such employee “must have a situation sufficiently similar to plaintiff's to support at least a minimal inference that the difference of treatment may be attributable to discrimination.” *Kearney v. ABN AMRO, Inc.*, 738 F. Supp. 2d. 419, 426 (S.D.N.Y. Sept. 15, 2010) (quoting *McGuinness*, 263 F. 3d at 54) (internal quotation marks omitted). Employment characteristics which can support a finding that two employees are “similarly situated” include “similarities in education, seniority, performance, and specific work duties,” *DeJesus v. Starr Technical Risks Agency, Inc.*, 03 Civ. 1298 (RJH), 2004 WL 2181403, at *9 (S.D.N.Y. Sept. 27, 2004), and similar requirements for skill, effort, and responsibility for jobs performed “under similar working conditions.” *DeJohn v. Wal-Mart Stores E., LP*, 09 Civ. 01315 (GTS), 2013 WL 1180863, at *6 (N.D.N.Y. Mar. 20, 2013).

In the Court's order granting Defendants' first motion to dismiss, the Court noted that Karunakaran's general allegations that she was treated less favorably than certain similarly situated employees were insufficient "without ... additional details about specific events and without ... additional facts that [she] was similarly situated in all material respects to those comparator employees." Doc. 55 at 9-10. While given another opportunity to do so, Karunakaran again does not provide these specifics. Karunakaran merely re-alleges, upon information and belief, that she was replaced by a younger professor. She does not identify or otherwise describe this professor, nor does she provide any facts alleging that she and this professor were similarly situated in any material respect or that she was treated less well than this professor.

In addition, in a purported attempt to remedy the deficiencies in her FAC, Karunakaran explains that *all* her former co-workers are her comparators: "All faculty regardless of appointment, are comparators." Doc. 62 at 17. But, again, she does not explain how she was similarly situated to all faculty members. That they teach the same students, as Karunakaran alleges, is not enough. *See id.* Nor does she offer specific examples of disparate treatment with respect to these co-workers. While Karunakaran generally alleges that her similarly-situated co-workers were not terminated, *id.* ¶ 55, she does not provide any further details.

Karunakaran also alleges that another professor in the psychology department at times let her students leave after only one hour of class, even though the class was meant to run for two and a half hours. Doc. 62 at 59-60. Karunakaran does not identify or describe this alleged comparator, nor does she explain how this professor's choice to let her students leave class early in any way supports an inference of discrimination against her; notably, Karunakaran does not allege that she would not have been allowed to make the same choice. At bottom, none of these allegations can support even a minimal inference that Karunakaran experienced a difference in treatment attributable to discrimination. *See Henry v. NYC Health & Hosp. Corp.*, 18 F. Supp. 3d 396, 409 (S.D.N.Y. 2014) (dismissing discrimination claims where complaint fails to identify, let alone describe, any purported comparator).

As to her claim that Defendants discriminated against her by failing to address the Student's behavior, Karunakaran does not show how this failure is in any way connected to her race, national origin, or age.

***5** Because, as Defendants argue, Karunakaran does not submit any allegations to support an inference that Defendants' failure to address the Student's behavior and denial of her reappointment were at all motivated by her race, national origin, or age, her federal discrimination claims are dismissed.

### ii. Retaliation Claims

Karunakaran alleges Defendants retaliated against her for her participation in a protected activity. Doc. 62 at 14. Specifically, she alleges Defendants denied her reappointment because of her "persistent participation in lawful union activity" and because of her "whistleblower queries." *Id.* ¶ 40.

Like her discrimination claims, Karunakaran's retaliation claims also are analyzed under the *McDonnell* framework. [2] Under that framework, a plaintiff first must establish a *prima facie* case of retaliation. *McDonnell*, 411 U.S. at 802. Once the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to offer a legitimate, nonretaliatory reason for its actions. *Id.* at 802–03; *Kirkland v. Cablevision Sys.*, 760 F.3d 223, 225 (2d Cir. 2014). If the defendant satisfies its burden, the burden shifts back to the plaintiff to demonstrate that the proffered reason is pretextual. *McDonnell*, 411 U.S. at 804; *Kirkland*, 760 F.3d at 225.

To state a *prima facie* case of retaliation under § 1981, a plaintiff must establish (1) participation in a protected activity; (2) defendant's knowledge of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action. *Dickens v. Hudson Sheraton Corp., LLC*, 167 F. Supp. 3d 499, 522 (S.D.N.Y. 2016), *aff'd*, 689 F. App'x 670 (2d Cir. 2017).

Here, Karunakaran cannot plausibly allege a protected activity. "A protected activity is one that 'protest[s] or oppose[s] statutorily prohibited discrimination.' " *Kouakou v. Fideliscare New York*, 920 F. Supp. 2d 391, 400 (quoting *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566); *Brands-Kousaros v. Banco Di Napoli S.P.A.*, No. 97 Civ. 1673 (DLC), 1997 WL 790748, at *5 (S.D.N.Y. Dec. 23, 1997) ("the protected activity alleged must involve some sort of complaint about a type of discrimination that [a statute] forbids."). While a protected activity generally involves the filing of a formal

complaint of discrimination with an administrative agency, *see* *Kotcher v. Rosa & Sullivan Appliance Ctr.*, 957 F.2d 59, 65 (2d Cir. 1992), “both formal and informal complaints [are] protected activity....” *Schaper v. Bronx Lebanon Hosp. Ctr.*, 408 F. Supp. 3d 379, 391 (S.D.N.Y. 2019) (citing *Hubbard v. Total Commc'ns, Inc.*, 347 F. App'x 679, 680–81 (2d Cir. 2009)).

Protected complaints generally include “making complaints to management ..., protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges.” *Soliman v. Deutsche Bank AG*, No. 03 Civ. 104 (CBM), 2004 WL 1124689, at *12 (S.D.N.Y. May 20, 2004) (citing *Cruz*, 202 F.3d at 566); *see also* *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990). An informal complaint may be “nothing more than a simple ‘objection voiced to the employer,’ ... but at the very least, ‘there must be some form of professional indicia of a complaint made against an unlawful activity.’ ” *Soliman*, 2004 WL 1124689, at *12 (internal citations omitted).

***6** Though Karunakaran repeatedly refers to “union activities” and “whistleblowing” she does not, as Defendants point out, provide any allegations that her union activities or whistleblowing concerned or were related to some statutorily-prohibited discrimination. In particular, Karunakaran alleges that she emailed Perez to encourage him to program every department printer to print double-sided; she asked Perez why online classes could not be taught through “Peer faculty mentoring;” she asked Defendant Sangeeta Bishop whether she could serve on an equity and inclusion task force but was told that adjunct professors were not included; she asked whether faculty needed to include attendance information in their syllabi; and she asked why hard copies of mail had not been delivered to BMCC's uptown campus.[3] Doc. 62 at 50-51. None of these suggestions or questions is a complaint, protest, or objection and, in any event, Karunakaran does not show how any of these activities relates to an unlawful activity, let alone statutorily-prohibited discrimination. As Karunakaran cannot allege a protected activity, her federal retaliation claim is dismissed.

### b. NYSHRL and NYCHRL Claims

A district court may decline to exercise supplemental jurisdiction over state and city law claims when “the district court has dismissed all claims over which it has original jurisdiction.” 28 U.S.C. § 1367(c)(3); *see also* *In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 61 (2d Cir. 1998) (“[W]hen the federal claims are dismissed the ‘state claims should be dismissed as well.’ ” (quoting *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966))). Once a district court's discretion is triggered under § 1367(c)(3), it balances the traditional “values of judicial economy, convenience, fairness, and comity” in deciding whether to exercise jurisdiction. *Kolari v. New York-Presbyterian Hospital*, 455 F.3d 118, 122 (2d Cir. 2006) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)). The Supreme Court has noted that in a case where all federal claims are eliminated before trial, “the balance of factors ... will point toward declining to exercise jurisdiction over the remaining state-law claims.” *Id.* (quoting *Cohill*, 484 18 U.S. at 350 n.7). Having dismissed all of Karunakaran's federal claims under Rule 12(b)(6), the Court declines to exercise supplemental jurisdiction over, and dismisses, her state and city law claims.

## IV. CONCLUSION

For the reasons set forth above, the Defendants’ motion to dismiss the SAC is GRANTED with prejudice.

It is SO ORDERED.

### All Citations

Not Reported in Fed. Supp., 2022 WL 902370

## Footnotes

1 Antonio Perez, Karin Wilks, Sangeeta Bishop, Rifat Salam, Antoinette McKain, Robert Diaz, Ian Wentworth, Michael Hutmaker, and Marva Craig.

2 Title VII and the ADEA contain nearly identical provisions forbidding retaliation. *Kessler v. Westchester Cnty. Dep't of Soc. Servs.*, 461 F.3d 199, 205 (2d Cir. 2006). Retaliation claims under Title VII and the ADEA therefore are analyzed under the same framework. Dickens v. Hudson Sheraton Corp., LLC, 167 F. Supp. 3d 499, 522 (S.D.N.Y. 2016), aff'd, 689 F. App'x 670 (2d Cir. 2017); see also Terry, 336 F.3d at 141 (applying the same standards and burdens to claims of retaliation brought under both Title VII and the ADEA).

3 Karunakaran also repeats her allegation—in her FAC—that she engaged in protected activity when she complained to Defendants about the Student's behavior, but the Court in its order granting Defendants' first motion to dismiss found none of those complaints—her informal complaints to Defendants as well as her formal March 18 complaint—amounted to protected activities because they did not concern unlawful activity. *See* Doc. 55 at 11.

**End of Document** © 2026 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Blue-Striped Flag
Appeal Filed by Oakley v. MSG Networks Inc., 2nd Cir., September 11, 2026

2026 WL 2364632
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Charles OAKLEY, Plaintiff,
v.
MSG NETWORKS, et al., Defendants.

No. 17-cv-6903 (RJS)
|
Signed 08/14/2026

**Attorneys and Law Firms**

Plaintiff Charles Oakley is represented by Douglas H. Wigdor, Valdi Licul, and Katherine Vask of Wigdor LLP, 85 Fifth Ave., 5th Fl., New York, New York 10003; and Nelson A. Boxer and Marcelo A. Triana of Petrillo Klein & Boxer LLP, 655 Third Ave., 22nd Fl., New York, New York 10017.

John S. Crain, Seppinni Law, PLLC, New York, NY, Kenneth Daniel Walsh, for Plaintiff.

Defendants MSG Networks, Inc., The Madison Square Garden Company, and Sphere Entertainment Group are represented by Randy M. Mastro of Dechert LLP, Three Bryant Park, 1095 Avenue of the Americas, New York, NY 10036; Jessica C. Benvenisty, Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, NY 10019; and Damien Jerome Marshall, John Thomas Goodwin, and Lauren Kobrick Myers of King & Spalding LLP, 1290 Avenue of the Americas Fl 14, New York, NY 10104.

Jim Walden, Milton L. Williams Jr., Walden Haran Williams LLP, New York, NY, Akiva Shapiro, Holtzman Vogel Baran Torchinsky & Josefiak PLLC, New York, NY, Casey Kyung-Se Lee, Ropes & Gray LLP, New York, NY, Declan T. Conroy, Grace Elizabeth Hart, Gibson, Dunn & Crutcher, LLP, New York, NY, for Defendant MSG Networks.

OPINION AND ORDER

Richard J. Sullivan, Circuit Judge:

***1** After security guards removed him from a New York Knicks basketball game in February 2017, Plaintiff Charles Oakley sued Defendants MSG Networks, Inc., Madison Square Garden Sports Corp., and Sphere Entertainment Group, LLC (collectively, “MSG”). Oakley initially brought a grab bag of claims, all of which the Court dismissed in February 2020. On appeal, the Second Circuit affirmed the Court's dismissal except as to Oakley's assault-and-battery claim.

MSG then moved for pre-discovery summary judgment based on video footage showing Oakley's removal. The Court granted that motion, and Oakley again appealed. The Second Circuit reversed, explaining that the videos alone did not provide a clear enough picture of events to warrant summary judgment, and that additional evidence gleaned from discovery might clear up any remaining factual disputes.

That discovery is now complete, and MSG again moves for summary judgment. MSG points to new video evidence, numerous sworn declarations from eyewitnesses, and multiple depositions, all confirming that Oakley was not assaulted. Indeed, even though the alleged assault occurred in the middle of Madison Square Garden and in front of nineteen thousand fans and scores of video cameras, Oakley concedes that “there is *no* other witness” – besides himself – “who says that [he] was pushed” to the ground. (Doc. No. 429 at ¶ 127 (emphasis added and internal quotation marks omitted).) Because Oakley has produced no evidence to support his claim that he was assaulted by MSG security guards, MSG's motion for summary judgment is GRANTED.

## I. BACKGROUND

### A. Facts

Charles Oakley, a former All-Star power forward for the New York Knicks, attended a Knicks game at Madison Square Garden (the “Garden”) on February 8, 2017. (Doc. No. 429 at ¶¶ 1, 11.) During the game, Oakley was approached by MSG security guards and New York City Police Department (“NYPD”) officers, who physically removed him from the arena, purportedly because he was behaving inappropriately. (*Id* at ¶¶ 66–202.) While the parties contest whether Oakley had been belligerent prior to his removal – and whether he was intoxicated – there is no dispute that Oakley was asked to leave the arena and that he refused to comply.

On September 12, 2017, Oakley filed a complaint asserting defamation, libel, slander, abuse-of-process, false-imprisonment, and denial-of-public accommodation claims against both MSG and its Executive Chairman, James Dolan. (Doc. No. 1 ¶¶ 8, 77–93, 100–20.) This original complaint also asserted assault-and-battery claims against MSG alone, alleging that stadium guards used unwarranted physical force to eject Oakley from the premises, including by "push[ing] him to the ground," "throw[ing him] onto the ground," and "dragging him to the ground." (*Id.* ¶¶ 47–48, 94–99.)

On February 9, 2018, Oakley amended his complaint, adding new details alleging that the guards used excessive force in removing him. (Doc. No. 36 at ¶¶ 43–50.) The Defendants responded by moving to dismiss on March 30, 2018. (Doc. No. 41.)

***2** On February 19, 2020, the Court issued an opinion and order granting Defendants' motion to dismiss all of Oakley's claims. *See* *Oakley v. Dolan*, No. 17-cv-6903 (RJS), 2020 WL 818920, at *1 (S.D.N.Y. Feb. 19, 2020). Regarding Oakley's assault-and-battery claims, the Court held that "[t]he law is clear that the MSG Defendants had the right to expel Oakley from the Garden and that his refusal to leave justified their use of reasonable force to remove him." *Id.* at *13. The Court then explained that the only remaining question was "whether Defendants used unnecessary force or intended to injure [Oakley]." *Id.* Presuming the truth of Oakley's allegations, as required at that stage of the litigation, *Ferran v. Town of Nassau*, 11 F.3d 21, 22 (2d Cir. 1993), and without consulting extrinsic evidence such as the videos, the Court nevertheless held that Oakley's allegations of excessive force were conclusory and did not support a plausible inference of unnecessary force or injurious intent. *Oakley*, 2020 WL 818920, at *13–14.

Oakley appealed the dismissal of his amended complaint to the Second Circuit (Doc. No. 70), which affirmed this Court's decision in all respects except for its dismissal of Oakley's assault-and-battery claims. *See* *Oakley v. Dolan*, 980 F.3d 279, 280 (2d Cir. 2020); *Oakley v. Dolan*, 833 F. App'x 896, 898 (2d Cir. 2020). As to those claims, the Second Circuit concluded that the *act* of Oakley's removal was not itself unreasonable, but that Oakley's claim that "security guards used excessive force in *accomplishing* the removal" survived dismissal. *Oakley*, 980 F.3d at 283 (emphasis added). The Second Circuit emphasized those portions of Oakley's amended complaint "that allege[d] that he was 'thrown to the ground' by actions that 'greatly exceeded the amount of force that was necessary' and 'clearly exceeded the bounds of reasonable behavior,' and that he 'ha[d] suffered and continues to suffer harm[.]' " *Id.* (quoting Doc. No. 36 at ¶¶ 43, 47, 50, 125.) The Second Circuit accordingly remanded the case for further proceedings on the assault-and-battery claim.

On January 22, 2021, MSG moved for pre-discovery summary judgment based solely on the video footage documenting Oakley's removal from the Garden. (Doc. No. 102.) On November 8, 2021, the Court granted that motion. The Court first explained that "when opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Oakley v. MSG Networks*, No. 17-cv-6903 (RJS), 2021 WL 5180229, at *4 (S.D.N.Y. Nov. 8, 2021) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). It then held that "the video footage conclusively rebuts Oakley's version of events – and vindicates Defendants' version." *Id.* at 7 (relying on videos reattached to current motion at Doc. No. 400, Ex. 21 (hereinafter "*Stadium Vid.*") and Ex. 29 (hereinafter "*Fan Vid. I*")).)

Oakley appealed again. (Doc. No. 123.) This time, the Second Circuit reversed via summary order. The Circuit explained that the video of Oakley's initial encounter with MSG guards had "a choppy and degraded ... quality" and did not "record the initial conversation between Oakley and the MSG security guards," making it "difficult to see clearly what happened" during that interaction. *Oakley v. Dolan*, No. 21-2939, 2023 WL 3263618, at *3 (2d Cir. May 5, 2023) (hereinafter "*Oakley II*"). But it also emphasized that "additional discovery [might] yield[ ] additional videos showing other camera angles, as well as helpful eyewitness testimony to overcome the limitations in the video record and give context." *Id.*

On remand, Oakley moved to file a second amended complaint. (Doc. No. 148.) The court granted that motion in part (Doc. No. 158), and on April 18, 2024, Oakley filed the operative complaint. (Doc. No. 164.)

***3** Meanwhile, the parties proceeded to discovery, exchanging "thousands of documents, including contemporaneous witness statements, sworn declarations of multiple witnesses to Oakley's ejection, and numerous videos from MSG and other sources, such as media and fans." (Doc.

No. 398 at 13.) The parties also submitted expert reports and "t[ook] depositions of fifteen fact witnesses and two experts." (*Id.*)

At the conclusion of discovery, MSG again moved for summary judgment, which Oakley opposed.

## II. MOTION FOR SUMMARY JUDGMENT

### A. Legal Standard

Courts grant summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). While this standard generally leaves "choices between conflicting versions of the events" up to the jury, *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996), summary judgment is nonetheless appropriate if no rational jury would "credit the [non-moving party's] allegations," *Jeffreys v. City of New York*, 426 F.3d 549, 551 (2d Cir. 2005). Indeed, the Supreme Court has recognized that a rational jury would reject allegations that are "blatantly contradicted by the record." *Scott*, 550 U.S. at 380. And the Second Circuit has held that summary judgment is appropriate where the non-movant "rel[ies] almost exclusively on his own testimony" and that testimony suffers from "inconsistencies and improbabilities," *Jeffreys*, 426 F.3d at 551 (internal quotation marks omitted).

### B. Scope of the Issue

This case turns solely on the question of "whether [MSG] security guards used *excessive force* in accomplishing [Oakley's] removal." *Oakley II*, 2023 WL 3263618 at *2 (emphasis added and internal quotation marks omitted); *see id.* (explaining that MSG indisputably had the "right to use reasonable force to eject" Oakley). An officer's "[a]pplication of force is excessive ... if it is objectively unreasonable." *Maxwell v. City of New York*, 380 F.3d 106, 108 (2d Cir. 2004); *see also Posr v. Doherty*, 944 F.2d 91, 95 (2d Cir. 1991) (explaining that "the essential elements" of state and federal excessive-force claims are "substantially identical"). As discussed below, there is no genuine issue of material fact as to whether MSG guards used such force: all of the post-discovery evidence – including multiple videos and the consistent testimony of every witness except Oakley – shows that they did not.

Oakley attempts to avoid this problem by (i) asserting that the Second Circuit "h[eld] that a trial is necessary" here (Doc. No. 431 ("Oakley Br.") at 21); (ii) attempting to muddy the record enough to survive summary judgment on his physical assault-and-battery claims; and (iii) concocting a new claim of non-physical assault found nowhere in the amended complaint (*id.* at 10). None of these arguments is persuasive.

### C. Mandate Rule

Oakley first points to *Oakley II*, where the Second Circuit explained that "once a jury sorts out *what* exactly happened, it must make a determination as to whether the force used to eject Oakley was reasonable." *Oakley II*, 2023 WL 3263618, at *3. Invoking the mandate rule, which "compels compliance on remand with the dictates of the superior court," *United States v. Ben Zvi*, 242 F.3d 89, 95 (2d Cir. 2001) (internal quotation marks omitted), Oakley contends that the Second Circuit foreclosed the possibility of a second, post-discovery motion for summary judgment and instead directed that this case go "to a jury." (Oakley Br. at 21.)

***4** But the Second Circuit's reference to a "jury" came in a paragraph where it was analyzing whether summary judgment was appropriate – not conclusively prescribing the identity of the factfinder. The Second Circuit first explained the legal standard that would apply at a potential trial, noting that a jury would need to "determin[e] ... whether the force used to eject Oakley was reasonable." *Oakley II*, 2023 WL 3263618, at *3. It then considered the question of whether a "reasonable jury could conclude that the defendants gave Oakley a reasonable opportunity to depart, and that they then used only reasonable force." *Id.* And it finally decided that, given the underdeveloped record, it could not yet rule that no reasonable jury would side with Oakley. *Id.* That bread-and-butter summary-judgment analysis – describing the standard at trial, weighing whether a reasonable jury could find in favor of the non-movant on the pre-discovery record, and then denying early summary judgment – hardly *mandated* that Oakley's case proceed to trial.

Nor could it have. To begin, the mandate rule does not even apply when a district court is weighing "new evidence." *United States v. Carr*, 557 F.3d 93, 102 (2d Cir. 2009). And even more fundamentally, Oakley has cited no case where any court has precluded a party from making a post-discovery motion for summary judgment and instead compelled it to go

directly to trial. That is hardly surprising, since Federal Rule of Civil Procedure 56 expressly provides that a defendant "may move for summary judgment" on any claim for which "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). And, as the Supreme Court recently explained, such motions are typically made "[d]uring or after" the close of discovery. *Dupree v. Younger*, 598 U.S. 729, 731 (2023). In fact, the Second Circuit appears to have contemplated just such a sequence here when it emphasized that "additional discovery [might] yield[ ] additional videos showing other camera angles, as well as helpful eyewitness testimony to overcome the limitations in the video record and give context." *Oakley II*, 2023 WL 3263618, at *3.

In short, the mandate rule does not permit courts to short-circuit discovery or otherwise ignore the Federal Rules of Civil Procedure.

D. Physical Assault and Battery

Oakley next argues that genuine issues of material fact exist regarding whether MSG used excessive force in removing him from the Garden. Oakley's excessive-force claims turn on three distinct incidents where his accounts of the facts differ from MSG's. But as discussed in detail below, the vast amount of post-discovery evidence – including multiple videos and the uniform sworn testimony of every witness – "blatantly contradict[s]" Oakley's "stor[y]," *Scott*, 550 U.S. at 380, which is "unsubstantiated by any other direct evidence" and suffers from "inconsistencies and improbabilities," *Jeffreys*, 426 F.3d at 551 (internal quotation marks omitted).

1. MSG's Initial Contact with Oakley

Oakley first asserts that there is "sufficient evidence ... for a jury to find that [he] suffered a battery when guards initiated physical contact with [him] by pushing and pulling him as he stood up from his seat." (Oakley Br. at 13.) To support this claim, Oakley insists that, in one of the videos, MSG security guard Kori Keaton "can be seen pushing Oakley in the chest as Oakley stands while the other guards begin pulling at [him]." (*Id.* at 14 (citing *Stadium Vid.* at 7:54–8:15).)

But the record "blatantly contradict[s]," *Scott*, 550 U.S. at 380, this version of events. For starters, the video does *not* show Keaton pushing Oakley. (*See Stadium Vid.* at 7:54–8:19.) On the contrary, frame-by-frame analysis reveals Keaton standing back, *Oakley* lunging toward him, and Police Officer John Maher restraining Oakley in response. (*See id.*; Doc. 434 at App'x A.) And while the Second Circuit found that this footage has a somewhat "choppy and degraded ... quality," *Oakley II*, 2023 WL 3263618, at *3, it underscored that "helpful eyewitness testimony" could "overcome the limitations in the video record." *Id.* That is precisely what happened here; the fully developed record shows that MSG employees repeatedly asked Oakley to leave, and refrained from making *any* physical contact with him *until* he became aggressive:

***5** • Keaton testified that (i) he "didn't push Mr. Oakley"; (ii) he instead "took a step back in a defensive manner"; and (iii) Oakley "put[ ] his hand up," causing Keaton to "step[ ] backwards" so as to avoid Oakley's hand (Doc. No. 400, Ex. 24 at 104:14–106:23);

• Former MSG security guard Todd Jackson testified that (i) "Mr. Keaton stepp[ed] backwards with his hands up in a defensive posture to avoid Mr. Oakley's outstretched arm"; and (ii) none of the guards "pushed Mr. Oakley to the ground ... at any ... point during the incident" (Doc. No. 402 at ¶¶ 11, 23);

• New York City Police Officer John Maher testified that (i) when Oakley stood up he was "clearly angry and belligerent[ ] and appeared as though he was about to strike members of the MSG security team"; (ii) Maher accordingly "attempted to restrain [Oakley]"; and (iii) "[a]t no point did [Maher] observe any members of MSG security push[ing] or shov[ing] Mr. Oakley" (Doc. No. 404 at ¶¶ 10–11);

• MSG security guard Jayson Jacknow stated that MSG personnel asked Oakley to leave, but Oakley responded by cursing at them and saying "I'm not going anywhere" (Doc. No. 399 at ¶ 85 (internal quotation marks omitted));

• Another security guard, Thomas Redmond, testified that (i) he saw Oakley "standing, shouting, and flailing his arms"; (ii) he then approached Oakley, got his attention, and asked him to leave; and (iii) Oakley refused (Doc. No. 407 at ¶¶ 7–8);

• Tennis legend John McEnroe, who attended the game as a spectator and was seated a few rows away from Oakley, testified that MSG employees "approached Oakley and asked him to leave" and that Oakley responded by

swearing at them and refusing to comply with their directives (Doc. No. 405 at ¶ 7);

- Timothy Obeweger – Oakley's acquaintance who had invited him to the game – testified that (i) Oakley seemed "agitat[ed]"; (ii) MSG security guards subsequently "approached" him, "ask[ed] him to settle down[,] and eventually request[ed] that he leave"; (iii) Oakley "refused to comply"; and (iv) Oakley "appeared very agitated and was yelling and pushing the [guards] back." (Doc. No. 406 at ¶¶ 6–7.)

Faced with this testimony, Oakley argues that "a court '*must disregard all evidence favorable to the moving party that the jury is not required to believe.*' " (Oakley Br. at 17 (quoting *Porter v. Dartmouth-Hitchcock Med. Ctr.*, 92 F.4th 129, 147 (2d Cir. 2024).) But Oakley only half-articulates the rule: the Court *is* required to credit "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000) (internal quotation marks omitted). And while Oakley also insists that the eyewitnesses are not "neutral" because some of them are MSG guards, that argument goes only so far. (Oakley Br. at 17.) Keaton, Redmond, and Jackson have not been employed by MSG for years, and McEnroe, Maher, and Obeweger were never employed by MSG (though Maher was a paid-detail officer compensated by MSG pursuant to the NYPD's Paid Detail Policy). (Doc. No. 434 at 7 n.5; Doc. No. 429 at ¶¶ 10, 63.)

Finally, Oakley's *own* complaint and sworn deposition testimony contradict his summary judgment papers. In his brief, Oakley claims that "Keaton can be seen pushing Oakley in the chest as Oakley stands." Oakley Br. at 14 (citing *Stadium Vid.* at 7:54–8:15). But in his complaint, Oakley does not allege that *anyone* pushed him – he asserts only that he was "grabbed ... and roughly pulled ... backwards." (Doc. No. 164 at ¶ 40.)

***6** The same is true of Oakley's deposition, during which MSG's counsel showed Oakley the video of the initial encounter with Keaton. When pressed by counsel to identify where on the video he was assaulted, Oakley refused to swear that Keaton pushed him – even when asked point-blank over twenty-five times. (Doc. No. 400, Ex. 10 at 334–56.) Indeed, Oakley repeatedly implied that Keaton *did not* push him. (*See, e.g.*, *id.* at 342:5–9 (Oakley explaining that "[it] is the guy on the inside" who is "touching" him), 346:25–347:7 (Oakley explaining that "it's the guy behind who pushed" him).) And when MSG's counsel followed up with direct questions about who touched Oakley, with what degree of force, and where, Oakley provided virtually no additional information, and instead vaguely repeated the assertion that he was "trying to protect" himself, and that he "felt force." (*See, e.g.*, *id.* at 342:10–17, 351:14–18.)

In sum, Oakley's counterarguments as to why the Court should not credit evidence favorable to Defendants regarding his initial contact with MSG officials are unpersuasive. *See Taylor v. Ridley*, 904 F. Supp. 2d 222, 232 (E.D.N.Y. 2012) (granting summary judgment on excessive-force claim where allegations in complaint were "unexplainedly inconsistent and contradictory with [non-movant's] testimony ... and [his] deposition, at least in terms of the force allegedly used during his arrest, and are uncorroborated by any independent evidence in the record").

2. Pushing Oakley to the Ground

Oakley next argues that he was "pushed down from behind" after he stood up from his seat and that the "new videos" "corroborat[e]" his account. (Oakley Br. at 15.) But the videos show the exact opposite. They depict then-MSG Director of Arena Operations Thomas Redmond attempting to guide Oakley *backward*, only for Oakley to slip *forward* and out of his grasp – nearly dragging Redmond down to the floor on top of him. (*See* Doc. No. 400, Ex. 30 (hereinafter "*Fan Vid. 2*") at 00:01–00:18.) The Court has repeatedly reviewed this new, close-up video, attempting to ferret out any potential ambiguity as to what transpired. There is none: indeed, it is hard to imagine a clearer depiction of an accidental slip.

As the primary new video shows, Redmond attempted to hold Oakley's left bicep, while MSG guard Jayson Jacknow lightly placed his open hand on Oakley's upper back. (*Id.* at 0:03–0:12.) At that point, Oakley turned toward his seat, only to trip and fall to the ground, pulling Redmond – who was still holding his arm – with him, so that Redmond doubled over and lurched into the aisle. (*Id.* at 0:13–0:16.) Oakley then sat for a few seconds on the lip of the stadium stairs, before rising to his feet without assistance. (*Id.* at 0:14–0:22.) Tellingly, though Oakley had been highly agitated and confrontational with the MSG guards from the outset, at no point on the video did he accuse anyone of having pushed him to the ground. (*Id.*)

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

Eyewitness evidence also confirms that Oakley was not pushed. McEnroe testified that he "saw Oakley slip and fall to the floor." (Doc. No. 405 at ¶ 8.) So did Officer Maher, Redmond, Jackson, and others. (*See, e.g.*, Doc. No. 404 at ¶ 11 ("I observed [Oakley] trip and fall on his own."); Doc. No. 407 at ¶ 8 ("I observed Mr. Oakley catch his footing on the lip of the riser, slip, and fall to the ground."); Doc. No. 402 at ¶ 23 (similar).)

Oakley's own statements suggest the same thing. In drafts of his autobiography – which were altered only after his counsel in this litigation directed him to re-write them – Oakley explained that he "slipped," and in a February 2022 interview, Oakley noted that he "slipped down and fell." (*See* Doc. No. 429 at ¶¶ 132–34; Doc. No. 400, Ex. 28 at 01:13–01:14.) And while Oakley now argues that "the terms 'push' and 'slip' are not mutually exclusive" and that "Redmond's push ... caused Oakley" to slip (Oakley Br. at 16), a reasonable factfinder could not be expected to "undertake the suspension of disbelief necessary to credit [Oakley's] allegations," *Jeffreys*, 426 F.3d at 551. In short, Oakley's "conclusory and self-serving statements" hardly suffice to create a genuine issue of material fact when pitted against the vast amount of blatantly contradictory evidence in the record. *Wyatt v. Zuckerman*, 240 F. App'x 885, 887 (2d Cir. 2007).

### 3. Oakley's Removal from the Garden

***7** Finally, Oakley contends that MSG guards "continued to manhandle" him as they escorted him out of the Garden, inappropriately "loom[ed]" over him after he again fell to the ground, and improperly attempted to pry his hands free from a railing to which he was clinging. (Oakley Br. at 18–19.) But as Oakley himself concedes, by the time the guards forcibly ejected him from the Garden, he had (i) repeatedly been asked – and refused – to leave; (ii) cursed at the guards; and (iii) "push[ed]" them, "slapped" them, and "chopped down" on their limbs. (Doc. No. 429 at ¶¶ 83, 90–91, 132–34, 140, 146–47, 150–52 155–58 (internal quotation marks omitted); *see also* Oakley Br. at 20.)

Indeed, as the videos of the incident reveal, it was *Oakley* – who is six feet, nine inches tall and weighs roughly 270 pounds (*see* Doc. No. 429 at ¶ 71) – who struck the guards, not the other way around. (*See Fan Vid. 1* at 00:42–01:00.) After falling and standing back up, Oakley stepped toward the much-smaller Redmond, shoved his finger close to Redmond's eye, shouted "get the [expletive] out of my face," bumped his chest into Redmond, and then, finally, jabbed Redmond's face with his index finger, causing Redmond's head to snap backward. (*Id.* at 0:41–0:49; Doc. No. 429 at ¶ 147; Doc. No. 400, Ex. 35 at 0:17–32.) In response, Jacknow – who was still standing behind Oakley – took hold of Oakley's upper bicep and attempted to pull him away from Redmond. (*Fan Vid. 1* at 0:49–0:51.) But Oakley then whirled around, chopped downward on Jacknow's arm, and pushed him – twice – causing Jacknow to stumble back several paces and prompting nearby fans to gasp audibly. (*Id.* at 0:53–0:58.) It was only at that point that several other security personnel endeavored to step in and grab both of Oakley's arms. (*Id.* at 0:59–1:01.)

Oakley attempts to justify his use of violence by arguing that he "only took those actions after he had been pushed and pulled ... and pushed in the back." (Oakley Br. at 21.) But as described above, that assertion is contradicted by incontrovertible video evidence, and no reasonable jury could credit Oakley's account of the earlier stages of his removal. *See Scott*, 550 U.S. at 380.

The video further shows that the guards "proceeded with caution, remained in control of the situation and their emotions, showed considerable restraint, and used [appropriate] force ... as occasioned by Oakley's behavior at each juncture." (Doc. No. 398 at 20 (internal quotation marks omitted); *Fan Vid. 1* at 01:01–03:04.) After being guided several yards onto the exit ramp, Oakley again fell – despite at least one guard's effort to keep him upright – this time in the aisle below the railing where one of the fan videographers was standing. (*Id.* at 1:10.) As the video shows, from an angle directly above the scene, security personnel crowded around Oakley, repeatedly telling him to "get up" and "stand up." (*Id.* at 1:15–1:35.) Several security personnel then tried to take hold of Oakley's wrists to pull him up, but Oakley cradled his arms close to his body and resisted their efforts. (*Id.* at 1:15–1:40.) At one point, Oakley even stated "I don't want to stand up." (*Id.* at 1:34.)

Finally, after roughly seventy-five seconds on the ground, Oakley pulled himself to his feet, using the stadium railing as support. (*Id.* at 2:29.) But he then moved just a few paces toward the exit before again stopping, at which point he refused to accompany the guards the rest of the way and clasped the railing with both hands to maintain his position. (*Id.* at 2:29–2:47.) After approximately fifteen more seconds, during which an NYPD officer twice attempted to

pry Oakley's hands from the railing (*id.* at 2:47–2:59), Oakley was finally ushered out of the stadium.

***8** Oakley's arguments that MSG guards (i) did not "giv[e] him a chance to rise," (ii) tried to "drag [him] down again," and (iii) attempted to prevent him from "holding himself up" on the railing are therefore contradicted by the clear video evidence. (Oakley Br. at 19.) Instead, that evidence shows that the guards attempted to help Oakley to his feet and to shuttle him as swiftly as possible out of the Garden, and that it was *Oakley* who stayed on the ground, resisted the guards' efforts to assist him, and clung to the railings to avoid removal. (*Fan Vid. 1* at 01:12–03:04.) Oakley cannot now transform this conflict – which he himself both initiated and prolonged – into a viable assault-and-battery claim merely by asserting (without evidence) that he was unreasonably touched.

E. Non-Physical Assault

Finally, Oakley advances a new theory of assault, premised not on the *actual* force used by the MSG guards while removing him from the Garden, but rather on the *threat* of force that he feared when the MSG guards initially "surrounded" him. (Oakley Br. at 11.) But while it is possible to prove an "assault" under New York law by showing that a defendant "intentional[ly] plac[ed] [a plaintiff] in fear of imminent harmful or offensive contact," *United Nat. Ins. Co. v. Waterfront New York Realty Corp.*, 994 F.2d 105, 108 (2d Cir. 1993), Oakley's non-physical assault claim fails for two reasons.

*First*, it is "well settled that a [c]ourt should not on summary judgment consider factual allegations and legal theories not raised in the complaint." *Lopez v. Gap, Inc.*, 883 F. Supp. 2d 400, 413 (S.D.N.Y. 2012) (internal quotation marks omitted); *Greeindge v. Allstate Ins. Co.*, 446 F.3d 356, 361 (2d Cir. 2006). And the record is clear that Oakley articulated his non-physical theory of assault for the first time in his opposition to MSG's motion for summary judgment – not in his Second Amended Complaint. (*See* Doc. No. 164.) *See Valentine Props. Assocs., IP v. U.S. Dep't of Hous. & Urb. Dev.*, 785 F. Supp. 2d 357, 372 (S.D.N.Y. 2011) (rejecting as forfeited "claims [that] do not appear to stem from the Amended Complaint[ ] but are being raised for the first time in Plaintiffs' motion papers"), *aff'd*, 501 F. App'x 16 (2d Cir. 2012).

Oakley seeks to salvage this theory by pointing to language in his complaint alleging that several guards "converg[ed] on" him and "intentionally place[d] [him] in imminent fear of harmful and/or offensive conduct." (Oakley Br. at 11 (quoting Doc. No. 164 at ¶¶ 35, 96).) But this effort fuses disparate paragraphs in the complaint into a single allegation that strips each of its surrounding context. Indeed, Oakley refers to "security personnel ... converg[ing] on" him in the complaint's narrative description of his removal from MSG – a sequence in which he *nowhere* alleges that he feared the security guards would use unreasonable force, but merely explains that he was "confused" and gradually realized that the guards were "seeking to oust him from the Garden." (Doc. No. 164 at ¶¶ 35–38.) By contrast, when Oakley's complaint *does* arrive at *to* physical* assault claim, it clearly alleges that "[MSG] intentionally placed [Oakley] in imminent fear of harmful and/or offensive conduct when, *inter alia, they physically and forcibly removed [him] from the Garden.*" (*Id.* at ¶ 96 (emphasis added).)

*Second*, even if Oakley had pleaded this "[i]nitial [a]ssault" (Oakley Br. at 10), his claim would still fail because there is no genuine issue of material fact as to whether he was assaulted. Under New York law, "assault is the *intentional* placing of another person in *reasonable* apprehension of imminent *harmful* or *offensive* contact." *Schoolcraft v. City of New York*, 133 F. Supp. 3d 563, 569 (S.D.N.Y. 2015) (emphasis added). In his summary-judgment papers, Oakley argues that (i) Dolan told Keaton to "do what [you] have to do" (apparently out of Oakley's earshot), (ii) there were several different security guards, and (iii) Oakley himself was worried that he would be attacked. (Oakley Br. at 12 (internal quotation marks omitted).) The problem for Oakley is that none of these assertions creates a genuine issue of material fact as to whether he was non-physically assaulted. To begin, Oakley never persuasively suggests that MSG *intended* to place him in fear of physical harm at this moment (as opposed to merely intending to eject him from the arena with sufficient security to avoid an incident). To the contrary, Oakley himself notes that Dolan ordered that he be ejected (*see* Oakley Br. at 12), not attacked. What is more, Oakley's allegation that he *subjectively* feared that he would be attacked is beside the point; Oakley must show that such apprehension was "reasonable." *Schoolcraft*, 133 F. Supp. 3d at 569. And the only non-subjective fact Oakley offers to explain why his apprehension was reasonable is that he was approached by "a small army" of guards. (Oakley Br. at 12.) But that fact alone hardly creates an issue of material fact as to whether Oakley – sitting in the middle of Madison Square Garden

amongst nineteen thousand fans – *reasonably* apprehended that he would fall victim to imminent harmful or offensive contact. Indeed, if the Court were to adopt Oakley's theory, a plaintiff would have a viable assault claim under New York law *any time* a large group of security guards, in view of thousands of spectators, approached him. That is not the law.

***9** In short, no rational jury could conclude that Oakley reasonably feared himself at risk of wrongful physical contact – let alone that MSG *intended to* stir such an apprehension. [1]

III. CONCLUSION

On Oakley's previous appeal, the Second Circuit explained that discovery might "yield[ ] additional videos showing other camera angles, as well as helpful eyewitness testimony to overcome the limitations in the video record and give context." *Oakley II*, 2023 WL 3263618, at *3. That is exactly what happened here. Ample evidence – including videos from multiple angles and the unanimous testimony of every witness (even, to some extent, Oakley himself) – shows that Oakley had a reasonable opportunity to depart the Garden, that he instead resorted to physical violence, and that he was never pushed to the ground.

The Court recognizes, of course, that the "question of whether the use of force was reasonable under the circumstances is generally best left for a jury to decide." *Id.* at *1. But when, after nine years of litigation, an accumulated tidal wave of evidence – including the first draft of the plaintiff's own autobiography – "blatantly contradict[s]" that plaintiff's allegations, *Scott*, 550 U.S. at 380, the Court must award summary judgment.

For the reasons stated above, IT IS HEREBY ORDERED that MSG's motion for summary judgment is GRANTED. The Clerk of Court is respectfully directed to terminate the motion pending at Doc. No. 397. The case, however, shall remain open while the Court adjudicates Oakley's motion for Rule 11 sanctions (Doc. No. 422), MSG's motion for Rule 11 sanctions (Doc. No. 410), and MSG's motion for contempt (*see* Doc. Nos. 473, 483).

SO ORDERED.

**All Citations**

Slip Copy, 2026 WL 2364632

## Footnotes

1 Relying on *Phoenix Light SF Ltd. v. Bank of New York Mellon*, Oakley contends that MSG forfeited its ability to challenge his non-physical assault theory because it attacked that claim "only in a footnote." (Oakley Br. at 10 (quoting No. 14-cv-10104 (VEC). 2017 WL 3973951, at *20 n.36 (S.D.N.Y. Sep. 7, 2017).) But Oakley ignores the next sentence in *Phoenix Light*, which clarified that while "[m]erely mentioning or simply stating an issue is insufficient" to preserve it, "*advanc[ing] an argument*" suffices. 2017 WL 3973951, at *20 (emphasis added and internal quotation marks omitted). MSG did just that here by providing the Court with a roughly 150-word footnote fully advancing its arguments against Oakley's non-physical assault theory. (*See* Doc. No. 398 at 24 n.9; *cf.* *In re Demetriades*, 58 F.4th 37, 54 (2d Cir. 2023) (explaining that when an "issue is adverted to only in a perfunctory manner, unaccompanied by any effort at developed argumentation, it must be deemed waived – or, more precisely, forfeited" (alterations adopted and citation and internal quotation marks omitted)).) Furthermore, MSG can be excused for devoting no more than a footnote to a novel and untimely argument that Oakley never previously articulated – either in this Court or during his two trips to the Second Circuit.

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 11438085
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Ted PERRY, Plaintiff,
v.
COUNTY OF WESTCHESTER, Defendant.

Case No. 06-CV-3000 (KMK)
|
Signed 03/31/2008

**Attorneys and Law Firms**

Pamela D. Hayes, Esq., Law Office of Pamela D. Hayes, Esq., New York, New York, Counsel for Plaintiff.

Stuart E. Kahan, Esq., Oxman Tulis Kirkpatrick Whyatt & Geiger, LLP, White Plains, New York, Counsel for Defendant.

OPINION AND ORDER

KENNETH M. KARAS, UNITED STATES DISTRICT JUDGE

***1** On April 19, 2006, Plaintiff Ted Perry ("Plaintiff") filed this employment discrimination suit against Defendant County of Westchester ("Defendant"). Before the Court is Defendant's Motion for Summary Judgment, seeking dismissal of Plaintiff's Complaint. For the reasons stated herein, Defendant's Motion is GRANTED.

## I. Background

### A. Employment and Disciplinary History

The following facts are undisputed, except where indicated. Plaintiff, an African-American man, began his employment with Defendant in June 1988 as a seasonal laborer in the Department of Parks Recreation and Conservation. (Def.'s Revised Statement of Material Facts Pursuant to Local Civil Rule 56.1(a) ¶¶ 1-2 ("Def.'s 56.1 Stmt"); Pl.'s Revised Counter-Statement of Material Facts Pursuant to Local Rule 56.1(b) ¶¶ 1-2 ("Pl.'s 56.1 Stmt").) Shortly thereafter, in July 1988, Plaintiff was promoted to a full-time Maintenance Laborer, Grade IV. (Def.'s 56.1 Stmt ¶ 3; Pl.'s 56.1 Stmt ¶ 3.) In 1992, Plaintiff was promoted to the position of Maintenance Mechanic II, Grade VII. (Def.'s 56.1 Stmt ¶ 4; Pl.'s 56.1 Stmt ¶ 4.)

Later, in 1993, Plaintiff's title was reclassified to the position of Housekeeper, Grade VII. (Def.'s 56.1 Stmt ¶ 5; Pl.'s 56.1 Stmt ¶ 5.) The titles of two other employees – Roger Emery ("Emery") and John Ponce ("Ponce"), both of whom are Caucasian – were also reclassified to Housekeeper, but, unlike Plaintiff, these employees filed a union grievance regarding this reclassification. (Def.'s 56.1 Stmt ¶¶ 6-7; Pl.'s 56.1 Stmt ¶¶ 6-7.) Emery and Ponce were successful in their grievance and had their positions reclassified to Maintenance Mechanic. (Def.'s 56.1 Stmt ¶ 8; Pl.'s 56.1 Stmt ¶ 8; Aff. of Stuart E. Kahan, Ex. H ("Kahan Aff.").)

In the fall of 1995, Plaintiff was suspended for approximately sixty days without pay in connection with an altercation between Plaintiff and a co-worker. (Def.'s 56.1 Stmt ¶¶ 9-12; Pl.'s 56.1 Stmt ¶¶ 9-12; Kahan Aff., Ex. J.) Plaintiff was soon thereafter reassigned to the Division of General Maintenance in November 1995. (Def.'s 56.1 Stmt ¶ 13; Pl.'s 56.1 Stmt ¶ 13.) Years later, in 2000, Plaintiff was reassigned to Croton Point Park, and in 2001, Plaintiff was again reassigned to the Bronx River Parkway Reservation, where he reported to superintendent Robert Bates ("Bates"). (Def.'s 56.1 Stmt ¶¶ 21-22; Pl.'s 56.1 Stmt ¶¶ 21-22.)

Plaintiff was issued a warning notice by Bates on May 14, 2002 for "refus[ing] to do the work assigned to him and [for leaving the] work site without permission." (Def.'s 56.1 Stmt ¶ 23; Pl.'s 56.1 Stmt ¶ 23.) On October 24, 2002, Bates issued to Plaintiff another warning notice, citing Plaintiff for "time abuse." (Def.'s 56.1 Stmt ¶ 25; Pl.'s 56.1 Stmt ¶ 25.) According to Plaintiff, on November 8, 2002, he missed several hours of work to answer a jury summons in the Bronx County Courthouse. (Def.'s 56.1 Stmt ¶ 26; Pl.'s 56.1 Stmt ¶ 26.) Plaintiff alleges that on the following work day, November 12, 2002, Bates reprimanded Plaintiff for attending jury duty and told him that his pay would be docked for the time missed. (Def.'s 56.1 Stmt ¶ 27; Pl.'s 56.1 Stmt ¶ 27.) [1] Defendant claims that Plaintiff's time was never docked for jury duty (Def.'s 56.1 Stmt ¶ 28), but Plaintiff insists that it was (Decl. of Pl. Ted Perry in Opp'n to Def.'s Mot. for Summ. J. ¶ 14 ("Pl.'s Decl.") ). On November 25, 2002, Plaintiff was issued another warning notice, this time for taking time off on November 18, 2002, though he had already used up all of his available time. (Kahan Aff., Ex. Y.) Plaintiff, however, denies missing work on November 18, 2002, and insists that this warning notice was actually for the time he missed

attending jury duty. (Pl.'s Decl. ¶ 14.) Yet more warning notices were issued to Plaintiff on December 30, 2002, for failing to produce a driver's license, and on January 24, 2003 and January 27, 2003, for calling in sick with no sick leave balance. (Kahan Aff, Ex. AA, BB.)

***2** On May 2, 2003, Plaintiff injured his back while working, which he did not report until May 5, 2003. (Def.'s 56.1 Stmt ¶¶ 34-35; Pl.'s 56.1 Stmt ¶¶ 34-35.) Also on May 5, Plaintiff was issued a warning notice for inappropriate conduct and insubordination. (Kahan Aff., Ex. DD.) That was the last day Plaintiff went to work. Plaintiff was issued two more warning notices, on May 8, 2003 and May 9, 2003, both for failing to report to work and failing to call in. (Def.'s 56.1 Stmt ¶ 37; Pl.'s 56.1 Stmt ¶ 37.) Thereafter, Plaintiff began collecting worker's compensation and social security disability benefits. (Def.'s 56.1 Stmt ¶ 39; Pl.'s 56.1 Stmt ¶ 39.) Defendant officially terminated Plaintiff's employment on October 28, 2004. (Def.'s 56.1 Stmt ¶¶ 44-45; Pl.'s 56.1 Stmt ¶¶ 44-45.)

B. Plaintiff's Allegations of Discrimination

Plaintiff alleges that Defendant discriminated against him on the basis of race in violation of Title VII of the Civil Rights Act of 1964 and of the Civil Rights Act of 1866, 42 U.S.C. § 1981. Plaintiff claims that he was subjected to disparate treatment and a hostile work environment when he was forced to work out-of-title – while his Caucasian co-workers were not – from 1995 through May 5, 2003, performing dangerous and undesirable tasks that had no relationship to his job duties and that ultimately resulted in his back injury. (Compl. 3-4, 7-8.)[2] Further, Plaintiff asserts that, from 1999 to 2003, he was subjected to a hostile work environment when he was disciplined for minor infractions, while Caucasian employees were not disciplined for the same or worse behavior. (*Id.* 3.) One incident highlighted by Plaintiff is alleged to have taken place in November 2002, when Plaintiff claims to have had his pay docked for attending jury duty. Plaintiff asserts that Caucasian employees – in particular, Jason Aubry ("Aubry") – were never docked pay for attending court appearances. (*Id.* 4-5, 7.)

In sum, Plaintiff alleges that:

> Plaintiff has continually been disciplined and treated in a disparage [sic] fashion, due to his race. He was forced to work out of title since 1995 when he was required to perform tasks which had no relationship to his duties. He was docked for performing legitimate duties, such as jury duty, all the while white employees were given time off to go to court. He was disciplined, while other white employees were not disciplined for the same or worse behavior. Said discrimination occurred solely because of Plaintiff's race, and amounted to a hostile environment.

(*Id.* 1-2.)

C. Procedural History

On October 5, 1999, Plaintiff filed a complaint alleging harassment on account of his race with the Westchester County Equal Employment Opportunity/Affirmative Action Office ("EEO/AAO"). (Def.'s 56.1 Stmt ¶ 14; Pl.'s 56.1 Stmt ¶ 14.) In February 2000, the EEO/AAO determined that there existed no evidence of racial discrimination or harassment, and in May 2000, the EEO/AAO closed its file on Plaintiff's complaint. (Def.'s 56.1 Stmt ¶¶ 15-16; Pl.'s 56.1 Stmt ¶¶ 15-16.) Plaintiff filed a complaint dated June 2, 2000 with the Equal Employment Opportunity Commission ("EEOC"), alleging racial discrimination and retaliation premised on a continuing violation spanning from August 2, 1999 to April 14, 2000. (Def.'s 56.1 Stmt ¶ 17; Pl.'s 56.1 Stmt ¶ 17.) In June 2001, the EEOC issued to Plaintiff a Dismissal and Notice of Rights Letter, in which it "adopted the findings of the State or Local Fair Employment Practices Agency that investigated this charge." (Def.'s 56.1 Stmt ¶ 19; Pl.'s 56.1 Stmt ¶ 19.) Plaintiff never filed a lawsuit in connection with these claims. (Def.'s 56.1 Stmt ¶ 20; Pl.'s 56.1 Stmt ¶ 20.)

***3** On August 11, 2003, Plaintiff filed another complaint alleging discrimination with the New York State Department of Human Rights ("NYSDHR"). (Def.'s 56.1 Stmt ¶ 40; Pl.'s 56.1 Stmt ¶ 40.) In this complaint, Plaintiff claimed that he had been treated disparately by Defendant due to his race from 1999 until May 5, 2003, and that he had been assigned undesirable tasks at work since 1999. (Kahan Aff., Ex. GG.) The NYSDHR determined on September 28, 2005, that there existed no probable cause to support Plaintiff's allegations of discrimination. (Def.'s 56.1 Stmt ¶ 42; Pl.'s 56.1 Stmt ¶ 42.) On January 17, 2006, the EEOC issued to Plaintiff a Dismissal

and Notice of Rights letter. (Def.'s 56.1 Stmt ¶ 43; Pl.'s 56.1 Stmt ¶ 43.)

Plaintiff initiated the present lawsuit on April 19, 2006, alleging: (i) employment discrimination in violation of Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. § 2000e-5(f) (Compl. 8); and (ii) racial discrimination in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981 (*id.* 6). Discovery closed on January 3, 2007. On February 26, 2007, Defendant filed a Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56(b), seeking summary judgment in its favor on the following grounds:

> (a) portions of plaintiff's complaint are time barred pursuant to the 300 day limitations period set forth [in] 42 U.S.C. § 2000e-5(e); (b) plaintiff may not seek damages due to his termination from employment since plaintiff failed to exhaust administrative remedies; (c) the plaintiff has failed to make out a prima facie case of racial discrimination via disparate treatment since the plaintiff cannot prove that he was subjected to an adverse employment action or that a reasonable inference of racial discrimination can be reached based upon defendant's actions; (d) assuming that plaintiff has met the minimal requirements for a prima facie case of racial discrimination, the County presented a race neutral reason for its employment decisions regarding [Plaintiff] and the plaintiff cannot prove that the County's actions were mere pretext; (e) the plaintiff's claim based upon the existence of a hostile work environment must be dismissed because there is no evidence that such an environment existed; and (f) plaintiff's Section 1981 claim must be dismissed.

(Def.'s Mem. of Law in Supp. of Def. County of Westchester's Mot. for Summ. J. 1-2 ("Def.'s Mem.").)

Plaintiff did not file opposition papers by the March 12, 2007 deadline set by Judge Colleen McMahon, to whom this case was originally assigned. On June 28, 2007, Judge McMahon issued an order, stating: "Plaintiff's opposition was due March 12, 2007. The court has not received any response. Plaintiff has 30 days to file a response to the motion. If no response has been filed, the motion will be deemed submitted and the court will decide it without benefit of any response." (Docket No. 27.) Plaintiff failed to file opposition papers within the thirty-day deadline set by Judge McMahon on June 28, 2007. On August 6, 2007, the case was reassigned to this Court. Plaintiff finally filed opposition papers on August 22, 2007 – without explanation as to the delay or permission from the Court to do so. The Court held oral argument on March 11, 2008. For reasons stated herein, Defendant's Motion for Summary Judgment is GRANTED.

## II. Discussion

### A. Standard of Review

Summary judgment may be granted when it is shown that there is "no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also* *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The Court must view all evidence in the light most favorable to the non-moving party and must draw all reasonable inferences in the non-movant's favor. *See* *Tufariello v. Long Island R.R. Co.*, 458 F.3d 80, 85 (2d Cir. 2006). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See* *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Segal v. City of New York*, 459 F.3d 207, 211 (2d Cir. 2006). "Once the moving party has made a properly supported showing sufficient to suggest the absence of any genuine issue as to a material fact, the nonmoving party, in order to defeat summary judgment, must come forward with evidence that would be sufficient to support a jury verdict in his favor." *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995). "The motion 'will not be defeated merely ... on the basis of conjecture or surmise.' " *Id.* (quoting *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991) ); *see also* *McPherson v. N.Y. City Dep't of Educ.*, 457 F.3d 211, 215 n.4 (2d Cir. 2006) ("[S]peculation alone is insufficient to defeat a motion for summary judgment."); *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) ("[The non-movant] must do more than simply show that there is some metaphysical doubt as to the material facts." (internal quotation marks omitted) ).

***4** The materiality of the facts considered by the Court will be governed by substantive law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). At summary judgment, the Court is not charged with weighing the evidence and determining its truth, but with determining whether there is a genuine issue for trial. *See Westinghouse Elec. Corp. v. N.Y. City Transit Auth.*, 735 F. Supp. 1205, 1212 (S.D.N.Y. 1990); *see also Castro v. Metro. Transp. Auth.*, No. 04-CV-1445, 2006 WL 1418585, at *2 (S.D.N.Y. May 23, 2006). A court's goal should be to "isolate and dispose of factually unsupported claims." *Celotex*, 477 U.S. at 323-24.

While courts are to be "particularly cautious" about granting summary judgment to employers in cases where the discriminatory intent of the employer is contested, *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997), "[i]t is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases," *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001). Though district courts must pay careful attention to affidavits and depositions that may reveal circumstantial proof of discrimination, *see Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994), courts are not to "treat discrimination differently from other ultimate questions of fact." *Abdu-Brisson*, 239 F.3d at 466 (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000) ); *see also Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 604 (2d Cir. 2006) (noting the caution with which the Second Circuit reviews the grant of summary judgment in discrimination cases "because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions[,]" but stating that "summary judgment remains available for the dismissal of discrimination claims in cases lacking genuine issues of material fact" (internal quotation marks omitted) ).

B. Applicable Time Limitations

In its Motion for Summary Judgment, Defendant argues that Plaintiff is not entitled to base his claim on any discrete acts of alleged discrimination occurring before October 14, 2002 because such acts are more than 300 days before Plaintiff's NYSDHR complaint was filed.[3] (Def.'s Mem. 3.) Further, Defendant argues that acts of alleged discrimination that served as the basis of Plaintiff's 1999 complaint with the NYSDHR may not form the basis of Plaintiff's present claim because Plaintiff failed to file suit on those acts within ninety days of the EEOC's June 11, 2001 Notice of Rights letter. (*Id.* 5-6.)

To these arguments, Plaintiff responds that his present claims are not dependent on any discrete acts occurring before those time periods but insists that consideration of past acts is appropriate in demonstrating the existence of a hostile work environment and validating a theory of a continuing violation based on disparate treatment and out-of-title work. (Pl.'s Mem. of Law in Opp'n to Def. County of Westchester's Mot. for Summ. J. Pursuant to Fed. R. of Civ. P. 56(b) 4 ("Pl.'s Mem.") ("These instances provide the Court with a history of how the underlying cause of action came to pass and does not specifically ask for action on events which started years earlier. It merely demonstrates the theory of a continuing violation.").)

***5** The Supreme Court has made clear that discrete acts occurring more than 300 days before Plaintiff filed his complaint with the NYSDHR are not actionable. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002) ("[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. Each discrete discriminatory act starts a new clock for filing charges alleging that act. The charge, therefore, must be filed within the ... 300-day time period after the discrete discriminatory act occurred."). Recently, in *Ledbetter v. Goodyear Tire & Rubber Co.*, the Supreme Court elaborated:

> A new violation does not occur, and a new charging period does not commence upon the occurrence of subsequent nondiscriminatory acts that entail adverse effects resulting from past discrimination. But of course, if an employer engages in a series of acts each of which is intentionally discriminatory, then a fresh violation takes place when each act is committed.... [C]urrent effects alone cannot breathe life into prior, uncharged discrimination....

127 S. Ct. 2162, 2169 (2007)

Acts that were the subject of Plaintiff's 1999 EEO/AAO and EEOC complaints are also not actionable because Plaintiff failed to bring suit on those acts within ninety days from receipt of the EEOC Notice of Rights letter. To the extent that the second right-to-sue letter, dated January 2006, is based on the same facts as the first, Plaintiff cannot complain about those claims in this lawsuit. *See Lo v. Pan Am. World Airways*, 787 F.2d 827, 828 (2d Cir. 1986) (per curiam) (denying claims where second EEOC complaint was based on same facts as earlier lapsed right-to-sue letter). However, the June 2001 right-to-sue letter will not preclude the current suit "to the extent that plaintiff's Complaint is based on allegations in the second [EEOC complaint] which did not appear in the first [EEOC complaint]." *Dahbany-Miraglia v. Queensboro Cmty. Coll.*, No. 03-CV-8052, 2004 WL 1192078, at *7 (S.D.N.Y. May 27, 2004). Time-barred acts will only be considered to the extent that they constitute "background evidence in support of a timely claim." *Morgan*, 536 U.S. at 113 ("The existence of past acts and the employer's prior knowledge of their occurrence, however, does not bar employees from filing charges about related discrete acts so long as the acts are independently discriminatory and charges addressing those acts are themselves timely filed."); *see also Williams v. British Airways, PLC*, 06-CV-5085, 2007 WL 2907426, at *11 n.20 (E.D.N.Y. Sept. 27, 2007) ("[C]ertain incidents, even if time-barred, 'may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue.' " (quoting *Morgan*, 536 U.S. at 112) ).

The continuing violation theory is a tolling mechanism that rarely permits recovery for otherwise untimely violations. *See Santiago v. Newburgh Enlarged City Sch. Dist.*, 485 F. Supp. 2d 327, 331 (S.D.N.Y. 2007) ("Very few acts qualify as continuing violations, so as to trigger a continuous tolling of the statute of limitations."). A hostile work environment claim is a type of continuing violation based on the "cumulative affect of individual acts," which together constitute "one unlawful employment practice." *See Morgan*, 536 U.S at 115. "It does not matter, for purposes of the [time limitation in the] statute, that some of the component acts of the hostile work environment fall outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Id.* at 117; *accord Santiago*, 485 F. Supp. 2d at 331 ("[I]n a hostile work environment case, acts outside the 300 day limit that contribute to an ongoing hostile work environment are actionable under a continuing violation theory."). The Supreme Court, however, has rejected the notion "that an employment practice committed with no improper purpose and no discriminatory intent is rendered unlawful nonetheless because it gives some effect to an intentional discriminatory act that occurred outside the charging period." *Ledbetter*, 127 S. Ct. at 2172.

***6** To the extent Plaintiff is able to establish that there existed a hostile work environment during his employment with Defendant, recovery may be premised even on untimely acts as long as they – in conjunction with timely acts – created a hostile work environment. The Court notes, however, that even if the past acts contributed to a hostile work environment under a continuing violation theory, those acts would not be actionable to the extent that they formed the basis of Plaintiff's 1999 complaint. Plaintiff's opportunity to file suit on those alleged violations has long since passed and no tolling doctrine will revive them at this point. With respect to Plaintiff's disparate treatment claim based on adverse employment actions, Plaintiff can only rely on discrete acts of alleged discrimination occurring within the 300-day period preceding Plaintiff's August 11, 2003 EEOC complaint. *See Morgan*, 536 U.S. at 113.

C. Plaintiff's Request to Supplement the Record

On March 13, 2008, after March 11 oral argument, Plaintiff's counsel submitted to the Court an application to supplement the record with a new affidavit from Plaintiff and with what appears to be the minutes of a meeting held on November 9, 1999.[4] According to Plaintiff's counsel, these additional submissions "clearly show Plaintiff was treated differently, that everyone knew about it ... and [that] Plaintiff was held to a different standard which was discriminatory and caused him to suffer damages." (Letter from Pamela D. Hayes, Esq., to the Court, dated March 17, 2008.) Notably absent from Plaintiff's counsel's recent submissions is an explanation as to why it has taken until now to submit these items to the Court – over a year after Plaintiff's full response to Defendant's Motion was due.

"Under Fed. R. Civ. P. 6(b)(2), the Court has discretion to allow plaintiff to submit new evidence if the Court determines that plaintiff's failure to submit such evidence in a timely fashion 'was the result of excusable neglect.' " *Davidson v. Scully*, 148 F. Supp. 2d 249, 251 (S.D.N.Y. 2001) (quoting *Davidson v. Keenan*, 740 F.2d 129, 132 (2d Cir. 1984) ). "The determination whether neglect is 'excusable' in a particular case rests with the sound discretion of the district court." *Keenan*, 740 F.2d at 132. In making the equitable

determination of whether failure to make a more timely submission of new evidence constitutes excusable neglect, the factors that the Court may consider include: " 'the danger of prejudice' to the non-moving party, 'the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith.' " *Scully*, 148 F. Supp. 2d at 251-52 (quoting *Pioneer Inv. Servs. Co. v. Brunswick Assoc. Ltd. P'ship*, 507 U.S. 380, 395 (1993) ).

Here, the Court has little trouble finding that Plaintiff (or, really his counsel) has failed to meet the excusable neglect burden. The information Plaintiff seeks to add was available to him long ago (over a year) and obviously any first-hand testimony he offers has always been available to him. Moreover, Defendant is plainly prejudiced by the late use of this information as it likely would have been the subject of rigorous inquiry during Plaintiff's deposition and other discovery. Nor is there good faith. Plaintiff's counsel only tendered these new offerings when it was clear that her initial representations were exposed as wholly unsupported by the record as it existed at the time the Motion was fully briefed. Thus, the Court finds the extraordinary delay here to be inexcusable. Therefore, Plaintiff's request to supplement the record with the March 13 submissions is denied.

D. Plaintiff's Claims of Employment Discrimination

***7** Plaintiff claims he was the victim of employment discrimination. To establish a claim of racial discrimination, Plaintiff must show that either: "(1) an adverse employment action under circumstances giving rise to an inference of discrimination based on race; or (2) harassment on the basis of race that amounts to a hostile work environment." *Williams*, 2007 WL 2907426, at *11 (citing *Feingold v. New York*, 366 F.3d 138, 149 (2d Cir. 2004) ). Plaintiff asserts claims of racial discrimination based on each of these theories, so the Court will consider them in turn.

1. Disparate Treatment Claim & the *McDonnell Douglas* Framework

Title VII of the Civil Rights Act of 1964 makes it an "unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race...." 42 U.S.C. § 2000e-2(a)(1). The Supreme Court's opinion in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), "established an allocation of the burden of production and an order for the presentation of proof in Title VII discriminatory-treatment cases." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993). First, the plaintiff must establish, by a preponderance of the evidence, a prima facie case of racial discrimination. *Id.* Plaintiff's burden in establishing a prima facie case is "de minimis." *See Douglas v. Dist. Council 37 Mun. Employees' Educ. Fund Trust*, 207 F. Supp. 2d 282, 289 (S.D.N.Y. 2002). However, a party's bald assertions, without more, are insufficient to overcome a motion for summary judgment. *See Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991); *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985) ("To allow a party to defeat a motion for summary judgment by offering purely conclusory allegation of discrimination, absent any concrete particulars, would necessitate a trial in all Title VII cases."); *Fair v. Weiburg*, No. 02-CV-9218, 2006 WL 2801999, at *3 (S.D.N.Y. Sept. 28, 2006) ("To avoid summary judgment ... the non-moving party must offer 'some hard evidence' of its version of the facts, not merely rely on conclusory allegations or speculation."); *During v. City Univ. of N.Y.*, No. 01-CV-9584, 2005 WL 2276875, at *4, *8-9 (S.D.N.Y. Sept. 19, 2005) (granting summary judgment on discrimination claim where only evidence was conclusory allegations of plaintiff).

The establishment of a prima facie case gives rise to a presumption of discrimination. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981). At that point, the burden of production (not persuasion) shifts to the defendant "to provide a legitimate, nondiscriminatory reason for [its] decision." *Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 49 (2d Cir. 2002) (hereinafter *RECAP*) (citing *Reeves*, 530 U.S. at 142 and *Heyman v. Queens Vill. Comm. for Mental Health for Jamaica Cmty. Adolescent Program, Inc.*, 198 F.3d 68, 72 (2d. Cir. 1999) ). A defendant's burden in this regard is not high; indeed, a defendant need not prove that it was actually motivated by these legitimate reasons. *See Deravin v. Kerik*, No. 00-CV-7487, 2007 WL 1029895, at *6 (S.D.N.Y. Apr. 2, 2007) (citing *Burdine*, 450 U.S. at 254).

If the defendant makes a satisfactory showing, the presumption of discrimination disappears and the burden shifts back to the plaintiff. *See id.* The plaintiff must then "prove that the defendant[ ] intentionally discriminated against [him] on a prohibited ground." *RECAP*, 294 F.3d at 49. In other words, the plaintiff must show that defendant's "articulated, legitimate, non-discriminatory reasons were

pretextual." *Id.* (internal quotation marks omitted); *accord* *Feingold*, 366 F.3d at 152 ("If the defendant has stated a neutral reason for the adverse action, 'to defeat summary judgment ... the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination.' " (quoting *Stern v. Trs. of Columbia Univ.*, 131 F.3d 305, 312 (2d Cir. 1997) ) ); *Deravin*, 2007 WL 1029895, at *6 ("The plaintiff 'may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.' " (quoting *Burdine*, 450 U.S. at 254) ).

***8** Under *McDonnell Douglas* and its progeny, the plaintiff has the ultimate burden of proving discrimination, regardless of whether the defendant offers evidence of a legitimate reason for the adverse employment action at issue. *See St. Mary's Honor Ctr.*, 509 U.S. at 507; *Burdine*, 450 U.S. at 253; *Calabro v. Westchester BMW, Inc.*, 398 F. Supp. 2d 281, 292 (S.D.N.Y. 2005) (holding that plaintiff ultimately has the burden of proving employer's discriminatory animus to survive summary judgment).

a. Prima Facie Case

A plaintiff may establish a prima facie case of disparate treatment by demonstrating: "1) that he belonged to a protected class; 2) that he was qualified for the position he held; 3) that he suffered an adverse employment action; and 4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Feingold*, 366 F.3d at 152.

Because Plaintiff is an African-American man, he belongs to a protected class and thereby satisfies the first prong of his prima facie case. Defendant is willing to assume, as is the Court, that Plaintiff was qualified for the position he held while working for Defendant, satisfying the second prong. (Def.'s Mem. 9.) Defendant argues that it is entitled to summary judgment on Plaintiff's discrimination claim because Plaintiff failed to satisfy the third and fourth prongs of his prima facie case.

i. Adverse Employment Action

An adverse employment action is a " 'materially adverse change' in the terms and conditions of employment. To be 'materially adverse' a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Galabya v. N.Y. City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000) (internal citations and quotation marks omitted). The Second Circuit has "defined adverse employment action broadly to include 'discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand.' " *Lovejoy-Wilson v. Noco Motor Fuel, Inc.*, 263 F.3d 208, 223 (2d Cir. 2001) (quoting *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999) ); *accord* *Feingold*, 366 F.3d at 152 ("Examples of materially adverse employment actions include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation." (internal quotation marks omitted) ).

Plaintiff argues that the following constitute adverse employment actions: (1) the alleged docking of Plaintiff's pay for attending jury duty on November 8, 2002 (Pl.'s Mem. 11); and (2) the out-of-title work Plaintiff was allegedly forced to perform, particularly on May 2, 2003, which led to his back and neck injury and significant loss of earning potential (*id.* 9-11).[5] Defendant argues that neither of these constitutes an adverse employment action. (Def.'s Mem. 10, 12-15.)

***9** Plaintiff alleges that he was docked pay for the several hours of work he missed on November 8, 2002, when he answered a jury summons in Bronx County. (Pl.'s Mem. 11; Compl. 4.) On November 25, 2002, Bates issued to Plaintiff a warning notice, in which Bates wrote: "Mr. Perry has used up all his time and continues to take off. On November 18, 2002 [he] used 3 ½ hrs. [leave without pay]. This is warning no. 2." (Kahan Aff., Ex. Y.)

Defendant argues that Plaintiff was never docked pay for attending jury duty on November 8, 2002, but that he was docked 3.30 hours of pay for being absent on November 18, 2002. In support of this position, Defendant submitted Plaintiff's leave history, which shows that Plaintiff was not docked any time on November 8, 2002, and that he was docked 3.30 hours on November 18, 2002. (Kahan Aff., Ex. W.) Defendant also offered affidavits from Joan Vassari, Defendant's director of personnel, and Bates, Plaintiff's then-supervisor, both of whom swear that Plaintiff was never docked pay for attending jury duty. (Aff. of Joan Vassari ¶ 13 ("Vassari Aff."); Aff. of Robert Bates ¶ 8 ("Bates Aff."); Dep.

of Joan Vassari 11 ("Vassari Dep.") ("[An employee] would never be docked for jury duty.").)

The only evidence in the record that supports Plaintiff's claim that he was docked pay for attending jury duty on November 8, 2002, is his own deposition testimony and his own declaration, in which Plaintiff claims that Bates told him that he would be docked for attending jury duty. (Dep. of Ted Perry 81-82 ("Pl.'s Dep."); Pl.'s Decl. ¶ 14.) Plaintiff swears that he was not absent from work on November 18, 2002, arguing instead that the time he took off for jury service was not docked from his paycheck until the following pay period on November 18, 2002. Plaintiff claims that the November 25, 2002, warning notice was actually for the time Plaintiff missed on November 8, 2002. (Pl.'s Decl. ¶ 14.)

Thus, with regard to whether Plaintiff was docked pay for jury duty, the Court has before it conflicting evidence, giving rise to a factual question suited for a jury. Therefore, construing the evidence in the non-movant's favor, the Court assumes for purposes of this Motion that Plaintiff was docked pay for attending jury duty.

Assuming therefore that Plaintiff's pay was docked for his jury duty service, the next question is whether such a docking of pay qualifies as an adverse employment action; in other words, whether it constitutes a "materially adverse change in the terms and conditions of employment." *See Galabya,* 202 F.3d at 640 (internal quotation marks omitted). For purposes of this Motion, the Court is willing to assume that it does. *See Cunningham v. Consol. Edison Inc.,* No. 03-CV-3522, 2006 WL 842914, at *17 (E.D.N.Y. Mar. 28, 2006) ("[D]ocking of an employee's pay is an adverse employment action."); *see also Hicks v. Baines*, 99-CV-315, 2006 WL 1994808, at * (W.D.N.Y. July 14, 2006) ("The only specific allegations that arguably evince an adverse employment action are the docking of two hours of [one plaintiff's] pay ... and the docking of 15 minutes of [the other plaintiff's] pay...."). Therefore, Plaintiff satisfies the third prong of his prima facie case with respect to the jury duty issue.

Plaintiff argues that he also suffered an adverse employment action when he was forced to work outside of his Housekeeper title – often performing the duties meant for employees with higher pay grades – beginning in 1995. [6] (Pl.'s Mem. 12.) New York State Civil Service Law § 61(2) prohibits out-of-title work by declaring that "[n]o person shall be appointed, promoted or employed under any title not appropriate to the duties to be performed and, except upon assignment by proper authority during the continuance of a temporary emergency situation, no person shall be assigned to perform the duties of any position unless he has been duly appointed, promoted, transferred or reinstated to such position...." New York courts have further defined out-of-title work to encompass situations "when an employee has been assigned ... to perform the duties of a higher grade, without a concomitant increase in pay, frequently, recurrently and for long periods of time." *Sprague v. Governor's Office of Employee Relations,* 786 N.Y.S.2d 634, 635 (App. Div. 2004) (internal quotation marks omitted) (ellipses in original). [7] However, "not all additional duties constitute out-of-title work, and the mere fact that there may be some overlap between two particular positions does not mandate a finding that a petitioner is being compelled to perform out-of-title work." *Woodward v. Governor's Office of Employee Relations,* 718 N.Y.S.2d 465, 467 (App. Div. 2001).

***10** Plaintiff claims that his working out-of-title eventually led to a back injury when, on May 2, 2003, he was ordered to move several concrete bumpers. (Compl. 3-4; Pl.'s Decl. ¶ 17.) This injury resulted in a partial permanent disability and loss of Plaintiff's earning potential, which, according to Plaintiff, constituted an adverse employment action. (Pl.'s Mem. 9-11; Compl. 7.)

Defendant disputes Plaintiff's claim that he was working out-of-title or that he was performing the work of a higher salary grade employee. (Def.'s Mem. 13.) Defendant cites *Healy v. County of Nassau,* 796 N.Y.S.2d 377, 379 (App. Div. 2005), for the proposition that "work is not considered 'out-of-title' where it is related to, similar in nature to, or a reasonable outgrowth of, the 'in-title' work." According to Defendant, the job assignments that Plaintiff was asked to complete either fell under his title of Housekeeper or were "reasonably related to" the Housekeeper job description (Def.'s Mem. 14.), and, in either case, were based on the needs of the Department (*id.* 19).

The Court finds a genuine issue of material fact as to whether the assignments given to Plaintiff – particularly the May 2, 2003 assignment – were out-of-title, in-title, or reasonably related to in-title work. In order for Plaintiff to establish that allegedly out-of-title assignments, particularly the assignment to move concrete bumpers, constituted an adverse employment action, Plaintiff must demonstrate that such assignments resulted in a " 'materially adverse change' in the terms and conditions of [his] employment." *Galabya,* 202 F.3d at 640. If what Plaintiff claims is true – that he was assigned duties outside of his Housekeeper title that somehow

were typically performed by employees in a higher pay grade – then Plaintiff will have satisfied his minimal burden of demonstrating that he suffered an adverse employment action, at least with regard to out-of-title work performed within the 300-day-period preceding the filing of Plaintiff's NYSDHR complaint. *See* *Santiago*, 485 F. Supp. 2d at 335-36 (referring to employer's refusal to compensate employee's performance of out-of-title duties as discrete act). Defendant has failed to adequately demonstrate that there exists no genuine issue of material fact with regard to whether Plaintiff's pay was concomitant with the duties he was assigned. Therefore, for purposes of this Motion, the Court assumes that Plaintiff suffered an adverse employment action by being assigned out-of-title work usually performed by employees with a higher pay grade.

ii. Inference of Discriminatory Intent

To establish his prima facie case, and thereby shift the burden of production to Defendant, Plaintiff must establish an inference of discrimination. Though not required, this is most commonly done by demonstrating that other similarly situated persons, not of Plaintiff's protected class, were treated more favorably than he was in the workplace. *See* *Abdu-Brisson*, 239 F.3d at 467-68. Indeed, Plaintiff has chosen this approach to make his case. To be similarly situated, these persons must have been subject to the same standards governing performance evaluation and discipline and must have engaged in conduct similar to Plaintiff's. *See* *Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 96 (2d Cir. 1999); *see also* *McGuinness v. Lincoln Hall*, 263 F.3d 49, 54 (2d Cir. 2001) ("[W]here a plaintiff seeks to establish the minimal prima facie case by making reference to the disparate treatment of other employees, those employees must have a situation sufficiently similar to plaintiff's to support at least a minimal inference that the difference of treatment may be attributable to discrimination."). Evidence of disparate treatment, however, cannot be based on conclusory allegations. *See* *Finney v. Planned Parenthood of N.Y. City, Inc.*, No. 02-CV-7942, 2003 WL 22928730, at *4 (S.D.N.Y. Dec. 10, 2003) (granting summary judgment where only evidence of disparate treatment was plaintiff's own conclusory allegations); *Griffin v. Ambika Corp.*, 103 F. Supp. 2d 297, 308 (S.D.N.Y. 2000) ("Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." (internal quotation marks omitted) ).

***11** Defendant argues that even if Plaintiff did suffer adverse employment actions, Plaintiff failed to establish that such actions took place under circumstances giving rise to an inference of discriminatory intent. (Def.'s Mem. 16-18.) Plaintiff relies on the alleged disparate treatment between him and his Caucasian co-workers (in particular, Aubry, Emery and Ponce) to support his claim that he suffered adverse employment actions under circumstances giving rise to an inference of discriminatory intent. (Pl.'s Mem. 12-13.) More specifically, Plaintiff claims that he was constantly disciplined and forced to do undesirable out-of-title work, while his Caucasian co-workers were not. According to Plaintiff, this disparate treatment demonstrates that the adverse employment actions he suffered were motivated by racial discrimination.

In 1993, Emery, Ponce and Plaintiff had their positions reclassified to that of Housekeeper – the position Plaintiff still held when his employment with Defendant ended. After filing a grievance, Emery and Ponce had their positions reclassified to Maintenance Mechanic, which, according to Plaintiff, left them "open to higher salaries and promotion opportunities." (Pl.'s Decl. ¶¶ 7-8.) Plaintiff claims that he was not allowed to grieve his reassignment. (*Id.* ¶ 8.) Plaintiff makes this argument with no proof whatsoever.

As previously noted, after oral argument, Plaintiff submitted to the Court an application to supplement the record with what appears to be the minutes from a meeting that took place in November 1999. According to Plaintiff, this document demonstrates that "Defendant treated Plaintiff differently from the white County employees (Mr. Em[e]ry and Mr. Ponce), thereby showing that Defendant ... was fully aware that Plaintiff's title was supposed to have been changed and was not." (Letter from Pamela D. Hayes, Esq., to the Court, dated Mar. 17, 2008.) Despite Plaintiff's urging, this document cannot be used to create an issue of fact because the meeting minutes are inadmissible hearsay. *See* *Patterson v. County of* Oneida, 375 F.3d 206, 219 (2d Cir. 2004); *Witkowich v. Gonzales*, 05-CV-7756, 2008 WL 701280, at *10 n.11 (S.D.N.Y. Feb. 25, 2008) ("[I]nadmissible hearsay ... [cannot] be used to defeat summary judgment."). Further, as discussed above, Plaintiff has failed to demonstrate to the Court that excusable neglect was to blame for this document not being added to the record earlier. *Cf.* *Scully*, 148 F. Supp. 2d at 251-52 (plaintiff was permitted to supplement the summary judgment record because the new evidence was not previously available, plaintiff exercised good faith, and only minimal delays would result). Moreover, even if admissible,

these minutes do Plaintiff no good, for they fail to rebut Defendant's argument that Plaintiff was always free to grieve his assignment, but never did. Plaintiff claims he was unaware of this option, a claim contradicted by the minutes themselves, but Plaintiff still fails to tender any evidence that Defendant engaged in any conduct blocking Plaintiff's efforts to grieve his assigned title.

Without this inadmissible and tardy information, Plaintiff has no admissible evidence showing that Defendant prohibited him from grieving his reassignment, that Defendant had an affirmative obligation to notify Plaintiff of his right to grieve his reassignment or to help him do it, or that Defendant helped Emery and Ponce to grieve their status. Moreover, this alleged act of discrimination was a discrete act occurring several years before Plaintiff initiated legal action. Therefore, the Court will not entertain Plaintiff's argument that discriminatory intent can be inferred from Emery and Ponce being reclassified to the Maintenance Mechanic position after filing grievances.

Plaintiff also focuses on what he sees as the disparate treatment between him and Aubry. Plaintiff claims that he was docked for attending jury duty, but that when Aubry had to appear in court on several occasions, he was given time off and never had his pay docked. (Compl. 4-5; Pl.'s Dep. 117 ("Jason used to go to jail for long periods of time and come back and have his job and nothing said or nothing done.").)[8] Also, Plaintiff alleges that Aubry was permitted to drive County vehicles without a license – even though one was required for his position – but that Plaintiff was disciplined for failing to produce a driver's license – even though his position did not require that he have such a license. (Compl. 5; Pl.'s Mem. 13; Kahan Aff., Ex. AA.) Indeed, according to Plaintiff, he was disciplined for not having a license, while Defendant actually helped Aubry obtain his license. (Pl.'s Mem. 13.) Further, Plaintiff claims that he was constantly disciplined for minor infractions, while Aubry committed much more serious infractions and was not similarly disciplined or docked pay. (*Id.* 13; Compl. 4-5; Pl.'s Decl. ¶ 19; Kahan Aff., Ex. GG ("In contrast to Mr. Aubry, I have been written up for numerous incidents, none of which are as grave as the incidents involving Mr. Aubry.").)

***12** Plaintiff offers no evidence to support his argument that Aubry went undisciplined while committing infractions similar to or worse than those committed by Plaintiff. Plaintiff was disciplined many times during the course of his employment with Defendant, mostly for infractions such as time abuse and insubordination, and he offers no proof that those were improperly imposed sanctions. (Def.'s 56.1 Stmt ¶¶ 9-12, 23, 25, 29-33, 36-37.) Moreover, Defendant submitted unrefuted evidence demonstrating that Aubry was in fact disciplined for time abuse, at least during 2003 and 2004. (Kahan Aff., Exs. LL-NN.) In fact, the evidence shows that, because of his excessive absenteeism, Aubry was denied salary increments on August 13, 2003, November 10, 2003, and February 19, 2004, and that he was denied an unpaid leave of absence on February 2, 2004. (*Id.*, Ex. MM.) Further, an Amended Notice of Charges dated April 15, 2004, was issued to Aubry, detailing 169 charges and specifications brought against him by Defendant for time abuse spanning from January 16, 2003, through April 5, 2004. (*Id.*, Ex. LL.) Aubry resigned before the charges could be resolved. (*Id.*) According to Plaintiff, this evidence does nothing to disprove his claim of disparate treatment since "nothing was done to Mr. Aubry while Plaintiff was on the job." (Pl.'s Mem. 13.)

Although the Court agrees with Plaintiff that the record contains evidence of discipline of Aubry (who was employed by Defendant for far less time than Plaintiff) that largely post-dates Plaintiff's employment and, therefore, it does little to disprove Plaintiff's claim of disparate treatment, it is not Defendant's burden to disprove an unsupported claim of disparate treatment. Plaintiff has the ultimate burden under the *McDonnell Douglas* framework, *St. Mary's Honor Ctr.*, 509 U.S. at 507, and he cannot satisfy his burden by making bare and conclusory assertions that he and Aubry were similarly situated but that they were treated differently.[9] A conclusory allegation without support in the record will not give rise to an inference of discriminatory intent nor will it defeat a motion for summary judgment.

Aubry, who was a Maintenance Laborer, was required to have a driver's license. Based on the Housekeeper job specifications, it appears that Plaintiff was not.[10] (Kahan Aff., Ex. I.) On December 30, 2002, however, Plaintiff was issued a warning notice by Bates for failure to produce a license. (*Id.*, Ex. AA ("Mr. Perry could be asked to drive at any time and should have his license with him.").) The record shows that on June 17, 2002, Aubry was notified by Commissioner Stanley G. Motley that his probationary appointment would be terminated if he failed to produce a driver's license by July 22, 2002. (Pl.'s Exs. in Opp'n Pursuant to Local Rule 56.1(a) 21 ("Pl.'s Ex.").) In response to this notification, Aubry wrote a letter to Motley on July 8, 2002, indicating that he was in the process of getting his license back, but that he may not have it back from the Department of Motor Vehicles ("DMV") within the time limit specified. (*Id.*)

Motley replied to Aubry on July 10, 2002, stating that "[the County] will try to expedite the return of your driver's license through the Department of Motor Vehicles. I[n] the event we can not please be assured that you will still be an employee in good standing since you have met the legal requirements and are just awaiting the return of your paperwork from the State of New York." (*Id.*)

***13** Again, Plaintiff has not pointed to any evidence in the record from which the Court could conclude that Plaintiff and Aubry were similarly situated with regard to the driver's license issue. The record demonstrates that Aubry was threatened with termination (by someone other than Bates) if he did not produce a driver's license by a certain date. The record also suggests that Defendant did not offer to "help" Aubry until it was satisfied that Aubry had done all that he could to obtain his driver's license and that he was waiting on paperwork from the DMV. Plaintiff offers no evidence suggesting that, at the time he was issued a warning notice, he, like Aubry, had done all that could to obtain his license but was waiting on documentation from the DMV. Further, Plaintiff and Aubry did not hold the same positions. Though it is not entirely clear from the record why Plaintiff was issued a warning notice for failure to produce a driver's license, there is nothing in the record suggesting that the reason was racial discrimination. And, Plaintiff's bare belief that Defendant was "messing" with him is not evidence of anything. *See Powell v. Consol. Edison Co.*, 97-CV-2439, 2001 WL 262583, at *12 (S.D.N.Y. Mar. 13, 2001) ("[P]laintiff's subjective belief that a supervisor had an improper motive is not evidence at all...."). From this feeble evidence, no reasonable jury could find that Plaintiff and Aubry were similarly situated but were treated disparately under circumstances giving rise to an inference of discriminatory intent.

Plaintiff argues that he was forced to work out-of-title, while his similarly-situated Caucasian co-workers were not. Some of his complained of out-of-title duties included digging ditches, performing firefighter duties, and moving concrete parking lot bumpers, none of which expressly appear on the illustrative list of possible Housekeeper duties. (Compl. 3-4; Kahan Aff., Ex. I.) [11] Even if the Court accepts Plaintiff's argument that he was given assignments outside of his Housekeeper title, Plaintiff has offered no evidence from which the Court could infer that such assignments were given on account of Plaintiff's race as opposed to any other reason (such as department need or even personal dislike of Plaintiff). It is noteworthy that in regard to this claim, Plaintiff has submitted no evidence of disparate treatment.

Defendant has submitted an affidavit from Bates, in which he stated that "[t]he decisions regarding jobs to be performed depended upon the needs of the department and who is available.... Perry's job assignments were no more difficult, demanding or dangerous than assignments given to other ... employees. That Perry did not like some of [ ]his job assignments is true, but Perry was not singled out for particular jobs." (Bates Aff. ¶¶ 3-4.) Plaintiff testified that during a meeting while Plaintiff was at Bronx River Parkway, Bates said that "any shit detail that was going to be done, [Plaintiff] would be doing it." (Pl.'s Dep. 45.) Plaintiff also testified that, while at Bronx River Parkway, he worked as part of a crew – albeit "not the popular crew." (*Id.* 44.)

Plaintiff cannot defeat Defendant's Summary Judgment Motion with these statements. By themselves, these alleged comments show only that Bates might have disliked Plaintiff (and others in the group), not that he discriminated against him. Thus, it is even more apparent that Plaintiff has failed to demonstrate that any of the work he was assigned – including the assignment that allegedly led to his back injury on May 2, 2003 – was assigned to him because of his race. In a conclusory fashion, Plaintiff claims that he was made to perform dangerous and demanding out-of-title work, while Caucasian co-workers were not. (Pl.'s Mem. 9.) Plaintiff has not made any specific allegations asserting, nor has he provided any admissible evidence suggesting, that Plaintiff was given assignments more dangerous or demanding than similarly-situated Caucasian co-workers. [12] *See Meiri*, 759 F.2d at 998 ("To allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all Title VII cases."); *Jones*, 2008 WL 495498, at *11 (finding plaintiff failed to establish prima facie case of discrimination because plaintiff offered no specific information or evidence to substantiate his conclusory allegation that "white [co-workers] with less seniority and experience were provided summer employment while he was not"); *Marro v. Nicholson*, No. 06-CV-6644, 2008 WL 699506, at *10 (E.D.N.Y. Mar. 12, 2008) (holding vague and conclusory statements that similarly situated employees were treated differently failed to give rise to issue of material fact regarding disparate treatment); *Randolph v. CIBC World Markets*, No. 01-CV-11589, 2005 WL 704804, at *13 (S.D.N.Y. Mar. 29, 2005) ("Although [plaintiff] has made the general allegation that he was treated more harshly than white ... employees who committed similar violations ..., there is no other evidence in the record to support this

assertion. Conclusory allegations of this sort are insufficient to survive a motion for summary judgment.").

***14** As set forth above, Plaintiff has failed to establish a prima facie case of racial discrimination based on disparate treatment because he has not offered admissible evidence suggesting that he suffered adverse employment actions under circumstances giving rise to an inference of racial discrimination.

2. Hostile Work Environment Claim

Plaintiff also brings a hostile work environment claim. "The question of whether a work environment is sufficiently hostile to violate Title VII is one of fact. On a motion for summary judgment, the question for the court is whether a reasonable factfinder could conclude, considering all the circumstances, that the harassment is of such quality or quantity that a reasonable employee would find the conditions of [his] employment *altered for the worse*." *Schiano*, 445 F.3d at 600 (internal quotation marks and citations omitted).

> In order to prevail on a hostile work environment claim, a plaintiff must first show that the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. Second, the plaintiff must demonstrate a specific basis for imputing the conduct creating the hostile work environment to the employer.

*Feingold*, 366 F.3d at 149-50 (internal citations and quotation marks omitted).

The first prong involves an objective and a subjective component: "the misconduct shown must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive." *Id.* (internal quotation marks omitted). In determining whether a work environment is "hostile" or "abusive," courts are to look at the totality of the circumstances, as guided by the following factors: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993), *abrogated on other grounds by*, *Burlington Indust., Inc. v. Ellerth*, 524 U.S. 742 (1998). Thus, to satisfy the first prong, a plaintiff " 'must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were 'sufficiently continuous and concerted' to have altered the conditions of [his] working environment.' " *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) (quoting *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000) ). Though a single incident may be severe enough to materially alter employment conditions, *see Patterson*, 375 F.3d at 227, in general the actions taken by the defendant "must be more than 'episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.' " *Alfano*, 294 F.3d at 375 (quoting *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997) ); *see also Carrero v. N.Y. City Hous. Auth.*, 890 F.2d 569, 577 (2d Cir. 1989) (holding "incidents must be more than episodic"). "Where reasonable jurors could disagree as to whether alleged incidents of racial insensitivity or harassment would have adversely altered the working conditions of a reasonable employee, the issue of whether a hostile work environment existed may not properly be decided as a matter of law." *Patterson*, 375 F.3d at 227.

***15** The existence of a hostile environment alone is insufficient to make out a Title VII claim, however. Plaintiff must also show there is some reason to impute the discriminatory conduct of the employees that created the hostile work environment to the employer. *See Perry*, 115 F.3d at 149. Employers are not generally liable for the harassing behavior of a plaintiff's co-workers; to make an employer liable for a hostile work environment claim, the harassment must generally come from a supervisor with authority over a plaintiff. *See Mack v. Otis Elevator Co.*, 326 F.3d 116, 123 (2d Cir. 2003) ("[I]t is only when a supervisor with immediate (or successively higher) authority over the employee has engaged in the complained of conduct, that the employer may be subject to vicarious liability. Employers are not, by contrast, vicariously liable for hostile work environment created by a mere co-worker of the victim." (internal citations and quotation marks omitted) ).

Finally, Plaintiff must prove that the hostile conduct occurred because of his membership in a protected class. To make such a showing, a plaintiff must introduce evidence of hostile conduct that a reasonable juror could find was a result of the

plaintiff's membership in a protected class. *See* Brennan v. Metro. Opera Ass'n, 192 F.3d 310, 318 (2d Cir. 1999).

Plaintiff argues that the accumulation of the following incidents – which occurred from 1995 through May 2003 – demonstrate that he was treated differently than his Caucasian co-workers and constitute a hostile work environment: [13] (1) After filing a grievance, Emery and Ponce were reclassified from the Housekeeper title to the Maintenance Mechanic title, and Plaintiff was not (Pl.'s Mem. 15); (2) Plaintiff was told he would be fired if he did not do what he was told, regardless of whether the assignment was in- or out-of-title (*id.*; Compl. 5; Pl.'s Dep. 112); (3) Plaintiff was the only person docked pay for going to jury duty (Pl.'s Mem. 15); (4) Plaintiff was written up for excessive absenteeism on May 8 and 9, 2003, even though his supervisor knew that he was out because of the May 2, 2003 injury (*id.*); (5) Plaintiff had to drive Aubry around, even though Aubry was required to have a license (*id.*; Pl.'s Dep. 113); (6) Plaintiff was not allowed to wear safety equipment like his Caucasian co-workers (Pl.'s Mem. 15); (7) Plaintiff was subjected to "Kunta Kinte" jokes (*id.* 15-16); [14] and (8) Plaintiff was disciplined for minor infractions while his Caucasian co-workers were not (Compl. 3). Plaintiff acknowledges that he was not generally subjected to racial epithets or insults, but insists that, because he was the only African-American person in his group, no outright insults were necessary. (Pl.'s Mem. 16.)

***16** Plaintiff does not suggest, and the Court does not find, that any one of these alleged incidents was severe enough by itself to alter the conditions of Plaintiff's employment and thereby constitute hostile work environment. [15] Therefore, the Court considers these incidents in the aggregate to determine whether, under the totality of the circumstances, Plaintiff was subjected to a hostile work environment during his employment with Defendant. For present purposes, with regard to timeliness, the Court will assume – without deciding – that these acts are all properly before the Court as part of Plaintiff's hostile work environment claim, unless otherwise noted.

The first issue for the Court is whether Plaintiff was subjected to an objectively hostile environment during his employment with Defendant. *Feingold,* 366 F.3d at 150. In making this determination, the *Harris* factors guide the Court's "totality of the circumstances" analysis. *See* *Harris,* 510 U.S. at 23. The conduct complained of spans a period of approximately eight years, which is a considerable amount of time considering the fact that most of the incidents complained of are isolated occurrences. The fact that the incidents are spread out over a long period of time tends to weigh against a finding that Plaintiff's work environment was altered for the worse. *See* *Williams,* 2007 WL 2907426, at *11 ("The incidents that plaintiff points to were isolated in nature and took place over a number of years.... Taken together, the incidents described are separated in time and space and do not demonstrate a change in work environment.").

Nonetheless, keeping in mind that it is not for the Court to act as a " 'hierophant of social graces,' " *see* *Schiano,* 445 F.3d at 605 (quoting *Holtz v. Rockefeller Co.,* 258 F.3d 62, 75 (2d Cir. 2001) ), the Court is unwilling to say that no reasonable jury could find that the incidents listed above were severe enough in the aggregate to alter the conditions of Plaintiff's employment, though the Court has serious doubts. Indeed, the Second Circuit has cautioned that "hostile work environment claims present 'mixed question[s] of law and fact' that are 'especially well-suited for jury determination.' " *Id.* (quoting *Richardson v. N.Y. State Dep't of Corr. Serv.,* 180 F.3d 426, 437 (2d Cir. 1999) ) (alteration in original). Only when "application of the law to th[e] undisputed facts will reasonably support only one ultimate conclusion" is summary judgment appropriate. *Richardson,* 180 F.3d at 438. Because reasonable minds may differ on the issue of whether the conduct complained of altered Plaintiff's employment for the worse, the Court will not grant summary judgment to Defendant on the objective element of Plaintiff's hostile work environment case.

With regard to whether Plaintiff subjectively believed that his work environment with Defendant was hostile, Plaintiff has pled that he was caused to "undergo an intimidat[ing], hostile and offensive work environment causing [him] monetary damages and emotional injuries and numerous other injuries." (Compl. 8.) At this stage, Defendant does not challenge Plaintiff's claim that he found the work environment subjectively hostile, so the Court will assume, for purposes of this Motion, that this element is satisfied.

Plaintiff must show a basis upon which to impute the discriminatory conduct of the employees that created the hostile work environment to the employer. *See* *Perry,* 115 F.3d at 149. Because most of the complained-of conduct was alleged to have been committed by Bates, Plaintiff's direct supervisor, Defendant can be held vicariously liable for any resulting hostile work environment. *See* *Mack,* 326 F.3d at 123.

***17** Finally, Plaintiff must demonstrate that the hostile conduct occurred because of his membership in a protected class. *See Brennan*, 192 F.3d at 318. “Although the incidents comprising a hostile work environment claim need not make reference to any trait or condition on the basis of which the discrimination has occurred ... they must occur under circumstances in which ... the incidents can reasonably be interpreted as having taken place on the basis of that trait or condition.” *Williams*, 2007 WL 2907426, at *10 (internal quotation marks omitted) (ellipses in original). Plaintiff points to no admissible evidence in the record suggesting that his race played a role in the way he was treated during his employment with Defendant. Instead, Plaintiff relies on his own conclusory statements that: (1) race must have been a motivating factor because Plaintiff was the only African American employee in the group (Pl.'s Mem. 16); and (2) he was treated differently from his Caucasian co-workers (Compl. 1-2, 3-5, 7; Pl.'s Mem. 15). The problem, however, is that Plaintiff's membership in a protected class in and of itself does not establish discriminatory intent. *See Ghent v. Moore*, 519 F. Supp. 2d 328, 338 (W.D.N.Y. 2007) (“Without other evidence of discrimination, [the fact that plaintiff was the only African-American employee] alone is not probative of unlawful discrimination.”); *Bennett v. Watson Wyatt & Co.*, 136 F. Supp. 2d 236, 252 (S.D.N.Y. 2006) (“It is not enough simply to be a member of a protected class. To invoke the protections of Title VII, an employee must have actually suffered discrimination.”). Further, as discussed above, Plaintiff has offered no evidence demonstrating that these Caucasian co-workers were similarly-situated to and actually treated differently than Plaintiff. *See Hill v. Rayboy-Brauestein*, 467 F. Supp. 2d 336, 360 (S.D.N.Y. 2006) (“When a person only makes general allegations that African-Americans are treated differently in the workplace, those allegations are insufficient to support a hostile work environment claim.”); *see also Marro*, 2008 WL 699506, at *10; *Randolph*, 2005 WL 704804, at *13.

The Second Circuit has said that “[i]n a hostile work environment case, it may well be a proper exercise of the district court's broad discretion to allow the plaintiff to build [his] case partly by adducing incidents for which the link to any discriminatory motive may, in the first instance, appear tenuous or nonexistent.” *Schiano*, 445 F.3d at 605. However, the Second Circuit has stood firm on its position that district courts are not to “treat discrimination differently from other ultimate questions of fact.” *Abdu-Brisson*, 239 F.3d at 466; *accord Schiano*, 445, F.3d at 603 (“[S]ummary judgment remains available for the dismissal of discrimination claims in cases lacking genuine issues of material fact.” (internal quotation marks omitted) ). On the record before the Court, no reasonable jury could find that Plaintiff was subjected to a hostile work environment on account of his membership in a protected class. Therefore, Defendant's Motion for Summary Judgment dismissing Plaintiff's hostile work environment claim is granted.

3. Section 1981 Claim

The *McDonnell Douglas* burden-shifting framework also applies to 42 U.S.C. § 1981 claims. *See Evans-Gadsden v. Bernstein Litowitz Berger & Grossman, LLP*, 491 F. Supp. 2d 386, 402 (S.D.N.Y. 2007). “To establish the requisite prima facie case for a violation of [Section 1981], a plaintiff must establish: (1) that [he] is a member of a racial minority; (2) that the Defendant intended to discriminate against Plaintiff on the basis of [his] race; and (3) that the Defendant discriminated in connection with one of the statute's enumerated activities.” *Id.* (citing *Brown v. City of Oneonta*, 221 F.3d 329, 339 (2d Cir. 1999) ).

An individual may be held liable under Section 1981 where the plaintiff demonstrates “some affirmative link to causally connect the [defendant] with the discriminatory action.” *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 75 (2d Cir. 2000) (internal quotation marks omitted). Although the elements of a Section 1981 claim and a Title VII claim are distinct, discriminatory intent is a necessary element of a Section 1981 claim. *See Patterson*, 375 F.3d at 226 (“[A] plaintiff pursuing a claimed violation of § 1981 ... must show that the discrimination was intentional.”). Thus, a failure to establish sufficient evidence of discriminatory intent to survive summary judgment on a Title VII claim is fatal to a similar claim of racial discrimination under Section 1981. *See Gonzalez v. City of New York*, 354 F. Supp. 2d 327, 330 n.2 (S.D.N.Y. 2005) (“Although claims under 42 U.S.C. § 1981 ... involve different elements than those involved in Title VII claims, they share in common with Title VII claims the essential element of intentional unlawful discrimination. Therefore, the Court's determination that certain of Plaintiffs' Title VII claims do not survive summary judgment due to the inadequacy of evidence regarding discriminatory intent also results in dismissal of Plaintiffs' § 1981 ... claims.” (internal quotation marks and citations omitted) ); *Patterson*, 375 F.3d at 225 (holding that reasons supporting summary judgment for defendants on Title VII claims also merited dismissal of plaintiff's Section

1981 claims). As described in the previous section, Plaintiff has failed to show intentionally discriminatory conduct on the part of Defendant, and therefore, summary judgment on Plaintiff's Section 1981 claim is granted.

III. Conclusion

***18** For the reasons stated herein, Plaintiff's application to supplement the record is DENIED, and Defendant's Motion for Summary Judgment is GRANTED. The Clerk of Court is respectfully directed to terminate all pending motions (Dkt. Nos. 23, 45), to enter judgment for Defendant, and to close this case.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2008 WL 11438085

## Footnotes

1 Defendant's Employee Handbook provides the following:

> If you are required to serve as a juror or to appear in court pursuant to a subpoena or court order, you will be granted a leave with pay for such required attendance. Any fees received for such attendance, other than travel and meals, must be paid to the County. This leave with pay does not apply when your own personal interests are the subject of the court activity.

(Kahan Aff., Ex. Z.)

2 The Court will cite to Plaintiff's Complaint by page number rather than paragraph number in an attempt to alleviate the confusion resulting from Plaintiff's reuse of paragraph numbers within the document.

3 "[I]n a case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State or local agency with authority to grant or seek relief from such practice ..., such charge shall be filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful employment practice occurred...." 42 U.S.C. § 2000e-5(e)(1).

4 Plaintiff offered these tardy additions to the record, after he failed to provide the record evidence he claimed would prove that a supervisor had referred to Plaintiff as "Kunta Kinte." Obviously, the Court found Plaintiff's assertion of this claim in response to Defendant's Summary Judgment Motion, which was not backed up by any evidence in the record (despite representations to the contrary), to be potentially material, if not dispositive, in resolving the Motion. Accordingly, the Court asked counsel for Plaintiff to show where in the record there was support for this assertion. Plaintiff never did provide any evidence in the record as it existed when he responded (several months late) to Defendant's Motion. Instead, Plaintiff sought to augment the record with the March 13 submissions.

5 Defendant reads Plaintiff's submissions to assert that the various warning notices Plaintiff was issued for time abuse and failure to produce a driver's license were adverse employment actions in support of this claim. The Court disagrees with this reading. Instead, it is evident to the Court, based on its reading of Plaintiff's various submissions, that Plaintiff relies on these warning notices not as adverse employment actions, but as evidence of discriminatory intent and in support of his hostile work environment claim.

6 Plaintiff offers no specific allegations – let alone evidence – to support this claim. First of all, Plaintiff never identifies which title would be the appropriate recipient of such duties, nor does he identify the salary grade appropriate to these duties. Despite these significant infirmities in Plaintiff's claim and because the outcome

herein is the same either way, the Court will assume – for purposes of this Motion – that the complained-of assignments would normally be given to an employee with a higher salary-grade title.

7 Interestingly, Plaintiff does not here claim a failure to compensate for higher grade work he allegedly was assigned, but claims that the out-of-grade work he was assigned both was highly undesirable (which one would imagine would be lower-grade work) and led to his injuries in May 2003.

8 In his Complaint, Plaintiff also states "the other white employees were given time off without being docked when they had to perform citizenship duties." (Compl. 7.) Without any specific allegations or evidence to support this statement, it cannot be relied upon to establish the fourth prong of Plaintiff's prima facie case. *See Jones v. W. Suffolk Boces*, No. 03-CV-3252, 2008 WL 495498, at *11 (E.D.N.Y. Feb. 20, 2008) (finding as insufficient to satisfy fourth prong of prima facie case plaintiff's conclusory allegation that "white [employees] with less seniority and experience were provided summer employment while [plaintiff] was not").

9 On December 14, 2006, Magistrate Judge George A. Yanthis ordered that Defendant turn over to Plaintiff in discovery Aubry's leave history from 2001 through 2004. (Dkt. No. 15.) Exhibit 34 to Plaintiff's Local Civ. R. 56.1 Statement indicates that these records were in fact provided to Plaintiff. Interestingly, however, Plaintiff decided not to include Aubry's leave history in the present record. Based solely on the record before it, the Court has no way of knowing whether Aubry was excessively absent while Plaintiff was employed by Defendant or, more importantly, whether his pay was ever docked as a result. The Court cannot assume either of these things to be the case based solely on Plaintiff's bare assertions.

10 The Court notes, however, that there is evidence in the record to suggest that, in May 2002, Plaintiff was told that some work assignments would require him to drive. (Kahan Aff., Ex. V.) During his deposition, Plaintiff testified to his belief that his supervisors would make him drive because "they w[ere] just messing with [him]." (Pl.'s Dep. 60.)

11 Plaintiff elaborated more fully on this issue in his complaint before the NYSDHR:

> Since Mr. Bates became my supervisor, I have been assigned tasks that no one else wants to do. These tasks are the most physically demanding and dangerous assignments. For example, I have been assigned to dig holes without a back hoe or assistance, and I have been required to move concrete parking lot bumpers despite the fact that I have a documented back injury. I have been sent to do weed-whacking jobs without chaps, safety glasses and ear protection. The aforementioned examples are not an exhaustive list of undesirable duties I have been assigned since 1999. It should be noted that when co-workers are assigned to work with me, they view the assignments as a form of punishment. I am being punished everyday especially since almost all the work I perform is out of my job title.

(Kahan Aff., Ex. GG.) Again, it is entirely unclear from Plaintiff's allegations and submissions the title for which Plaintiff believes these duties are appropriate.

12 One of the alleged out-of-title assignments that Plaintiff complains of was when he was allegedly asked to perform "firefighter duties." (Compl. ¶ 1.) However, in an undated letter written by Donald Kranker, a Maintenance Laborer and Shop Steward, he complains of an August 23, 2002 firefighting assignment that was given to him, Plaintiff, Jason Aubry and one other employee. (*See* Pl.'s Ex. 29.) Thus, at least with respect to the firefighting assignment, the record not only fails to show that Plaintiff was singled out for the assignment, but actually demonstrates that Caucasian co-workers were given the same assignment; in fact, Jason Aubry – who happens to be the employee Plaintiff focuses on to demonstrate disparate treatment – was one of the employees sent to perform firefighting duties with Plaintiff. Therefore, there is no basis whatsoever for Plaintiff to claim that he was assigned firefighter duties based on his race.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

13 In his Complaint, Plaintiff alleged that the hostile work environment spanned from 1999 to 2003. (Compl. 3.)

14 In his opposition brief, Plaintiff asserted – as evidence that he was subjected to a hostile work environment – that he endured comments about "Kunta Kinte." (Pl.'s Mem. 15-16.) In support of this allegation, Plaintiff offered the Court an unhelpful and erroneous citation – without page number – to Plaintiff's Exhibit 3, which is an approximately 50-page excerpt from Plaintiff's deposition testimony. Yet, there was no reference to this comment in Plaintiff's deposition. In fact, nothing Plaintiff provided in opposition to the Summary Judgment Motion contained any evidence that Plaintiff was subjected to such comments.

During oral argument, the Court asked Plaintiff's counsel what in the record supported the allegation that Plaintiff was subjected to "Kunta Kinte" comments. Plaintiff's counsel represented to the Court that Plaintiff testified during his deposition that he was referred to as "Kunta Kinte" by his supervisor. Defendant's counsel indicated that he had a recollection of such testimony. Plaintiff's counsel further represented that she would send the relevant pages from Plaintiff's deposition transcript to the Court the following day, which she failed to do.

Instead, on March 12, 2008, Defendant's counsel sent to the Court Plaintiff's entire deposition transcript and a letter, in which he represented: "I have found no reference to the 'Kunta Kinte' comment referenced by plaintiff's counsel. I was in error when I stated that such a comment was made by Mr. Perry at his deposition." (Letter from Stuart E. Kahan, Esq., to the Court, dated Mar. 11, 2008.)

On March 14, 2008, the Court received from Plaintiff's counsel via overnight mail: (1) a letter dated March 13, 2008, in which she admitted, "[t]here is no reference to [the "Kunta Kinte" comment] in the *deposition* transcript," and (2) an application to supplement the record with a new affidavit from Plaintiff and what appears to be the minutes of a meeting held on November 9, 1999. (Letter from Pamela D. Hayes, Esq., to the Court, dated Mar. 13, 2008.) In his putative supplemental affidavit, Plaintiff states that he was referred to as "Kunta Kinte" by a supervisor identified only as "Mike," without any details regarding when or where this allegedly occurred.

This affidavit is suspicious. First, Plaintiff never made this allegation in either claim he made to the EEOC, nor included it in his Complaint. Second, it is plainly lacking in details – including the full identity of the speaker and the date. In any event, the Court will not accept this affidavit, as it is way out of time from a party that has already demonstrated, through his counsel, a profound disregard for deadlines and process in this case. *Cf. Scully*, 148 F. Supp. 2d at 251-52 (allowing plaintiff to oppose defendant's summary judgment with new evidence for limited purposes because plaintiff could not have submitted new evidence earlier and plaintiff demonstrated good faith).

15 Again, this excludes the alleged "Kunta Kinte" reference.

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 4004692
Only the Westlaw citation is currently available.
United States Court of Appeals, Second Circuit.

Tyson POULOS, Plaintiff-Appellant,
v.
COUNTY OF WARREN, Warren County Sheriff's Department, Dustin Spring, Corrections Officer, in his individual and official capacities, Charlene Maday, Corrections Officer, in her individual and official capacities, Matthew Hubbard, Corrections Officer, in his individual and official capacities, Christopher Perilli, Corrections Officer, in his individual and official capacities, Barrett Spring, Sergeant, in his individual and official capacities, Christopher Hatin, Investigator, in his individual and official capacities, Warren County District Attorney's Office, Matthew Burin, Assistant District Attorney, in his individual and official capacities, Defendants-Appellees, Kathleen Hogan, Warren County District Attorney, in her official capacity, Defendant.

21-2656
|
June 15, 2023

Appeal from a judgment of the United States District Court for the Northern District of New York (D'Agostino, *J.*).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of the district court is **AFFIRMED** in part and **VACATED** in part, and the matter is **REMANDED** for further proceedings.

**Attorneys and Law Firms**

FOR PLAINTIFF-APPELLANT: Tyson Poulos, pro se, Comstock, NY.

FOR DEFENDANTS-APPELLEES: Gregg T. Johnson, Hannah Hyde Hage, Johnson & Laws, LLC, Clifton Park, NY.

PRESENT: ROSEMARY S. POOLER, RICHARD C. WESLEY, MICHAEL H. PARK, Circuit Judges.

**SUMMARY ORDER**

***1** Appellant Tyson Poulos, formerly counseled but now pro se, appeals the district court's dismissal of his complaint. On January 20, 2014, Poulos was arrested on drug related charges. He was detained at the Warren County Jail, where he claims the officers harassed him. Poulos protested by flooding his cell which, followed by a contested series of events, led to him being charged and convicted for aggravated harassment by an incarcerated individual under New York Penal Law § 240.32. Poulos's harassment conviction was overturned on appeal, *see People v. Poulos*, 144 A.D.3d 1389, 1392 (3d Dep't 2016), and Poulos was acquitted at the retrial on January 29, 2018. By that point, he had been convicted of the drug charges and received a 33-year sentence.

Poulos sued several Warren County officials and corrections officers (collectively, "Defendants") for malicious prosecution, false imprisonment, *Monell* liability, falsification and spoliation of evidence, and deprivation of a right to fair trial under 42 U.S.C. § 1983. Poulos alleges that he was framed for harassment as part of a conspiracy by Defendants to enhance his parallel drug prosecution. Poulos also alleges that he was released on his own recognizance on the drug charges in April 2014 when a prosecutor failed to appear for the hearing. He was not convicted of the drug charges until 2016. Thus, Poulos alleges, for a period of over 20 months, he was detained solely for the harassment charges. The district court granted Defendants' motion to dismiss, concluding that several of Poulos's claims were time-barred or otherwise insufficiently pled. The court also determined that several of his claims failed, reasoning that the harassment charges did not deprive Poulos of his liberty because he would have been incarcerated based on the drug charges alone. *Poulos v. Cnty. of Warren*, No. 1:21-CV-96, 2021 WL 4307508, at *5 (N.D.N.Y. Sept. 22, 2021). Poulos appealed. We assume the parties' familiarity with the remaining underlying facts, the procedural history of the case, and the issues on appeal.

We review de novo a district court's dismissal under Rule 12(b)(6). *See Hamilton v. Westchester Cnty.*, 3 F.4th 86, 90 (2d Cir. 2021). To survive a motion to dismiss, a complaint must contain sufficient facts, accepted as true and with reasonable inferences drawn in the plaintiff's favor, to state a plausible claim to relief. *Id.* at 90–91. Although pro se filings are liberally construed to raise the strongest arguments they suggest, *see McLeod v. Jewish Guild for the Blind*, 864 F.3d 154, 156 (2d Cir. 2017), Poulos's main appellate brief and his filings in district court were all counseled.

**I. Spoliation, Conspiracy, and *Monell* Claims**

We agree with the district court that Poulos's spoliation, conspiracy, and *Monell* claims fail. First, his spoliation claim fails because there is no independent spoliation tort claim under New York Law. *See Ortega v. City of New York*, 9 N.Y.3d 69, 82 (2007). Second, his *Monell* claim fails because his conclusory allegations about Defendants' role in the alleged constitutional violations, and about the policies or customs that may have given rise to their actions, amount to an insufficient "formulaic recitation of the elements of a cause of action." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Finally, Poulos failed to plead a plausible meeting of the minds required to sustain a conspiracy claim. *See Beechwood Restorative Care Ctr. v. Leeds*, 436 F.3d 147, 154 (2d Cir. 2006).

**II. False Imprisonment Claim**

***2** The district court correctly found that Poulos's false-imprisonment claim is time-barred. The statute of limitations for a false-imprisonment claim "begins to run at the time the claimant becomes detained pursuant to legal process." *Wallace v. Kato*, 549 U.S. 384, 397 (2007). This occurs "when, for example, he is bound over by a magistrate or arraigned on charges." *Id.* at 389. Poulos alleges that he was detained pursuant to legal process in 2014. His false-imprisonment claim was brought in 2021, well after the three-year statute of limitations for § 1983 claims in New York. *See Milan v. Wertheimer*, 808 F.3d 961, 963–64 (2d Cir. 2015).

**III. Malicious Prosecution, Falsification of Evidence, and Fair Trial Claims**

The district court erred, however, by dismissing Poulos's claims for malicious prosecution, denial of fair trial, and falsification of evidence because he adequately alleged a deprivation of liberty. The district court concluded that Poulos failed to allege a deprivation of liberty because he was incarcerated on drug charges before he was charged with harassment, and he remained incarcerated after he was acquitted of the harassment charges. It is true that a plaintiff does not allege a deprivation of liberty when he was already incarcerated for an unrelated crime before the contested charges were brought and would have remained incarcerated for that crime regardless of the contested charges. *See Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 116 (2d Cir. 1995) ("A plaintiff asserting a Fourth Amendment malicious prosecution claim under § 1983 must ... show some deprivation of liberty consistent with the concept of 'seizure.' "); *see also Curry v. Yachera*, 835 F.3d 373, 380 (3d Cir. 2016) ("When McClure's charges were dropped, Curry was still in jail. As a result, McClure never deprived Curry of his liberty as a consequence of the charges McClure brought against Curry. Curry's liberty had already been deprived." (internal quotation marks omitted)).

Here, however, Poulos sufficiently alleged a deprivation of his liberty because—between his release on the drug charges in 2014 and his conviction on those charges in 2016—he claims that he was detained solely on the harassment counts. [1] *See* App'x at A26 (alleging that "Plaintiff was released on his own recognizance on the drug possession charges" after the April 2014 hearing); *id.* at A28 (alleging that the "sole basis for Plaintiff's custody and wrongful imprisonment in the New York State prison system at that time were his wrongful convictions for aggravated harassment of an employee by an inmate"). Accepting Poulos's allegations as true, he would not have been detained during this period but for the harassment charges. Poulos has thus adequately alleged a deprivation of liberty stemming from his pretrial detention between his 2014 release and 2016 conviction for the drug charges. We need not reach Poulos's alternative theories on how his liberty might have been deprived.

In addition, Poulos's fair-trial and fabrication-of-evidence claims are not time-barred. The limitations period for a § 1983 fabrication-of-evidence claim does not accrue until a favorable termination of the underlying criminal proceedings. *See McDonough v. Smith*, 139 S. Ct. 2149, 2154–55 (2019). Poulos's claim accrued on January 29, 2018, so his fair-trial and fabrication-of-evidence claims, brought on January 27, 2021, are timely.

**IV. Immunity** [2]

***3** Defendants also argue that dismissal was proper based on immunity. Defendant Burin is shielded by prosecutorial immunity for his actions that took place after Poulos was charged with harassment. *See Warney v. Monroe Cnty.*, 587 F.3d 113, 121 (2d Cir. 2009). To the extent that Poulos alleges that Burin was responsible for directing the harassment to occur, however, he would have only qualified immunity. *See Hill v. City of New York*, 45 F.3d 653, 661 (2d Cir. 1995).

Defendants did not raise qualified immunity below, although they do so now. We decline to reach this issue in the first instance because the record is not sufficiently developed. *See Burns v. Martuscello*, 890 F.3d 77, 94 n.4 (2d Cir. 2018).

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

We have considered all of Poulos's remaining arguments and find them to be without merit. For the foregoing reasons, the judgment of the district court is affirmed in part, vacated in part, and remanded for further proceedings.

**All Citations**

Not Reported in Fed. Rptr., 2023 WL 4004692

## Footnotes

1 Defendants argue that Poulos's alleged deprivation of liberty is hypothetical and that in the absence of harassment charges, the prosecutor would have appeared for the 2014 drug charge hearing, so Poulos would not have been released. Appellees' Br. at 16-17. At the motion to dismiss stage, we cannot consider such arguments.

2 Defendants discuss testimonial immunity, but we do not interpret Poulos's claims as relying entirely on Defendants' testimony. If § 1983 claims "exist[ ] independently of the [ ] testimony" then they are not immunized. *Coggins v. Buonora*, 776 F.3d 108, 113 (2d Cir. 2015).

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.